## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Drew Heriot and Drew Pictures Pty Ltd., §<br>§<br>*Plaintiffs,* §<br>§<br>vs. §<br>§<br>Rhonda Byrne, §<br>The Secret LLC (AKA TS Holdings LLC) §<br>Prime Time US Inc., §<br>TS Production Holdings LLC, §<br>TS Production LLC, §<br>TS Merchandising Ltd., And §<br>Robert E. Rainone Jr. §<br>§<br>*Defendants.* § | FILED: APRIL 21, 2008<br>Case No. 08CV2272          TG<br>JUDGE CONLON<br>MAGISTRATE JUDGE ASHMAN |

### COMPLAINT

Plaintiffs Drew Heriot and Drew Pictures Pty Ltd., by their attorneys, for their Complaint against the above named Defendants, hereby allege as follows:

### PLAINTIFFS

1.      **Drew Heriot** (hereinafter Heriot) is a motion picture director, producer, editor, and writer domiciled in Los Angeles, California. Heriot is an Australian citizen who has been a United States resident since March 2006. Heriot is the co-author of the screenplay known as *The Secret* and is the director and co-author of the movie based upon that screenplay known as *The Secret* (Original Edition) (collectively "the Works"). At all times during the creation of the Works, Heriot was an employee of Drew Pictures Pty Ltd.

2.      **Drew Pictures Pty Ltd.** (hereinafter Drew Pictures) is a company organized under the laws of Australia. By virtue of its employment of Heriot, Drew Pictures is the

owner of Heriot's interest in the Works, which were registered with the U.S. Copyright Office on September 10, 2007, Reg. No. PA 1-355-437. Drew Pictures is wholly owned by Heriot.

## DEFENDANTS

3.     **Rhonda Byrne** is an individual domiciled in Santa Barbara California. Defendant Byrne was the executive producer of the movie *The Secret* (Original Edition), who now claims to be the sole creator of the Works and sole author of materials that are derived from the Works. Defendant Byrne is the owner of Prime Time Productions Holdings Pty Ltd, TS Production Holdings LLC, The Secret LLC, and the Managing Director of TS Production LLC and Director of Prime Time US Inc. On information and belief, Defendant Byrne is the recipient of profits resulting from The Secret LLC's, Prime Time U.S. Inc.'s, TS Production LLC's, TS Production Holdings LLC's, and TS Merchandising Ltd's exploitation of and sales from the Works. Defendant Byrne currently resides at 900 Hot Springs Rd., Santa Barbara, CA 93108-1111.

4.     **The Secret LLC** is a Delaware limited liability company with a principal place of business at 1339 West George Street, Chicago, IL 60657. In 2006, Defendant The Secret LLC claimed to be the sole owner of copyrights in the Works. The Secret LLC is operating in Chicago under the assumed name TS Holdings LLC. The Secret LLC's registered agent for service of process is C T Corporation System, 208 South LaSalle St., Suite 814, Chicago, IL 60604.

5.     **Prime Time U.S. Inc.** is a Delaware corporation with a principal place of business at 1550 N. Cleveland Ave, Chicago, IL 60610 and conducts U.S. based business operations on behalf of TS Production LLC relating to the exploitation of copyrights in

2

the Works. On information and belief, Defendant Prime Time U.S. Inc. is the United States affiliate of Prime Time Productions Holdings Pty, an Australian production company that retained the services of Drew Pictures Pty. Ltd to assist with the creation of the Works. Defendant Prime Time U.S. Inc. is the wholly owned subsidiary of TS Production LLC. Prime Time U.S. Inc.'s registered agent for service of process is C T Corporation System, 208 South LaSalle St., Suite 814, Chicago, IL 60604.

6.     **TS Production LLC** is a shell company that was created to achieve favorable tax treatment for its owners and claims to be the sole owner, by assignment, of copyright in the Works. TS Production LLC is registered as a Hungarian limited liability company with a purported principal place of business at Eros Ugyvedi Iroda, Roosevelt Irodahaz, Roosevelt ter 7-8, Budapest H-1051, Hungary. In fact, this is the address of the Budapest office of Squire, Sanders & Dempsey L.L.P., Defendant TS Production LLC's counsel. On information and belief, TS Production LLC's true business operations are at 1550 N. Cleveland Ave., Chicago, IL 60610. TS Production LLC is the wholly owned subsidiary of TS Production Holdings LLC.

7.     **TS Production Holdings LLC** is a Delaware limited liability company and the parent company of TS Production LLC, the claimed owner of copyrights in the Works. On information and belief, TS Production Holdings LLC is the recipient of profits resulting from Defendant TS Production LLC's, Defendant Prime Time U.S. Inc.'s, and Defendant TS Merchandising Ltd.'s exploitation of the Works. TS Production Holdings LLC is owned, in whole or in part, by Rhonda Byrne and Robert Rainone. TS Production Holdings LLC was originally incorporated under the name Byrne Holdings LLC. TS

3

Production Holdings LLC's registered agent for service of process is The Corporation Trust Company, 1209 N. Orange Street, Wilmington, DE 19801.

