IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DREW HERIOT and<br>DREW PICTURES PTY LTD.,<br><br>    Plaintiffs,<br><br>    vs.<br><br>RHONDA BYRNE, THE SECRET LLC<br>(AKA TS HOLDINGS LLC), PRIME TIME<br>US INC., TS PRODUCTION HOLDINGS<br>LLC, TS PRODUCTION LLC,<br>TS MERCHANDISING LTD., and<br>ROBERT E. RAINONE, JR.,<br><br>    Defendants. | Civil Case No. 08CV2272<br><br>The Honorable Suzanne B. Conlon |

**DECLARATION OF PAUL HARRINGTON IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY PROCEEDINGS**

| | |
|---|---|
| David S. Elkins<br>Joseph A. Meckes<br>Joseph P. Grasser<br>SQUIRE, SANDERS & DEMPSEY L.L.P.<br>600 Hansen Way<br>Palo Alto, CA  94304-1043<br>Telephone:  (650) 856-6500<br>Facsimile:   (650) 843-8777 | Jack J. Carriglio<br>James G. Argionis<br>MECKLER BULGER & TILSON<br>123 North Wacker Drive, Suite 1800<br>Chicago, IL  60606<br>Telephone:  (312) 474-7900<br>Facsimile:   (312) 474-7898<br><br>Attorneys for Defendants<br>RHONDA BYRNE, TS RER LLC<br>(erroneously named as "THE SECRET LLC"<br>and "TS HOLDINGS LLC"), PRIME TIME<br>US INC., TS PRODUCTION HOLDINGS<br>LLC, TS PRODUCTION LLC,<br>TS MERCHANDISING LTD., and<br>ROBERT E. RAINONE, JR. |

I, Paul Harrington, declare as follows:

1.      I am a supervising producer employed by Prime Time Productions Holdings Pty. Ltd. ("PTP") and am a resident of Melbourne, Australia.  The matters set forth below are within my personal knowledge, and if called upon as a witness, I could and would testify competently thereto.

2.      I have worked for PTP for approximately 13 years on the production of various motion pictures and other programs for broadcast on Australian television.  During that time, I have worked with a director named Drew Heriot, who I understand is a plaintiff in this action.  Throughout this period, Rhonda Byrne was the managing director of PTP, and was the person to whom I, Mr. Heriot and all other employees of PTP reported.

3.      In early 2005, Ms. Byrne informed us that she wanted PTP to produce a series for broadcast on Australian television regarding "the law of attraction."  Over the next year, I worked with Ms. Byrne, Mr. Heriot and a team of approximately 200 cast and crew members to ultimately produce *The Secret* based on Ms. Byrne's idea and creative vision.  At all times, Ms. Byrne exercised complete creative control over the concept, writing, filming, editing and post-production work on *The Secret.*

4.      I understand that PTP was party to a Consultancy Agreement with Mr. Heriot and Drew Pictures Pty Ltd., a company owned by Mr. Heriot and based in Ivanhoe, Australia, which is a Melbourne suburb.  Attached hereto as Exhibit A is a true and correct copy of the Consultancy Agreement.

5.      Throughout the development of *The Secret,* Mr. Heriot worked full time for PTP, as he had since at least October 2003.  I am not aware of Mr. Heriot working on any other projects other than PTP productions from at least February 2004 to January 2006.  During this time, Mr. Heriot had no independent creative control over *The Secret*; his work was always subject to Ms. Byrne's close supervision and was nearly always revised or changed by Ms. Byrne or another member of the team.

6. Until mid January 2006 (after Mr. Heriot's contributions had largely ceased), I, and I understand everyone else working on *The Secret,* understood that *The Secret* was primarily for broadcast on Australian television. In fact, *The Secret* had been commissioned for broadcast on the Australian Nine Network, which required that *The Secret* be produced as required by the program standards of the Australian Broadcast Authority and that it qualify as an Australian program in accordance with the Australian Broadcast Authority guidelines

7. After detailed preparation for filming was completed in Australia, Ms. Byrne and Mr. Heriot and I, along with our Australian film crew, traveled to the United States to film some of the interviews to be used in *The Secret.* Other than interview subjects, nearly everyone who worked on *The Secret* during filming in the U.S. were Australians. During our time filming in the United States, we engaged 12 independent contractors (primarily technicians, makeup artists and caterers) to assist, but they were a small fraction of the crew hired for filming.