8.     **TS Merchandising Ltd.** is a British Virgin Islands company that was created to achieve favorable tax treatment for its owners. TS Merchandising Ltd.'s principal place of business is 1550 N. Cleveland Ave, Chicago, IL 60610. TS Merchandising Ltd. controls distribution sales of DVDs and other materials that contain or are derived from the Works. On behalf of TS Production LLC, TS Merchandising Ltd. operates the websites www.thesecret.tv and www.whatisthesecret.tv (the "Websites"), which have an Internet Protocol address of 72.3.221.85 and 72.3.221.82 respectively and are hosted on internet servers based in San Antonio, Texas. The Websites sell products that are derived from the Works, including DVDs, soundtracks, and books. The Websites sell versions of the Works that stream over the internet, and offer, free of charge, copies of images from the Works. TS Merchandising Ltd. is owned by AGW Idea Group Inc. TS Merchandising Ltd.'s registered agent for service of process is C T Corporation System, 208 South LaSalle St., Suite 814, Chicago, IL 60604.

9.     **Robert E. Rainone, Jr.** is an individual domiciled in Chicago, Illinois. Defendant Rainone is the President and/or Chief Executive Officer of The Secret LLC, TS Production Holdings LLC, TS Production LLC, and Prime Time U.S. Inc. Defendant Rainone was the registered agent of TS Merchandising Ltd. On information and belief, Defendant Rainone retains an ownership interest in these entities and is the recipient of profits resulting from The Secret LLC's, Prime Time U.S. Inc.'s, TS Production LLC's, TS Production Holdings LLC's, and TS Merchandising Ltd's exploitation of and sales

4

from the Works. Defendant Rainone currently resides at 1339 W. George St., Chicago, IL 60657-4101.

## JURISDICTION

10.     The claims alleged herein arise under United States Copyright Laws, 17 U.S.C. § 101 *et seq.* and Illinois common law. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 [actions arising under the Constitution, laws, or treaties of the U.S.]; 28 U.S.C. § 1338(a) [actions arising under Acts of Congress relating to copyrights]; 28 U.S.C. § 2201 [the *Federal Declaratory Judgment Act*]; and 28 U.S.C. § 1367 [supplemental jurisdiction over related actions arising under state law].

11.     Defendants have and continue to assert this Honorable Court's exclusive jurisdiction to adjudicate disputes relating to the Works. Defendants TS Production LLC and TS Merchandising Ltd have initiated trademark infringement and other claims relating to the Works before this Court, which are currently pending in Docket No. 1:07-cv-6518.

12.     The "Terms of Use" of Defendants' Websites, which sell products derived from the Works, states as follows:

> **17. Applicable Law and Jurisdictional Matters**
>
> This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Illinois, as they are applied to agreements entered into and to be performed entirely within Illinois. <u>Any action you, any third party or The Secret may bring to enforce this Agreement or, in connection with any matters related to the website shall be brought only in either the State or Federal Courts located in Chicago, Illinois, and you expressly consent to the jurisdiction of said courts.</u>

5

A copy of these Terms of Use is currently available on the Websites and can be found at http://www.thesecret.tv/terms_of_use.html.

## VENUE

13.    Venue is proper in this District and Division under 28 U.S.C. §§ 1391(b)(2) and 1400(a).

## STATEMENT OF FACTS

14.    Heriot is a motion picture and television director, producer, editor, and writer. He began creating movies at an early age, directing his first movie by age eleven. While still in High School, Heriot began making advanced clay animation films. By graduation, Heriot had been awarded an apprenticeship with Imagine If . . ., a 3D animation production company.

15.    In or around 1998, Heriot formed his own production company — Drew Pictures. Heriot began working with FM-TV, a well-known production company active in the production of television shows, TV and radio commercials, and corporate videos. Heriot quickly gained a reputation within the production community as a talented, creative, and efficient editor.

16.    Around 2000, Heriot's work came to the attention of Defendant Rhonda Byrne and Paul Harrington, two producers who were using FM-TV's facilities to edit a television show called *Australia Behaving Badly*. Defendant Byrne was the principal and owner of Prime Time Productions Holdings Pty (Prime Time). Harrington was a television producer employed by Prime Time. Prime Time contracted for Heriot's services as an editor on *Australia Behaving Badly* and paid for his services.

6

17.     Byrne and Harrington were pleased with Heriot's work and began using him as the principal editor on Prime Time's other projects. Prime Time contracted with Drew Pictures for Heriot's services. In February 2001, Prime Time began working on a new reality television series called *Marry Me*. Prime Time hired Drew Pictures to work on that project and paid Drew Pictures for Heriot's services. In 2002, Byrne asked Heriot to be the director and principal editor of the second season of *Marry Me*. On March 2, 2002, Heriot was offered a formal Employment Contract with Prime Time for the position of director for eight episodes of the TV show *Marry Me*, which was subsequently re-named *Loves Me, Loves Me Not*.     Heriot rejected the proposed employment contract.     Rather, Drew Pictures continued to perform work as an independent contractor of Prime Time. Neither Heriot nor Drew Pictures have ever been an employee of Prime Time or Byrne. When *Loves Me Loves Me Not* was completed, Byrne contracted with Drew Pictures to direct Prime Time's next television series called *Sensing Murder*.