8. Pre-production, filming and post-production work on *The Secret* took almost a full year before the original version of *The Secret* was complete. Of this time, only about 20 days were spent filming in the United States. Drew Heriot spent only about 11 days in the United States directing the filming of 15 out of a total of 26 interviews. Mr. Heriot was instructed to return to Australia before the interviews were complete to help edit the film to reflect Ms. Byrne's artistic vision.

9. Over the course of production, well over 120 persons worked as crewmembers on *The Secret.* Of those, only 12 were Americans who were hired as independent contractors during the short time we were filming in the United States.

10. Although the interviews were primarily filmed in the U.S., most of the filming of *The Secret* took place in Australia. A total of about 55 crew-days were spent filming by the various camera crews assigned to the project. Of these, 35 crew-days were spent filming in Australia.

11. There are about one hundred cast members shown in *The Secret.* Although most of the interview subjects were Americans, virtually all of the dramatic actors in the film were

Australians.  The American interview subjects simply provided unscripted responses to interview questions.  Of the approximately 100 cast members, about 80 percent of them were Australian actors filmed in Australia.

12. In connection with this litigation, I have reviewed a compilation of records relevant to the production of *The Secret.*  From this review, I have concluded that the Australian cast and crew contributed over 3,000 work days to the production of *The Secret.*  In contrast, American cast and crew members contributed about 51 total work days.

13. Because *The Secret* was intended for Australian television, all filming was on Australian-standard equipment owned or leased by PTP.  It was important for us to use Australian equipment because Australian television broadcasts are based on the "PAL" standard, which is different from the "NTSC" standard used in the United States.

14. In January 2006—after virtually all of Heriot's alleged contribution to *The Secret* was finished—Nine Network decided to defer broadcasting *The Secret*.  It was decided to license the release of *The Secret* as a DVD and streaming versions on the Internet.

15. Melbourne-based Vividas Pty Ltd. was hired to convert *The Secret* to a format suitable for streaming over the Internet.  In February 2006, PTP delivered a master tape of *The Secret* to Vividas in Australia for conversion.  It is this converted version that was subsequently streamed to purchasers of *The Secret* over the Internet.

16. I understand that Mr. Heriot claims that he worked with Marc Goldenfein supposedly "to develop an internet distribution model" for the film.  Mr. Goldenfein's only work in connection with *The Secret* occurred in Australia.  To the extent Mr. Heriot had any dealings with Vividas or worked on any "internet distribution model," it would have been in Australia since he was physically located in Australia during that time period.

17. *The Secret* was first shown to executives of the Australian Nine Network in its substantially final form in Australia in November 2005.  The final film was screened for executives of the Nine Network in Australia on multiple occasions in January 2006.  Each of these screenings was from Digital Betacam or VHS copies of the film made for this purpose.

18. Also in January 2006, VHS copies of *The Secret* were given to certain employees of PTP in Australia, including Mr. Heriot, which were played at multiple private screenings in Australia during the month of January. I understand that the finished film was screened to about 10 or 15 audiences in Australia in January 2006, including private screenings by Heriot himself where he exhibited the film to multiple friends and family members in Australia at a pre-launch party.

19. In mid-January, prior to release of the film in March 2006, I also understand that *The Secret* was screened for approximately 70 or 80 people from a VHS copy of the movie at a Transformational Leadership Council meeting in Cabo San Lucas, Mexico.

20. PTP still has at its Melbourne headquarters nearly all raw film footage, edits, transcripts and other documents and materials used in making *The Secret*.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 4, 2008 in Melbourne, Australia.