18.     On October 15, 2003, Prime Time and Drew Pictures entered into a Consultancy Agreement for Heriot's services as a Director of *Sensing Murder*. The Consultancy Agreement contained no retirement or other traditional employment provisions because "the Consultants' role is project based with a gross fee paid to the Consultant's corporate entity for services rendered."     Consultancy Agreement ¶ 6(a).     The Consultancy Agreement between Drew Pictures and Prime Time was for a period of one year and expired on October 14, 2004. Paragraph 18(b) of the Consultancy Agreement expressly stated that "no variation to this Agreement shall be valid unless it is in writing and signed by or on behalf of each of the parties." Heriot's final work on the last episode of *Sensing*

7

*Murder* was completed on or around November 2004. Prime Time paid Drew Pictures
pursuant to the Consultancy Agreement.

### Development of *The Secret*

19. In January 2005, Byrne told Heriot and Harrington about an idea she had for a
new television series based upon several "self-help" and "success" books and audio CDs
she had reviewed while on vacation. One of those CDs was commentary by Esther
Hicks, a well-known inspirational speaker. Two of the books were *The Science of
Getting Rich* by Wallace D. Wattles, and *The Master Key System* by Charles F. Hannel.
Byrne wanted to make a television series exploring several self-help principles in these
materials.

20. Byrne wanted to make a documentary-style series with various self-help
"teachers." This was the extent of her idea for the series at the time she raised it with
Heriot and Harrington. Byrne, Heriot, and Harrington discussed the idea and agreed that
the series could be successful. The three of them decided that the series should be called
*The Secret*, which ultimately focused on one self-help principle known as the "Law of
Attraction."

21. For the next several months, Byrne, Heriot and Harrington worked on the
concept. They collaborated to create a "pitch" to show the idea to several television
networks. Heriot created and edited three promotional trailers for the series by
combining his ideas and writings with the ideas of Harrington and Byrne.

22. Heriot created a highly stylized and unique look for the promotional trailers to
help brand and market the series on which the three were collaborating. Although the
Consultancy Agreement had expired, Drew Pictures invoiced Prime Time for Heriot's

services. Prime Time paid Drew Pictures as invoiced. Defendant Byrne represented to Heriot that he could "trust her" by working on the joint project in this manner. Defendant Byrne further acknowledged that Heriot and Drew Pictures would be entitled to a percentage of profits resulting from the project.

23.     Drew Pictures helped finance the joint creation known as *The Secret*. Specifically, Drew Pictures gave $10,000 to Prime Time in June, 2005 for use towards the development costs related to the project.

24.     Throughout this period, it was the intention of both Byrne and Heriot that they were co-creators of *The Secret* and would be so credited. Heriot and Byrne wrote several documents called "Rundowns," which were outlines of each show in the series and how the series would progress. Eventually, due to funding issues, the plan of creating seven episodes was abandoned in favor of creating one two-hour special called *The Secret*. Heriot and Byrne drafted separate "Rundowns" for this two-hour special, which continued the episode structure but condensed the topics into one episode.

25.     Using the outline set in the final Rundown, Heriot prepared a document called "Questions for Interview Subjects." This document was to be used for on-camera interviews with "the teachers" who would appear in the special show. The purpose of the document was to make sure that interviewees gave answers and sound-bites that could easily fit within the structure of the two-hour special as set forth in the Rundown prepared by Heriot and Byrne.

26.     To further fund production of the project, on or around June 2005, negotiations with several television networks began. On July 5, 2005, the Nine Network entered into a Commission Agreement with Prime Time Productions. On information and belief, the

9

Nine Network invested $600,000 in the project, which was to be paid in installments. In exchange, the Nine Network was given exclusive broadcasting rights in Australia along with a percentage of DVD sales.

## Making *The Secret*

27.     With this additional funding, a film crew was hired. Byrne and Heriot traveled with the film crew to the United States to begin filming interviews. As Director, Heriot was responsible for coordinating the film crew and directing the filming of each interview. Interviews were only conducted by Heriot or Byrne. When Byrne conducted interviews, she used the "Questions for Interview Subjects" document prepared by Heriot.

28.     Filming of *The Secret* began in Alaska in July 2005, where Byrne interviewed Esther Hicks with Heriot directing. Upon completion of the Hicks interview, Byrne, Heriot and the film crew traveled to Chicago, Illinois, where Heriot interviewed and filmed Dennis Waitley, Mike Dooley, and others. Heriot, Byrne and the film crew then traveled to Aspen, Colorado to film other speakers and authors in the fields of personal and professional development. The vast majority of the principal filming took place in Aspen, Colorado. There, as in Chicago, Heriot directed the filming and conducted all of the interviews. While in Aspen, Byrne advised Heriot that she would be opening up offices in the United States and asked Heriot to relocate to California to work on future projects in the United States.