[signature]
Paul Harrington

# **CERTIFICATE OF SERVICE**

Under penalties as provided by law, the undersigned, an attorney, hereby certifies and states that he caused a true and accurate copies of the following accompanying documents:

- *Defendants' Notice of Motion;*

- *Defendants' Motion to Dismiss or, in the Alternative, to Stay Proceedings;*

- *Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss or, in the Alternative, to Stay Proceedings;*

- *Declaration of Rhonda Byrne in Support of Motion to Dismiss or, in the Alternative, to Stay Proceedings;*

- *Declaration of Paul Harrington in Support of Motion to Dismiss or, in the Alternative, to Stay Proceedings;*

- *Declaration of Joseph A. Meckes in Support of Motion to Dismiss or, in the Alternative, to Stay Proceedings;*

- *Declaration of Robert E. Rainone, Jr. in Support of Motion to Dismiss or, in the Alternative, to Stay Proceedings*; and

- *Declaration of Donald J. Zyck in Support of Motion to Dismiss or, in the Alternative, to Stay Proceedings*

to be served upon the counsel listed below via the United States District Court for the Northern District of Illinois, Eastern Division's CM/ECF electronic filing system and by electronic mail on this 4th day of June, 2008.

Paul L. Price
(plp@heplerbroom.com)
Hepler, Broom, MacDonald, Hebrank, True & Noce, LLC
150 N. Wacker Drive, Suite 3100
Chicago, Illinois  60606

Mark S. Werbner
(mwerbner@swtriallaw.com)
Darren P. Nicholson
(dnicholson@swtriallaw.com)
Sayles |Werbner, P.C.
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas  75270

By  /s/ David S. Elkins

# HARRINGTON DECLARATION EXHIBIT A

# Prime Time Production Holdings

## CONSULTANCY AGREEMENT

Between

Prime Time Production Holdings Pty Ltd

and

Drew Pictures Pty Ltd

## TABLE OF CONTENTS

| ITEM | PAGE |
|---|---|
| Agreement Date | 1 |
| 1. Appointment | 1 |
| 2. Fee Payment | 1 |
| 3. Fee Review | 4 |
| 4. Performance under Contract Review | 4 |
| 5. Expenses of Position | 4 |
| 6. Superannuation | 4 |
| 7. Leave | 5 |
| 8. Duties and Responsibilities | 5 |
| 9. Hours | 6 |
| 10. Prohibition | 6 |
| 11. Confidentiality | 6 |
| 12. Termination as of Right | 7 |
| 13. Summary Termination | 7 |
| 14. Termination Through Illness | 7 |
| 15. Termination for Unsatisfactory Performance | 8 |
| 16. Surrender of property on Termination | 8 |
| 17. Settlement of Disputes | 9 |
| 18. Entire Contract of Engagement | 9 |
| 19. Severability | 9 |
| 20. Waiver | 9 |

## CONSULTANCY AGREEMENT

**THIS AGREEMENT** is made on 15th October, 2003

**BETWEEN**

Prime Time Production Holdings Pty Ltd of Level 3, 627 Chapel Street South Yarra in the State of Victoria 3141 ("PTPH" / "the Company");

and

Mr Drew Heriot of Drew Pictures Pty Ltd ("DP"), Unit 4, 39 Pakington Street, Kew, Victoria 3101 ("the Consultant").

**RECITAL**
PTPH has resolved to engage the services of Mr Drew Heriot through DP, under the terms and conditions of a Consultancy Agreement, in the capacity of Consultant for a period of 12 months effective from date of signing, being 15 October, 2003. The Consultant has agreed to serve PTPH in that capacity for a twelve (12) month period until 15 October, 2004. This agreement is renewable at the expiration of the contract date, the first review date sixty days prior to the expiration date..

**IT IS AGREED** as follows:

1. **Appointment**

PTPH appoints and engages the services of the Consultant from the commencement of this Agreement in the role of Consultant and the Consultant accepts the appointment to this position and agrees to serve PTPH subject to the terms and conditions contained in this Agreement.

The duration of this Agreement is for a period of twelve (12) months, commencing 15 October 2003 and concluding 15 October, 2004. . At the expiration of this 12 month period, and each subsequent period, PTPH and the Consultant may choose to renew the Agreement where both parties so agree.

2. **Fee Payment**

   a) DP shall charge to PTPH a Fee for Services rendered by that Consultant as detailed in the Fee Schedule. The Consultant's fee consists of two (2) components:
      (i) the fixed fee payable in fortnightly instalments (i.e. 26 payments pa); and
      (ii) a project incentive payment which is "at risk" and performance based.

### Fixed fee

b) The fixed fee is a gross amount and is all inclusive with the exception of subsidised car parking as noted below. The fixed fee is the amount set out in the Fee Schedule and is agreed at the outset of this contract. GST will be charged in addition to this amount.

c) Where the Consultant elects to include car parking as part of TEC, 50% of the cost of car parking (monthly) together with the value of any associated fringe benefits tax attaching to that amount will be borne by the Consultant, and the balancing 50% will be absorbed by the PTPH.