29.     In August 2005, approximately 40 interviews for *The Secret* had been completed. Heriot then began the process of editing the documentary, while Byrne conducted approximately 15 additional interviews. Tapes of those interviews were immediately sent

10

to Heriot. As director and co-creator of the project, Heriot and Drew Pictures had the audio stripped from each interview for transcription. For two months, Heriot reviewed the transcripts, selected portions that would go into the film, and arranged the dialogue according to the Rundown in a separate document called the "2hr Paper Edit." The 2hr Paper Edit was created and authored by Heriot. The 2hr Paper Edit was then given to the Editing Department, which compiled the footage, in accordance with direction from Heriot. As the film footage was compiled, Heriot made additional revisions to improve the pacing and narration of the film.

30.     Once Heriot had created a "rough-cut" of the interviews—the backbone of the film—the rough-cut was then transcribed into a document called the "tranSCRIPT." This document constitutes the screenplay for *The Secret*.   The tranSCRIPT continually evolved as additional interviews were reviewed, edited, and rearranged according to Heriot's artistic creation of the film.  Heriot, Harrington, and Byrne collaborated on the tranSCRIPT to write dramatic scenes that would overlay and weave through the interviews.  These dramatic scenes were primarily re-enactments of stories told in the interviews or visual aids that reinforced what those interviewed were saying.  There were approximately 42 versions of the tranSCRIPT created by Heriot, Harrington, and Byrne.

31.     Filming of the dramatic footage took place in September and October, 2005 with Heriot leading the effort as the principal Director.  Heriot obtained assistance from "assistant directors," but he selected the scenes he wished to direct and then supervised the direction of the assistant directors to ensure that their work was consistent with the visual style Heriot created for the film.

32. When the filming was completed, Heriot, Harrington, and Byrne worked jointly and collaboratively in the post-production phase of the film. As director, Heriot oversaw the creative aspects of the post-production work, including editing, visual effects, music, and the over-all style and look of the film. This was completed around January 2006. Heriot, Harrington and Byrne recorded a "directors' commentary" to the film, which they had jointly authored. Byrne was credited as the "Executive Producer," Harrington as the "Producer," and Heriot was credited as "the Director."

## Launching *The Secret*

33. In late 2005, the Nine Network decided that it would not air *The Secret*. Heriot, Harrington and Byrne decided to release *The Secret* as a DVD and to sell streaming versions on the Internet. Heriot and the associate producer, Marc Goldenfein, worked with a company called Vividas to develop an internet distribution model. Heriot helped design the website www.thesecret.tv and designed the launch website www.whatisthesecret.tv.

34. While in the United States, Byrne recognized the tremendous commercial success that would be realized from *The Secret*, and met with Defendant Robert E. Rainone, Jr. Rainone is a Chicago businessman and former Chief Development Officer of Universal Access Global Holdings, a US network service provider. Byrne asked Rainone to assist with business development. On December 12, 2005, Rainone created a Delaware limited liability company called The Secret LLC, which would be the center of all business operations surrounding *The Secret*. The Secret LLC's principal place of business was 1339 W. George Street, Chicago, IL 60657-4101, which was Defendant Rainone's home address. Mr. Rainone was listed as the Chief Executive Officer and, on information and

12

belief, the initial shareholders in The Secret LLC were Defendant Rainone, Defendant Byrne, and Defendant Rainone's wife, Margaret Rainone, and another person.

35.     Defendant Rainone also created a British Virgin Islands company called TS Merchandising Ltd, which has a principal place of business in Chicago, Illinois. TS Merchandising Ltd sought to control contracts with distributors for *The Secret* and planned to sell merchandise and other products related to *The Secret*.

36.     In or around January 2006, Byrne flew to Chicago to meet with Rainone regarding The Secret LLC's business operations in the United States. While in Chicago, Byrne had a number of conversations with Heriot about his moving to the United States. Byrne talked to Heriot for months about these plans, providing Heriot with details on housing locations and discussing future projects. Byrne told Heriot to come to the United States on an I Visa sponsored by Prime Time. Based on Byrne's repeated representations, Heriot made the necessary arrangements and moved to the United States on or around March 30, 2006.

37.     Publication of *The Secret* first took place in the United States. Internet pre-sales of *The Secret* began on March 23, 2006, and *The Secret* was officially released on March 26, 2006. *The Secret* was an instant success, averaging five purchases a minute. *The Secret* website was hosted on servers located in the United States, all DVDs were manufactured in the United States, and all sales and revenues were processed in the United States. Copies of *The Secret* carried the copyright notice "© The Secret LLC," a Delaware limited liability company doing business in Chicago, Illinois. Because of the contractual agreement with the Nine Network, *The Secret* was not made available for sale in Australia.