### Incentive Payment

d) The Consultant is eligible, as a key contributor to the management team, to participate in the Company's Incentive Payment Plan. This Plan will enable the Consultant to receive additional fees for service based upon achievement of production budget targets. Targets set for individual projects are agreed by the Managing Director at the inception of individual projects.

e) The budget set for each individual project to which this Incentive Payment Plan applies will be agreed in writing prior to commencement of project shooting and includes the likely profit, duration and any incentive structure.

f) For the purpose of setting project budget targets, sales includes both national and international sales, after accounting for ordinary adjustments for direct and related costs as identified in the Company's accounting system.

g) The Consultant is eligible to receive incentive payments under the Incentive Payment Plan equal to an amount in the range of 5% - 10% inclusive on the profit of any project subject to certain conditions (outlined in the next paragraph).

h) The Managing Director may exercise her discretion to increase the benchmark 5% incentive amount up to a maximum of 10%, to be determined on an individual project basis. This would always be established at the inception of the particular project. Such a determination would be based on an assessment of the Company's overall performance, and in recognition of the Consultant's expected contribution to the achievement of better than budgeted annual financial results.

i) The incentive program will take effect from Agreement date, and applies to future series of existing programs to which financial budgets attach.

j) The Consultant will be eligible to participate in the Company's Incentive Payment Plan in respect of individual projects subject to meeting three conditions:
- The Consultant is involved in the relevant project;
- Project budget target has been attained; and
- The Consultant continues to be under a Consultancy Agreement with PTPH at the time the incentive entitlement crystalises, that is, at the time the project has been completed and after project budget results have been calculated.

k) A ceiling will apply to limit the total incentive amount payable by the Company to the Consultant each financial year, which coincides with the commencement and conclusion of this Agreement. This amount is set at $20,000 per annum.

l) Any profit on the "old" format of "World's Greatest Commercials" is specifically excluded from this Incentive Payment Plan. However any "reincarnation" of this program will be recognised as a new project requiring the input of the Consultant and is therefore regarded as a project for the purpose of the Incentive Payment Plan.

m) A time line will be set for the completion of each individual project to facilitate its completion within budget, other than for any reasons that are not caused by the internal management of the process. Permissible extensions must be agreed in writing by the Managing Director.

n) The incentive plan's rules, measures and targets may change each time the contract is renewed. Changes to individual targets set to achieve the individual project budgets will be by mutual agreement. The entitlement to any payment under the Incentive Payment Plan is at the sole determination of the Managing Director in consultation with PTPH's external accountant and on the basis of a review of the final actual result against project budget target.

3. **Fee Review**

   a) The fixed fee for the Consultant's services is determined as part of the Consultancy Agreement and is detailed for the duration of this Agreement in the Fee Schedule attached. Eligibility to participate in the Company's Incentive Payment Plan is in lieu of any fee payment review for the duration of this Agreement.

   b) The existing or revised fixed fee shall be paid from the date of commencement of this contract.

   c) Fixed fee may be reviewed after the expiration of this Agreement. Any review is subject to this Agreement being renewed for a further 12 month period. Any change to the fixed fee would be subject to market movements, the Company's capacity to pay, and the Consultant's performance.

4. **Performance Review under Contract**

   a) The performance of the Consultant will be reviewed and monitored by the Managing Director during the life of the Agreement, in addition to the end of each Project.

   b) The review shall be conducted against the Duties and Responsibilities of the Consultant Duties Statement that will be agreed between the Consultant and the Managing Director, and with guidelines from time to time adopted by PTPH. The review may also take into account any other matters considered relevant by PTPH, incorporating but not limited to the achievement of agreed strategic objectives and business financials.

5. **Expenses of Position**

   a) PTPH will reimburse the Consultant for all expenses reasonably and necessarily incurred by the Consultant in the discharge of the Consultant's duties, including land line telephone and mobile telephone expenses. The Consultant must provide substantiation for any such expenses incurred. Claimable expense items will be agreed between the Consultant and the Managing Director, and may be amended from time to time.