13

38.     Promotional materials and press releases announcing *The Secret* acknowledge that
the film was co-created by Heriot, Byrne, and Harrington. For example, the press kit
issued by the Defendants stated:

> In early 2005, when The Secret was simply a name and a
> (momentus) vision, Prime Time Productions was made up
> of Rhonda, producer, Paul Harrington and director, Drew
> Heriot. Paul, who had worked with Rhonda at Prime Time
> Productions virtually since its beginning and Drew, who
> had directed several projects for the company as well
> became with Rhonda the foundation for The Secret team.

39.     The day after the launch, on March 27, 2006, Heriot emailed Byrne and Rainone
about the amount of unpaid invoices due to Drew Pictures. With Heriot's work
completed and the commercial success now completely apparent, Byrne, aided and
abetted by Rainone, started reneging and back-pedaling. Byrne informed Heriot that he
was "unappreciative of all the opportunities that have been given to you" and that they
had "some serious thinking to do."

### Exploiting *The Secret*

40.     Unbeknownst to Heriot, Byrne and Rainone had entered into a scheme to
fraudulently transfer intellectual property rights in *The Secret*, to defraud Heriot and
Drew Pictures of their investments and intellectual property rights in *The Secret*, to
market *The Secret* and planned derivative works as the sole creation of Defendant Byrne,
and to misappropriate Drew Pictures' copyright in the Rundowns, 2hr Paper Edit,
tranSCRIPTs, and other materials authored by Heriot to create unauthorized derivative
works.

41.     With the assistance and concerted action of Defendant Rainone, on March 3,
2006, Byrne formed a Delaware Limited Liability Company called "Byrne Holdings

14

LLC," which is now known as "TS Production Holdings LLC." Those incorporation papers were filed by the United States law firm of Squire, Sanders & Dempsey L.L.P.

42.    Byrne Holdings LLC in turn directed the formation of a Hungarian limited liability company called "TS Production LLC," seated at 1062 Budapest, Andrássy út 64, Hungary. In fact, this was the then address of Squire, Sanders. & Dempsey L.L.P.'s Hungarian office.    TS Production LLC was and is a shell company created to achieve favorable tax treatment but conducts no actual business operations.    Defendant TS Production LLC is the wholly owned subsidiary of Defendant TS Production Holdings LLC.

43.    With the assistance and concerted action of Defendant Rainone, on March 22, 2006, four days before the release of *The Secret* in the United States, Defendant Byrne as Principal of Prime Time executed a purported transfer of all copyright in the film from Prime Time Productions to Defendant Byrne in her individual capacity.    With the assistance and concerted action of Defendant Rainone, on April 11, 2006, Defendant Byrne then purported to transfer and assign copyright in the film *The Secret* to the shell company TS Production, LLC in Hungary.    These transactions were done with the fraudulent intent to deprive Heriot and Drew Pictures of their ownership interests in *The Secret*.

44.    On May 19, 2006, TS Production LLC then directed the formation of a Delaware company called Prime Time US Inc., which would function as an operating subsidiary of TS Production LLC. Although the sole incorporator was Michael Gardiner, an attorney with the law firm of Squire, Sanders, & Dempsey L.L.P. in Columbus Ohio, on information and belief Mr. Gardiner transferred all shares of Prime Time U.S. Inc. to TS

15

Production LLC, which is Prime Time U.S. Inc.'s current parent company. Mr. Gardiner is currently the General Counsel of Defendant Prime Time US Inc.

45.     On June 15, 2006, Defendant Byrne signed an Independent Contractor Agreement with Defendant Prime Time US Inc. acting on behalf of TS Production LLC. Defendant Byrne agreed to write a book based on *The Secret* and to transfer all copyright in the final book to TS Production LLC.

46.     Defendant Byrne "wrote" the book on or around August 2006, and a book called *The Secret* was released on or around November 2006 in which Defendant Byrne wrongfully claims to be sole author. An audio version of the book was also created, which uses the audio from the interviews of the teachers in the film *The Secret*. Rather than create a work of original authorship, however, Defendant Byrne took the Rundowns, 2hr Paper Edits, tranSCRIPTs, and other documents created by Heriot and Drew Pictures and used them to create the book *The Secret*. The book *The Secret* is substantially the screenplay to the film (including commentary from all the teachers), interspersed with additional commentary by Defendant Byrne. Heriot's contribution is even evident in the book's Table of Contents. For example, very early in the process, Heriot authored a document called "Episode Précis" dated May 5, 2005, which outlined seven planned episodes as follows:

> Episode One – What is the Secret
> Episode Two – How to Use the Secret
> Episode Three – The Secret to Wealth
> Episode Four – The Secret to Relationships
> Episode Five – The Secret to Health
> Episode Six – The Secret to Happiness
> Episode Seven – The Final Revelation of The Secret

In the book *The Secret*, Chapter Five is called "The Secret to Money," Chapter Six "The Secret to Relationships," and Chapter Seven "The Secret to Health." The Defendants have unlawfully copied the creative work of Plaintiffs.