6. **Superannuation**

   a) There will be no entitlements to superannuation as the Consultant's role is project based with a gross fee paid to the Consultant's corporate entity for services rendered.

7. **Leave**

   a) The fixed fee rate agreed is an all inclusive amount.
   b) There will be no entitlements to paid leave of any kind as the Consultant's role is project based with a gross fee paid to the Consultant's corporate entity for services rendered. An invoice will only be rendered for services actually rendered.

8. **Duties and Responsibilities**

   a) The Consultant shall perform the Duties and Responsibilities outlined in the Duties Statement to the best of his ability and to the satisfaction of the Managing Director. The Duties and Responsibilities may be amended by PTPH after consultation with the Consultant.

   b) The Consultant may be required to undertake other duties and responsibilities and his reporting line and/or position title may be altered from time to time. Should any of these events occur, these terms and conditions will continue to apply, unless replaced in writing by a new Consultancy Agreement.

   c) The Consultant will be expected to diligently perform all duties in a professional, competent and ethical manner, devote all time and attention and skills during business hours to PTPH's business, comply with all lawful instructions given by PTPH and with any policies relating to the conduct of Consultants. In undertaking his duties, the Consultant is also expected to maintain the reputation and integrity of PTPH. This extends to behaviour when representing PTPH at functions outside business hours.

   d) Under this Agreement, the Consultant will work exclusively for PTPH during the project's duration. The Consultant will be expected to devote the whole of the his time, attendance and skills during normal business hours, and at such other times as may be reasonably necessary, to the proper conduct of the affairs of PTPH and to the performance of the Consultant's duties under this Agreement. This is to ensure that there is a full and committed focus on meeting both the timetable and the quality of the program or project.

   e) The Consultant is expected at all times to obey all reasonable and lawful directions of the Managing Director and abide by PTPH's Code of Conduct.

9. **Hours**

The fixed fee for service payable to the Consultant is for a minimum of 40 hours per week during normal business hours being Monday to Friday. The Consultant will also work outside normal business hours, without additional payment, when necessary as requested, within reason.

10. **Prohibition**

The Consultant shall not:

   a) accept payment of any benefit in money or kind from a person as an inducement or reward for any act or forbearance in connection with any matter or business in relation to PTPH or the Duties and Responsibilities.

   b) without the prior written consent of PTPH (which shall not be unreasonably withheld), engage in any other engagement, business or occupation or hold any other paid office, other than those businesses already advised to the Managing Director;

   c) use any information acquired in the course of engagement in order to obtain a benefit for the Consultant or any other person or entity.

11. **Confidentiality**

   a) The Consultant must preserve the confidentiality of any document or information relating to PTPH's group affairs which is not in the public domain and which came in to the Consultant's possession or knowledge in the course of the Consultant's engagement by PTPH. The Consultant shall not, directly or indirectly, divulge such confidential information except as required by law or with the prior written authority of PTPH.

   b) The Consultant must not use or attempt to use any confidential information acquired during the course of the Consultant's engagement in any manner which may cause loss, damage or injury to PTPH.

   c) The obligations of the Consultant pursuant to the foregoing provisions of this clause shall survive the termination or expiry of this Agreement.

   d) For the purposes of this clause, information will be *prima facie* secret or confidential if it is not lawfully in the public domain and relates to the:
      - business methods;
      - financial affairs and accounting methods;
      - intellectual property, technology or research and development;
      - supplier or alliance negotiations

   of PTPH.

### 12. Termination as of Right

This Agreement will be terminated twelve months after the commencement date of 15 October, 2003, or date of execution, that is, 15 October, 2004, or twelve months from commencement date. The Agreement will only be renewed for a further twelve month period, commencing 15 October, 2004, subject to both parties' agreement.

Termination may also occur in the following situations:

### 13. Summary Termination

a) PTPH may by notice in writing summarily terminate the Consultant's engagement under this Agreement (without payment) for any cause warranting summary dismissal at common law or if the Consultant:

1. engages in any act or omission being serious misconduct in the role of Consultant;

2. in the reasonable opinion of PTPH, wilfully fails or wilfully neglects to perform or carry out the Duties and Responsibilities in a satisfactory manner;

3. commits a serious or persistent breach or non-observance of any of the provisions of this Agreement;

4. refuses or wilfully neglects to comply with any lawful or reasonable order given to the Consultant by the Managing Director;

5. commits a serious or material breach of the confidentiality of PTPH's affairs as described in clause 10; or

6. is convicted of any indictable offence.

b) If the Consultant's engagement is terminated under this clause, the Consultant shall be paid out the balance of any fixed fee payment owing for services rendered up to and including termination date, and any other benefits under this Agreement up to the conclusion of the day of termination, less any amount PTPH is entitled to claim as set-off.