47.     Having set up numerous business entities to exploit any profits from *The Secret*, misappropriating Plaintiffs' intellectual property and excluding Plaintiffs from any interest in those entities or share in the profits, Defendants Byrne and Rainone sought to further consolidate and isolate anyone with an interest in the film and to promote the *The Secret* and related works as the sole creation of Defendant Byrne.

48.     Defendant Byrne contacted Esther Hicks, a teacher who retained a 10% interest in profits from the film. Byrne demanded that Hicks either sign a new agreement that surrendered her intellectual property rights or be "cut" from the film. Hicks refused, and Defendant Byrne ordered that footage and dialogue of Hicks be replaced with footage and dialogue of Lisa Nichols and Marci Shimoff whose comments, in essence, copied what Hicks had said. For example, at one point in the film Hicks states:

> You're not here to try to get the world to be just like you want it to be, you are here to create the world around you that you choose, while you allow the world as others choose it to be, to exist also.

Defendant Byrne had this footage replaced with footage by Lisa Nichols who said:

> It's not your job to change the world, or the people around you. It's your job to go with the flow inside of the Universe, and to celebrate it inside the world that exists.

49.     On or around September 29, 2006, this "new" version of the film without Esther Hicks was released. This version was three minutes longer than the original and was marketed as *The Secret* (Extended Edition). Defendants' re-branded the original version as *The Secret* (Original Edition) and pulled it from the market. Defendant Byrne and

Paul Harrington created a new director's commentary for *The Secret* (Extended Edition), excluding Heriot, and which falsely portrayed Byrne as the "sole creator" of *The Secret*.

50.     In February 2007, Defendant Byrne appeared on the Oprah Winfrey show, Larry King Live and Ellen DeGeneres, billing herself as the "sole creator" of *The Secret*. With increased media exposure, sales of the film *The Secret* (Extended Edition) and the book *The Secret* continued to rapidly expand in 2007.

### Registrations with the U.S .Copyright Office

51.     On April 30, 2007, the U.S. Copyright Office granted copyright registration for the website www.thesecret.tv, Registration No. TX006543227, to Defendant TS Production LLC.

52.     On May 18, 2007, the U.S. Copyright Office granted copyright registration for the movie *The Secret* (Extended Edition), Registration No. PA0001381431, to Defendant TS Production LLC.

53.     On May 23, 2007, the U.S. Copyright Office granted copyright registration for the book *The Secret*, Registration No. TX0006577617, to Defendant TS Production LLC.

54.     On August 1, 2007, the U.S. Copyright Office granted copyright registration for the movie *The Secret* (Original Edition), Registration No. PA001355452, to Defendant TS Production LLC.

55.     On September 10, 2007 the U.S. Copyright Office granted copyright registration for the movie *The Secret*, Registration No. PA0001355437, to Drew Pictures Pty Ltd as the employer for hire of Drew Heriot, who was the co-author of the screenplay and the director of the movie.

56.     On September 25, 2007, an attorney with Squire, Sanders & Dempsey L.L.P sent a letter on behalf of TS Production, LLC, to an attorney with Kenyon & Kenyon L.L.P. in New York, counsel for Heriot and Drew Pictures, and demanded an immediate withdrawal of Drew Pictures' copyright registration. On October 11, 2007, Plaintiffs asserted their copyright interest in the screenplay and film and requested an accounting of all revenues derived from the exploitation of their copyright interests. TS Production LLC did not respond to the request for an accounting.

### Initiation of Foreign Litigation

57.     Although Heriot is now a resident of the United States, on October 18, 2007, TS Production LLC filed suit against Drew Pictures and Heriot in the Federal Magistrate's Court of Australia. TS Production LLC's Statement of Claims attempts to challenge Mr. Heriot's registration with the United States Copyright Office and seeks a declaration that TS Production LLC is the sole of the owner of *The Secret* (Original Edition) and the sole owner of the book *The Secret*. TS Production does not seek a declaration regarding ownership of the screenplay to *The Secret*.

58.     With the exception of David Schirmer, the filming of every teacher used to create *The Secret* took place in the United States. Publication of *The Secret* first took place in the United States. The infringement of Drew Pictures and Heriot's intellectual property rights first took place in the United States. All parties have registered their claimed copyrights in *The Secret* with the United States Copyright Office. Defendants TS Production Holdings LLC and Prime Time U.S. Inc. are United States companies, with offices in Chicago, Illinois. Defendant TS Production LLC is a wholly owned subsidiary of a United States Company whose business operations are located in Chicago, Illinois.

19

Defendant TS Merchandising Ltd is a wholly owned subsidiary of a United States company, with a principal place of business in Chicago, Illinois.

59.    Defendant Rainone is domiciled in Chicago, Il. Defendant Byrne is domiciled in Santa Barbara, CA.

## COUNT I
### (Declarations of Copyright Ownership and Defendant's Duty to Account)

60.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 59 hereinabove, as if fully set forth in this Paragraph 60.

61.    Heriot was the primary author of the screenplay and the motion picture *The Secret* (the "Works"). Heriot and Defendant Byrne collaborated on the Works between 2005 and 2006, and contributed independently copyrightable content, with the intention that their respective contributions be merged into inseparable or interdependent parts of a unitary whole. The Works are a "joint works" within the meaning of Section 101 of the Copyright Act [17 U.S.C. § 101].