### 14. Termination through Illness

a) If the Consultant is unable through illness, physical disability or other reason to attend to duties, PTPH may, at its option, and despite any medical opinion or prognosis rendered to it, immediately terminate this Agreement. Nothing in this clause shall limit PTPH's absolute discretion as to whether it will enforce, or not enforce, its terms.

Consultancy Agreement – Drew Harriott                                                    7

15. **Termination for Unsatisfactory Performance**

   a) PTPH may immediately terminate the Consultant's engagement on the grounds of unsatisfactory performance by giving the Consultant written notice of termination at any time during the Agreement.

   b) No such termination shall occur unless the Consultant has been:

   1. formally counselled the Managing Director or her designate as to those aspects of performance which are unsatisfactory;

   2. counselled on how performance can be improved;

   3. advised on the consequences of not meeting the required standards of performance;

   4. given a reasonable opportunity to reach a satisfactory level of performance against a clearly stated set of objectives;

   5. further counselled after such review period as the Managing Director thinks reasonably appropriate; and

   6. provided with documentation of continued unsatisfactory performance.

   c) Where PTPH elects to terminate the Agreement on notice, it may, in its absolute discretion, elect to make a pro-rata payment calculated on the base compensation component of the TEC payable at the time of termination of engagement. Where termination occurs before the conclusion of an individual project which is subject to the Incentive Payment Plan, no amount of the IP will be payable.

16. **Surrender of Property on Termination**

   a) On termination of this Agreement for any reason, the Consultant must forthwith deliver to PTPH:

   1. all documents in the Consultant's possession or control relating to the business or affairs of PTPH; and

   2. any property belonging to PTPH.

17. **Settlement of Disputes**

   a) If any dispute or grievance arises under this Agreement, it must be dealt with in the following manner:

   1. the matter must first be discussed between the Consultant and the Managing Director or her designate;
   2. if not settled, the dispute must be referred for mediation to a person agreed upon between the parties;
   3. if no person is agreed upon, the dispute must be referred for mediation to a person nominated by the Executive Officer of the Victorian Chapter of Lawyers Engaged in Alternative Dispute Resolution;
   4. until conclusion of mediation or until dispute is settled work, must continue at the direction of the Managing Director. No party shall be prejudiced by continuance of work;
   5. the parties to the dispute must co-operate to ensure that these procedures are carried out expeditiously.

18. **Entire Contract of Engagement**

   a) This Agreement, the Letter of Offer and the Remuneration Schedule embodies the entire Contract of Engagement and understanding between the parties with respect to all matters referred to in them.

   b) No variation to this Agreement shall be valid unless it is in writing and signed by or on behalf of each of the parties.

19. **Severability**

   a) The provisions of this Agreement shall be construed to be divisible and severable to the effect that if any provision herein at any time, be found or declared invalid, void, or unenforceable, the remaining provisions continue to be valid and enforceable.

20. **Waiver**

   a) Any waiver by PTPH of a breach by the Consultant of any term, condition or obligation in this Agreement, express or implied, will not operate as a waiver of a continuing or recurring breach of the same or any other term, condition or obligation.

## Prime Time Production Holdings Pty Ltd

**EXECUTED BY THE PARTIES**

**SIGNED AND DELIVERED** by PRIME TIME PRODUCTION HOLDINGS PTY LTD at Melbourne in the State of Victoria in the presence of:

_____  
Witness

_____  
PAUL HARRINGTON  
Print Name

_____  
Authorised Signatory

_____  
RHONDA BYRNE  
Print Name

**SIGNED AND DELIVERED** by THE CONSULTANT on behalf of DREW PICTURES PTY LTD in the presence of:

_____  
Witness

_____  
PAUL HARRINGTON  
Print Name

_____  
Signature

_____  
DREW HERIOT  
Print Name