62.    Heriot was a co-author of the Works, and Drew Pictures, as Heriot's employer, is the co-owner of the Works with Defendant TS Production LLC, holding an indivisible fifty-percent interest therein, under 17 U.S.C. § 201(a).

63.    As joint owner of the Works, Drew Pictures has a right to an accounting from Defendants TS Production LLC, its U.S. subsidiary Prime Time US Inc., its parent company TS Production Holdings LLC and its distribution affiliate, TS Merchandising Ltd, for any and all profits obtained as a result of Defendants' exploitation of the Works, under 17 U.S.C. §§ 101 and 201(a).

64.    As joint owner of the Works, Plaintiff Drew Pictures has the right to publish and otherwise exploit the Works independently of Defendant TS Production LLC in the

20

United States, subject only to his duty to account to said Defendant for his share of profits so obtained.

65.    U.S.   Copyright   Registration   Nos.   TX006543227,    PA0001381431,
TX0006577617, and PA001355452 secured by Defendant TS Production LLC in Defendant's name must be amended or supplemented by the Copyright Office to reflect Heriot's status as co-author and Drew Pictures status as joint owner of the Works.

66.    Defendants have wrongfully refused to recognize Drew Pictures' co-ownership of the Works and intending to appropriate all profits from the exploitation of The Works for themselves.

67.    As a result of Defendant Byrne's numerous, repeated, and unfounded allegations that she was the "sole creator" of the Works; as a result of Defendant TS Production LLC's registration of the Works in its name only; as a result of Defendant TS Production LLC's refusal to supplement the registration to provide notice of Heriot's co-authorship and Drew Pictures indivisible co-ownership of the Works; and, as a result of Defendants' refusal to account to Plaintiffs, notwithstanding Defendant's exploitation and/or licensing of the Works for profit and/or authorization of adaptations or derivative works based thereon, an actual, present, and justiciable controversy exists between Plaintiffs and Defendants, as to whether the Works are a "joint works;" whether Heriot was a joint author and Drew Picture joint owner thereof; whether Plaintiffs are now joint owners of the Works, with all rights and obligations attendant to this status; and, whether Defendants have a duty to account to Plaintiffs.

68.    Plaintiffs seek a Declaratory Judgment, pursuant to 28 U.S.C. § 2201, decreeing that the Works are a "joint works" under 17 U.S.C. § 101; that Plaintiff Drew Pictures is

21

a joint owner of the Works, under 17 U.S.C. § 201(b), and may exploit The Works independently of Defendants; that Heriot was co-author of the Works, and an original co-claimant as to all copyrights therein, under 17 U.S.C. § 201(a); that this contribution and ownership interest must be recognized by the Copyright Office in the context of Registration Nos. Nos. TX006543227, PA0001381431, TX0006577617, and PA001355452; and, that Defendants have a duty to account to Plaintiffs for all profits arising, directly or indirectly, from Defendants' exploitation of any copyright in the Works, or Defendant's licensure or authorization of others to use, exploit, or adapt the Works, within, or outside, the United States.

## COUNT II
### (Equitable Accounting)

69.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 59 hereinabove, as if fully set forth in this Paragraph 69.

70.     This Count, arising under the laws of the State of Illinois, is for an equitable accounting of profits derived from, or obtained through, Defendants' exploitation of the Works in any manner whatsoever, including, but not limited to, exploitation of the copyrights therein, and for payment of Plaintiffs' share of said profits.

71.     By virtue of Plaintiff Drew Pictures' status as a joint owner of the Works, Defendants have a continuing fiduciary duty to Plaintiffs to account for any and all income derived from the exploitation of the copyrights therein. This duty requires Defendants to disclose to Plaintiffs all income that they have collected from such exploitation, and to pay Drew Pictures its fifty-percent share of the profits.

72.     By virtue of the agreements between Heriot and Byrne, Defendants have a continuing fiduciary duty to Plaintiffs to account for any profits arising from the Works –

22

an obligation which extends beyond profits arising only from the exploitation of copyrights, encompassing any profits resulting from the Works. This duty independently requires that Defendants disclose to Plaintiffs all income they have collected as a result of the Works, and pay to Plaintiffs a share of the profits.

73. Plaintiffs have demanded that Defendants account for profits arising from the existence of the Works, and from Defendants' direct or indirect exploitation of the copyrights therein, but Defendants have failed and refused, and continue to fail and refuse, to render an accounting or pay Plaintiffs their share of the profits.

74. The precise nature and extent of Defendants' income attributable to the Works are unknown to Plaintiffs at the present time, and Defendants' profits cannot be determined without an accounting of Defendants' transactions relating to, *inter alia*, sales of *The Secret* (Original Edition), *The Secret* (Extended Edition), the book *The Secret*, the audio book *The Secret*, the Soundtrack to *The Secret* and any additional motion pictures and derivative works which, upon information and belief, are planned. Moreover, whereas Defendants may attempt to attribute portions of the profits received to factors other than the Works, the facts and accounts presented are so complex that adequate relief cannot be obtained at law, and an investigation of Defendants' accounts is necessary in order to effect justice between the parties, and establish the value of Plaintiffs' interests.

75. Plaintiffs seek an Order from this Court that Defendants render an accounting to Plaintiffs of the amounts owed, as well as a Judgment against Defendants, for a sum to be determined in the accounting, with prejudgment and post-judgment interest, as allowed by law.

23

## COUNT III
### (Copyright Infringement)

76.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 59 hereinabove, as if fully set forth in this Paragraph 76.

77.     In the event that this Court determines that the Works at issue are not "joint works" as defined in 17 U.S.C. § 101, then Defendants', by their actions alleged above, have infringed and will continue to infringe Plaintiffs' independently copyrightable contributions to the Works.

78.     Plaintiff Heriot's individual contributions to the screenplay and the movie constitute an original work of authorship in a protected subject matter, which are owned by Plaintiff Drew Pictures.

79.     By their infringing actions alleged herein, Defendants have violated Plaintiffs' exclusive rights to Heriot's independently copyrightable contributions in the Works at issue, including the rights to reproduce and distribute these works, the right to prepare derivative works based upon them, and the right to display them publicly, to Plaintiffs' irreparable harm.

80.     Plaintiffs are entitled to an injunction restraining Defendants and their respective officers, agents and employees, and all persons acting in concert with them, from engaging in any further acts in violation of the copyright laws, as alleged herein.

81.     Plaintiffs' are further entitled to recover from Defendants the damages they have and will sustain, plus Defendants' profits and advantages obtained by them by reason of their infringement and wrongful conduct. At present, the amount of such damages, gains, profits and advantages cannot be fully ascertained by Plaintiffs.

24

## COUNT IV
### (Unjust Enrichment)

82.     Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 59 hereinabove, as if fully set forth in this Paragraph 82.

83.     This Count, arising under the laws of the State of Illinois, is for unjust enrichment to recover for the profits in *The Secret* and its related works that were rightfully owed to Plaintiffs by virtue of Drew Pictures ownership interest in the Works and by Heriot and Defendant Byrne's understanding and representations that Heriot was entitled to a net percentage of profits.

84.     Defendants, by and through the wrongful conduct of Defendants' Byrne and Rainone, have procured profits owed to Heriot and Drew Pictures.

WHEREFORE, Plaintiffs pray that this Court:

1. Accept jurisdiction over this action;

2. Enter a Declaratory Judgment in favor of Plaintiffs decreeing as follows:

   a. That the Works at issue are "joint works" within the meaning of 17 U.S.C. § 101;

   b. That Heriot is a co-author of the Works, and that Drew Pictures is a joint owner of the Works, under 17 U.S.C. §§ 201(a), 201(b), with all the rights attendant thereto;

   c. That Defendants have a duty to account to Plaintiffs for all profits arising directly or indirectly from their exploitation of any copyright in the Works, including the issuance of licenses or informal authorizations to third parties, which permit their use, sale, exploitation, or adaptation of the Works, or the preparation of derivative works based thereon; and,

      d. That U.S. Copyright Registration Nos. TX006543227, PA0001381431, TX0006577617, and PA001355452 secured by Defendant TS Production LLC in Defendant's name must be amended or supplemented by the Copyright Office to reflect Heriot's status as co-author and Drew Pictures status as joint owner of the Works

3. Order the Defendants to render an accounting to Plaintiffs;

4. Enter Judgment against Defendants, jointly and severally, for a sum to be determined in the accounting, together with prejudgment and post-judgment interest, as provided by law;

5. In the alternative, enter an Order enjoining Plaintiffs from directly or indirectly infringing Plaintiffs' independently copyrightable contributions to the Works and to enter judgment against Defendants for infringement damages, including profits attributable to the infringement, pursuant to 17 U.S.C. § 504.

6. Enter judgment against the Defendants, jointly and severally, and for compensatory damages in amounts not less than those set forth herein and additional sums in amounts to be determined at trial together with prejudgment and post-judgment interest, as provided by law;

7. Enter judgment against the Defendants and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees;

8. Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: April 21, 2008

Respectfully submitted,


/s/ Paul L. Price
Hepler, Broom, MacDonald, Hebrank, True &
Noce, LLC
Paul L. Price
150 N. Wacker Drive, Suite 3100
Chicago, Illinois 60606
Phone: 312.230.9100
Fax: 312.230.9201

Sayles | Werbner, P.C.
Mark S. Werbner (Texas Bar No. 21179700)
Richard A. Sayles (Texas Bar No. 17697500)
Darren P. Nicholson (Texas Bar No. 24032789)
*(pro hac vice motion to be filed)*
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Phone: 214.939.8700
Fax: 214.939.8787

*Attorneys for Plaintiffs Drew Heriot and Drew
Pictures Pty Ltd.*