UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Drew Heriot and Drew Pictures Pty Ltd., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | Civil Case No. 08cv2272 |
| | § | |
| Rhonda Byrne, | § | The Honorable Suzanne B. Conlon |
| The Secret LLC (AKA TS Holdings LLC) | § | |
| Prime Time US Inc., | § | |
| TS Production Holdings LLC, | § | |
| TS Production LLC, | § | |
| TS Merchandising Ltd., And | § | |
| Robert E. Rainone Jr. | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY PROCEEDINGS

Mark S. Werbner
Darren P. Nicholson
Sayles | Werbner, P.C.
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Phone: 214.939.8700
Fax: 214.939.8787
*Admitted pro hac vice*

Paul L. Price
Hepler, Broom, MacDonald, Hebrank,
True & Noce, LLC
150 N. Wacker Drive, Suite 3100
Chicago, Illinois 60606
Phone: 312.230.9100
Fax: 312.230.9201


Attorneys of Plaintiffs Drew Heriot and
Drew Pictures Pty Ltd.

## I.    INTRODUCTION

Defendants' Motion to Dismiss or Stay is without merit. Each and every party in this suit is either a United States citizen, a United States resident, a United States company, or a foreign "shell" company that is wholly owned by a United States parent with operations in the United States. Every defendant either currently resides or resided at one time[1] in Chicago. The movie *The Secret* was filmed substantially in the United States (including Chicago) with additional drama footage filmed in Australia. The book *The Secret* was "written" by Defendant Byrne entirely in the United States, pursuant to an agreement between two Chicago-based companies. The book was published by Simon & Schuster, a United States company. Publication of the works at issue first occurred in the United States by a United States company and was orchestrated in Chicago. Exploitation of the works at issue first occurred in Chicago. Infringement of the works at issue first occurred (and continues) in Chicago. The vast majority of the discovery that needs to be done will take place in the United States, with extensive discovery in Chicago.

Yet Defendants' Motion either glosses over or simply ignores these facts. In stark contrast to their position in other cases pending before this Court, Defendants' Motion peddles the fiction that the parties' most "convenient forum" to litigate this dispute is on the other side of the planet and, once there, to come all the way back to Chicago to take discovery under the Hague Convention protocols. Defendants' arguments to dismiss under the abstention doctrine and under Rule 12(b)(6) are equally meritless.

## II.    BACKGROUND

Drew Heriot has been a United States resident since March 2006. He is engaged to be married next month to Jennifer Nell Keller, a United States citizen, and will be applying

---

[1] Defendant Byrne lived in Chicago in or around March and April 2006, during the launch of "The Secret." Byrne Depo. 12:10-24, Ex. B. Although Defendant Byrne currently resides in Santa Barbara, California, she travels to the Chicago offices of the other named defendants several times a year. *Id.* 18:10-13.

for permanent residency status. Mr. Heriot intends to permanently remain in the United States and to continue to pursue his successful career as a motion picture writer and director in Los Angeles, California. Heriot Decl. ¶ 1, Ex. A. Mr. Heriot's production company, Drew Pictures, Pty. Ltd ("Drew Pictures"), is not a going concern. *Id.* ¶ 3. Aside from holding copyright in Mr. Heriot's work, Drew Pictures does not currently conduct any business operations and has not since Mr. Heriot became a United States resident. *Id.* Drew Pictures' "principle place of business" of Unit 1/9 Ashby Grove Ivanhoe, Victoria 3079 Australia, is the residence of Mr. Heriot's father, Ian Heriot. *Id.* All of the business records of Drew Pictures, including invoices, the "Rundowns," the "2 Hr Paper Edit" and the "tranSCRIPT" that Mr. Heriot created are located in the United States, not Australia. *Id.*[2] Mr. Heriot does not regularly travel to Australia or have the time or financial means to do so. *Id.* ¶ 2.

To be sure, as Rhonda Byrne repeatedly testified in her May 6, 2008, deposition, *The Secret* was conceived and pre-production was conducted "in Australia at the time **initially**." R. Byrne Dep. 17:8-9, 31:17-19, Ex. B (emphasis added).[3] But that production effort was moved to the United States, where the vast majority of the actual filming took place:

> Q    Okay. You've indicated you were the creator of THE SECRET. Are there other contributors to THE SECRET?
> A    Well, it gave -- the concept and idea and everything gave birth in me. Then in terms of putting -- making the film, there was a production team involved in making the film.
> Q    Where was that production team based?
> A    The production team was based initially in Australia *but during the making of the film in the United States.*
> Q    Where in the United States?
> A    Well, *we actually filmed everywhere in the United States; in a lot of places. In Illinois, in California, various other places, Aspen.*
> \*       \*       \*

---

[2] Any additional records relating to Drew Pictures, if not in Plaintiffs' possession are under Plaintiffs' control and can be obtained quickly and with little expense. *Id.*

[3] The Nine Network, a TV station in Australia, was "initially" involved in the project but that "dissipated over time." R. Byrne Depo. 59:7-9. One of the primary Nine executives Rhonda Byrne was dealing with, Andrea Keir, was based in Los Angeles, California. *Id.* 59:10-60:2.

> Q    Do you know where he [Paul Harrington] was based at the time he was
> performing these activities?
> A    Well, they would vary because at some point he was in Australia and at
> some point he was in the United States. *We were in the United States a great
> deal during filming.*

R. Byrne Dep. 29:21-30:10, 56:17-22 (emphasis added). In fact, during the filming of the

movie, the production effort (including all plans for distribution and sales of *The Secret*)

shifted to Chicago, under the coordination of Defendant Rainone.

> Q    [Y]ou said you have certain businesses associated with THE SECRET?
> A    Yes.
> Q    What is the function of those businesses?
> A    The function -- the function of those businesses is to manage and look
> after the products of THE SECRET.
> \*        \*        \*
> Q    Okay. And the companies that you have that are in Chicago relate to
> these products, as you've described it, correct?
> A    The -- I assume they do, yes.
> \*        \*        \*
> Q    Prime Time Productions, I believe you told me, was the entity that
> originally compiled and began the production efforts on THE SECRET; is
> that correct?
> A    Prime Time Productions began making the film.
> Q    Am I correct that later those duties were assigned or overtaken in some
> way by other companies that you created?
> A    That's -- that would be my understanding.

R. Byrne Dep. 14:21-15:21, 54:16-55:8. This began in "October 2005" – 3 months before

*The Secret* was finished and 5 months before it was published -- when Defendant Rainone

became "responsible for overseeing distribution operations relating to the movie *The Secret*,

including the use of the Web site located at www.thesecret.tv" as CEO of "The Secret LLC"

in Chicago. Declaration of Robert E. Rainone, ¶¶ 2-3, Ex. C.[4] The movie was first sold on

*The Secret* website on March 23, 2006, which was hosted on United States servers, and

carried the copyright notice of a Chicago company "© The Secret LLC." Cmplt. ¶ 37. The

website expressly advised users that "any action" related to the website "shall be brought

---

[4] This declaration was submitted on behalf of Defendants TS Merchandising and TS Production in the case
of *TS Merchandising, et al v. Dan Hollings, et al. See* Docket No. 1:07-cv-6518, Docket Entry 45-2.

only in either the State or Federal Courts located in Chicago, Illinois." *Id.* ¶ 12.  Sales of the movie were expressly prohibited in Australia and measures were taken to ensure that no sales would or could occur in Australia.  Heriot Decl. ¶ 16.

Similarly, the book *The Secret* was "created" entirely in the United States in mid-2006 and published by Simon & Schuster, Inc. later that year. Cmplt ¶¶ 45-46; Rainone Dec. ¶ 9, attached to Defendant's Motion.

In July 2007, Plaintiffs retained the services of Jon Reichman, a copyright attorney based in New York. Mr. Reichman was engaged to assert Plaintiffs' rights in the works, to register copyright, to negotiate a settlement (if any), and to assist Plaintiffs in obtaining trial counsel to initiate litigation in the U.S. Reichman Dec. ¶¶ 2-3, Ex. D. In September 2007, Mr. Reichman received a letter from TS Production's lawyers at Squire Sanders & Dempsey arguing that Plaintiffs did not own copyright by virtue of the Australian Copyright Act and ordering Plaintiffs to withdraw their U.S. Copyright Registration. *Id.* ¶ 6. In response, Mr. Reichman noted that *TS Production's citations to Australian law* "were inapposite" but did not claim or "admit" that Australian law governed ownership of the works or otherwise waive Plaintiffs' rights.[5] Seven days later, Defendant TS Production initiated an action in Australia against Plaintiffs, which seeks a declaration that TS Production LLC is the sole owner of *The Secret* (Original Edition) and the sole owner of the book *The Secret*. Cmplt ¶

---

[5] In a footnote, Defendants divine that "Plaintiffs brought their case in this forum" because "as a matter of Australian law" the copyright in "a film" would be owned by Prime Time Productions, not Plaintiffs. Defendant's Memo at 10, n.6. As set forth in Mr. Reichmann's letter, Defendants' self-serving construction of Australian law is wrong. *Id.* ¶ 7. (citing Australian Copyright Act of 1968 §§ 35, 78, 98(4), and 98(6)). Plaintiffs will leave it to Defendants to explain their timing, conduct, and curious choice of forum. (Indeed, if Defendants' choice of law argument is correct, Defendants have the benefit of Australian law here, obviating the need to litigate in Australia.) It suffices to say that Plaintiffs do not have the financial means afforded by Defendants' multi-million-dollar enterprise. The Court should rest assured that Plaintiffs brought this action in Chicago because, as U.S. residents, it is decidedly more convenient for Plaintiffs to sue Chicago-based defendants in Chicago.

57. It does not seek a declaration regarding ownership of the screenplay to *The Secret* or of the movie *The Secret* (Extended Edition). *Id.*

Mr. Heriot learned about the action on October 19, 2007, when his father, Ian Heriot, was served with process in Australia. Heriot Dec. ¶ 21. Plaintiff Heriot retained counsel in Australia and advised them that he wanted to preserve and ultimately assert his and Drew Pictures' rights in the United States. *Id.* ¶ 22. On October 29, 2007, Plaintiffs' Australian counsel expressly informed TS Production's Australian counsel that Plaintiffs were considering "*whether to also commence a lawsuit in the United States relating to these issues.*" Reichman Decl. ¶ 10. Mr. Heriot, with the assistance of Mr. Reichman, immediately began searching for U.S. trial counsel to assert his rights in the U.S. In January 2008, Mr. Heriot contacted Mark Werbner of Sayles Werbner PC, who agreed to investigate Plaintiffs' claims. Heriot Decl. ¶ 24. From February to March 2008, Plaintiffs instructed Mr. Reichman and Plaintiffs' Australian counsel to provide Sayles Werbner PC with all documents related to Plaintiffs' claims and to assist Sayles Werbner PC in their investigation and due diligence. Plaintiffs retained the undersigned on April 15, 2008, and this action was initiated on April 21, 2008. *Id.* ¶ 25. Although the Australian proceeding was initiated in October 2007, procedurally there is no difference between the Australian proceeding and the present one. Reichman Decl. ¶ 18. In both, a Complaint or Statement of Claim[6] has been filed, but no Answer, Defense, or Cross Claim has been filed, no discovery has been started, no trial date has been set, and motions to stay are now pending before both courts. *Id.* In addition, TS Production has sought leave to amend its Statement of Claim, for the second time, to now seek a declaration regarding ownership of the screenplay to *The Secret* and the

---

[6] A Statement of Claim is the Australian equivalent of a Complaint in the United States.

6

movie *The Secret* (Extended Edition). *Id.* ¶ 16. TS Productions has also sought an anti-suit injunction against Plaintiffs, attempting to prevent them from proceeding in this case. *Id.*

## III.    ARGUMENT

Defendants' motion is, for lack of a better word, odd. Defendants do not cite (and Plaintiffs' have been unable to find) any case where a court has actually granted a *forum non conveniens* motion by a U.S. Defendant *who resides in the forum* against a Plaintiff *who resides in the U.S.*, so that the parties must go litigate in some other part of the world. While theoretically possible, "it will be the rare case indeed when a case filed in the federal district where the defendant resides . . . is dismissed on the ground of *forum non conveniens*." *Reid-Walen v. Hansen*, 933 F.2d 1390, 1395-1396 (8th Cir. 1991). In such a rare case, "forum resident[s] should have to make a stronger case than others for dismissal based on *forum non conveniens*." *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 609 (10th Cir.1998) *cert. denied*, 526 U.S. 1112 (1999); *see also Magellan Real Estate Inv. Trust v. Losch*, 109 F.Supp.2d 1144, 1151 (D. Ariz. 2000) (holding that defendant's residence in the forum "weighs heavily against dismissal on grounds of *forum non conveniens*"). Defendants' motion falls well short of this heightened standard.

### A. Dismissal Under *Forum Non Conveniens* is not Warranted

The doctrine of *forum non conveniens* is essentially "a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined." *American Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994).[7]    The doctrine allows a court to dismiss a case over which

---

[7] Along this vein, the Supreme Court has recently noted that the doctrine was codified in the general venue provisions of 28 U.S.C. § 1404(a) but that the "common-law doctrine of *forum non conveniens* 'has continuing application [in federal courts] . . . where the alternative forum is abroad.'" *Sinochem Int'l. Co. Ltd. v. Malaysia Int'l. Shipping Corp.*, 127 S.Ct. 1184, 1190-91 (2007) (quoting *American Dredging*, 510 U.S. at 449, n.2). Contrary to their position here, Defendants have been asserting that jurisdiction in Chicago is proper in another case before this Court involving *The Secret*. *See generally*, TS

it has jurisdiction "if it best serves the convenience of the parties and the ends of justice." *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 703 (7th Cir. 2005). As this Court has noted, a court may dismiss "when a trial in the chosen forum would result in vexation or oppression to the defendant which would <u>far outweigh</u> the plaintiff's convenience" or when the chosen forum would generate excessive "administrative or legal engagements for the trial court." *Chelios v. Nat'l Hockey Leage Players' Ass'n*, 2007 WL 178326, *3 (N.D.Ill., Jan. 18, 2007).

As the Supreme Court has held, the doctrine requires the court to consider (1) whether an adequate alternative forum exists, and, if so, (2) whether the balance of relevant public and private interest factors weighs in favor of dismissal. *American Dredging*, 510 U.S. at 447-448 (1994) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981)). The public and private factors were accurately set forth in Defendants' Memorandum at 5.

### 1. Australia is not an Available and Adequate Alternative Forum

Australia is not an available and adequate forum for Plaintiffs. First and foremost, Defendants consent to Australian jurisdiction only as to Plaintiff Drew Pictures, not to Plaintiff Drew Heriot. Thus, even assuming Defendants' consents are valid on their face, Australia is not an available forum as to Plaintiff Heriot. Second, Defendants cite neither law nor fact to support their bald assertion that an Australian tribunal will accept these consents. A consent, without further substantiation, is insufficient to make a foreign jurisdiction "available" for the purpose of a *forum non conveniens* inquiry. *See Kamel v. Hill-Rom Co., Inc.*, 108 F.3d 799, 803 (7th Cir.1997) (finding a consent to jurisdiction valid where defendant submitted the affidavit of an expert on Saudi law to substantiate that Saudi law

---

*Merchandising, et al v. Dan Hollings, et al*. *See* Docket No. 1:07-cv-6518. Defendant Hollings has initiated a counter-suit in the United States District Court for the Central District of California. *See, Dan Hollings v. Rhonda Byrne, et al.*, Docket No. cv08-03024. In that case, Defendants have moved for a transfer of venue to this Court. *Id.*

recognizes consents to jurisdiction). Defendants have given the Court nothing to substantiate their claims that Australia is an adequate and available forum.

In fact, although the Federal Court in Australia has discretion to accept consents, it is unlikely that the Court will accept jurisdiction for infringement that occurs in the United States because the Australian Copyright Act of 1968 limits Australian jurisdiction to infringement "in Australia." Swinson Decl. ¶ 9-11, Ex. E. Even assuming the Australian Court accepted jurisdiction, Plaintiffs do not have the same remedies available to them in the United States, which is not an adequate and available forum. *Id.* ¶¶ 25, 26.

### 2.  The Interests of the Parties Do Not Strongly Favor Dismissal

#### a)  *The Key Witnesses and Evidence are Located in the U.S.*

Defendants assert (without any support) that there are "dozens of witnesses" and "voluminous evidence" located in Australia. Of course, for the purposes of a motion to dismiss, the court must accept all well-pleaded allegations as true. *Cler v. Illinois Educ. Ass'n,* 423 F.3d 726, 729 (7th Cir. 2005). As alleged (and, tellingly, not rebutted) there were three principle "creators" behind *The Secret* whose testimony is key: Drew Heriot, Rhonda Byrne, and Paul Harrington. *See, e.g.,* Cmplt ¶¶ 19-26. Two of those people, Heriot and Byrne, are located in the United States. The third, Paul Harrington, has submitted a Declaration in support of Defendants' motion and has made himself available to be "called upon as a witness" in this case. Harrington Decl. ¶ 1. Plaintiffs anticipate needing additional U.S. discovery, including:

- The depositions of Leni Mex and Skye Byrne, who can confirm Mr. Heriot's role and who currently reside in the United States. Heriot Decl. ¶¶ 8, 10, 12, 13.
- The depositions of some of the "teachers" who appeared in the film to substantiate Mr. Heriot's contributions. Of the 25 "teachers" who appear in the film, 24 are located in the United States, and one is located in Australia. Heriot Decl. ¶¶ 9, 11, .
- Third party discovery of Simon & Schuster, Inc., concerning drafts and true authorship related to the book *The Secret.*

- The deposition of Dan Hollings, who resides in the United States, regarding *The Secret* website, including sales, distribution, and publication of *The Secret*.
- The depositions of Robert Rainone, Don Zyck, Athena Golias, Michael Gardiner and other employees of Defendants, regarding the creation, sales, distribution, and publication of *The Secret*.

As far as documents are concerned, all of the business records of Drew Pictures,

including invoices, the "Rundowns," the "2 Hr Paper Edit," and the "tranSCRIPT" that Mr.

Heriot created are located in the United States, not Australia. *Id.* ¶ 3. Defendants protest that

there will be a "logistical quagmire" because of the "voluminous records" that can only be

obtained at "enormous expense." Yet, in only forty days, Defendants were able to produce

sworn declarations and documents from "half a world away" in support of their motion. That

is no surprise, because these documents are in the possession of Prime Time Productions,

*which is a wholly owned subsidiary of Defendant TS Production LLC.*[8] Incredibly, the

Australian documents Defendants contend are essential but so "difficult" and "expensive" to

obtain are already in Defendants' possession and control.

### *b) Plaintiffs' Choice of Forum is Entitled to Deference*

In addition, there is ordinarily a "strong presumption" in favor of a plaintiff's choice

of forum "which may be overcome only when the private and public interest factors clearly

point towards trial in the alternative forum." *Macedo v. Boeing Co.,* 693 F.2d 683, 688 (7th

Cir.1982). Plaintiffs are entitled to this "strong presumption" because Heriot is a United

States resident and has been since 2006. Heriot Decl. ¶ 1. Drew Pictures, although

Australian as a matter of law, has its sole share-holder, director, and all discoverable

information residing in the United States, not Australia. "Citizens *or residents* deserve

somewhat more deference than foreign plaintiffs" in the *forum non* analysis. *Piper Aircraft

Co. v. Reyno.* 454 U.S. 235, 256, n.23 (1981) (emphasis added). Defendants' argument that it

---

[8] *See* September 25, 2007, Letter from Squire, Sanders, & Dempsey LLP to J. Reichman, attached to Reichman Decl., Ex. C. ("Prime Time Productions is a wholly-owned subsidiary of TS Production . . .").

is residency *in this district* that entitles a plaintiff to deference and not residency *in the United States* is wrong. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 75 (2d Cir. 2001) (remanding for reconsideration an order of dismissal under *forum non conveniens* where the district court did not "accord proper deference to plaintiff's chosen forum" where plaintiff was a United States resident, but not a resident in the district in which the court sat); *ICC Indus. Inc. v. Israel Discount Bank, Ltd.*, 170 Fed. Appx. 766, 767 (2d Cir. 2006) ("There is a presumption that a United-States-resident plaintiff's choice of forum is valid").[9]

### 3. The Public Interest Factors do not Strongly Favor Dismissal
#### a) U.S. Law Governs the Case

Defendants argue that (1) the Court should adopt the Second Circuit's analysis in *Itar-Tass Russian News Agency v. Russian Kruier*, 153 F.3d 82, 89-90 (2d Cir. 1998) on choice of law, (2) that the Court further conclude, without the benefit of discovery or cross-examination, that Australia has "the most significant relationship" to the screenplay, book, and movies at issue, (3) that the application of Australian law as to ownership for all works is therefore compelled,[10] and (4) that because Australian law governs the ownership issue, this factor "heavily weighs towards dismissal." Defendants' argument fails for several reasons.

First, Defendants' reliance on *Itar-Tass*, which has been adopted by no other circuit court,[11] is misplaced. Notably, Defendants ignore the Nimmer treatise's strong critique of

---

[9] Plaintiffs are aware of this Court's statement to the contrary in *Chelios*, 2007 WL 178326, *5. Plaintiffs respectfully submit, in light of the above authority, that the Court reconsider the issue. In a case such as this, allowing the presumption only for residents of the district results in a Catch-22. Plaintiff Heriot would be entitled to the presumption had he filed suit in Los Angeles, although that court would not likely have personal jurisdiction over all Defendants. But where Plaintiff Heriot gives up the benefit of the home forum to guarantee personal jurisdiction, he loses the presumption. The Supreme Court expressly granted the presumption to "[c]itizens or residents" not "citizens who are residents of the district or residents who are residents of the district." *Piper Aircraft Co.*, 454 U.S. at 256, n.23 (1981). Thus, the Supreme Court was giving the presumption to U.S. citizens and U.S. residents, generally.

[10] Defendants do not address whether, under the *Itar-Tass* analysis, the Court should accept or reject the doctrine of *renvoi* as part of its conflict analysis. *See* Restatement (Second) of Conflict of Laws § 8.

[11] *Itar-Tass* has been cited by some Circuit Courts, but for other propositions. *See Latin Am. Music Co. v. The Archdiocese Of San Juan Of The Roman Catholic & Apostolic Church*, 499 F.3d 32, 42 (1st Cir. 2007)

the *Itar-Tass* decision and the "hornets nest" the court created. *Nimmer on Copyright*
§ 17.05. Both Australia and the United States are parties to the Berne Convention for the
Protection of Literary and Artistic Works ("Berne"). Under Article 14*bis*(2)(a), Berne
established the choice of law rule that "[o]wnership of copyright in a cinematographic work
shall be a matter for legislation in the country where protection is claimed." The U.S. has
enacted such legislation – namely, the U.S. Copyright Act itself – which addresses the
ownership of motion pictures through a variety of provisions, *inter alia*, Section 101
(definitions of "motion pictures" and "work made for hire"); Section 102(a)(6) ("Subject
matter of copyright: In general"), and Section 201(a),(b) ("Ownership of copyright"). Thus,
this is not, as Defendants suggest, a requirement that member countries enact legislation
specifically tailored to cinematographic works. Rather, it is a specific choice-of-law rule
designed "to settle issues of ownership" for films. *Itar-Tass*, 153 F.3d at 91.

> The reference to the law of the country where protection is claimed makes it
> clear that ownership depends on the law of the country of importation,
> whoever may be considered the owner of the copyright in the country of
> origin of the film. **For example, if protection is claimed in the United
> Kingdom, it is the British law which governs ownership; if in France it is
> the law of that country.** World Intellectual Property Organization, *Guide to
> the Berne Convention for the Protection of Literary Works* (Paris Act 1971) at
> 85-86 (emphasis added).

Thus, it is United States law that governs ownership in this action, not Australian law.

Second, even if the Court disregards Article 14*bis*(2)(a) of Berne, there is at best a
significant factual dispute regarding the country with the "most substantial relationship"

---

(citing *Itar-Tass* discussion of standing); *Alameda Films SA de CV v. Authors Rights Restoration Corp. Inc.*, 331 F.3d 472, 476 (5th Cir. 2003) (quoting *Itar-Tass* for the proposition that "[d]etermination of a foreign country's law is an issue of law" in an action involving a restored foreign work under 17 U.S.C. § 104A); *Food Consulting Group, Inc. v. Azzalino* 270 F.3d 821, 826 (9th Cir. 2001) (citing *Itar-Tass* for proposition that federal courts can develop federal common law to decide a conflicts of law issue in a copyright case, where the Copyright Act does not contain a controlling provision).

under the *Itar-Tass* analysis.[12] To determine which country has the "most substantial relationship" the Court must consider who created the work, where the work was created, and in what country the work was first published to determine the governing law. *Itar-Tass*, 153 F.3d at 90. The Complaint, briefing, and competing declarations reveal that there is a significant factual dispute as to who created each work (i.e. the screenplay, the book, and the movie) and in what country those works were primarily created. Although Defendants argue that publication first occurred in Australia because there were several private screenings of the movie there, "publication" for copyright purposes means "the distribution of copies . . . of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101.[13] Defendants do not contest that the first distribution and sale occurred in the United States, not Australia. Cmplt. ¶ 37. Thus, should the Court adopt the *Itar-Tass* analysis, the appropriate time to consider the "substantial relationship test" is after the close of discovery, not before discovery even begins.

Finally, even if Australian law governs ownership, *Itar-Tass* makes clear that the "substantive rights" of Plaintiffs are nevertheless governed by U.S. law, not Australian law. *Itar-Tass*, 153 F.3d at 90. It is likely for this reason that Defendants do not cite (and Plaintiffs cannot find) any case where a court adopts the *Itar-Tass* analysis, and then uses that adoption as a basis to grant a *forum non conveniens* motion. While the application of foreign law is generally disfavored, this Court is certainly capable of applying Australian law to the issue of ownership if required to do so. *See, e.g., Chelios*, 2007 WL 178326, *7.

---

[12] For example, in contrast to Mr. Harrington's Declaration, just over 60% of the content of *The Secret* (Original Edition) is American and just under 40% is Australian. Heriot Decl. ¶ 17.

[13] This definition of "publication" is the same under Australian law. *See* Australian Copyright Act of 1968 § 29-1(b).

### *b) The Other Public Interest Factors Weigh Against Dismissal*

Defendants' arguments regarding the remaining public interest factors do not warrant significant comment. The Court is in a superior position than the parties to evaluate the congestion of its own docket. While Defendants suggest that the Australian case would proceed more quickly, that assertion is belied by the glacial pace of the Australian action. In the past eight months, nothing of substance has happened. There has been no Answer, Cross-Claim, or Defense filed (or required to be filed), no discovery conducted, and no trial date set. Reichman Decl. ¶ 18. Eight months after filing, the Australian action is in the same procedural position as this case, which has only been pending since April 21, 2008. Finally, Illinois has a paramount interest in resolving a dispute involving Illinois residents.

Because Australia is not an available or adequate forum, because it is not the most convenient forum for the parties, and because the public interest weighs in favor of this forum, the Court should deny Defendants' motion to dismiss for *forum non conveniens*.

### B. The Abstention Doctrine is Similarly Inapplicable

Leaving no stone unturned, Defendants recycle their *forum non conveniens* arguments under the guise of abstention, hoping that if the Court finds them unpersuasive for the former it will nevertheless find them persuasive for the latter. For all of the reasons set forth above, Defendants' arguments are without merit, and Defendants have not come close to meeting the "exceptional" circumstances necessary to invoke abstention. *Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 898 (7th Cir. 1999). As Judge Posner has held:

> When a federal court is asked to abstain in favor of a parallel litigation pending in another court, **the presumption is against abstention . . . the general rule being that a federal court has a duty to exercise the jurisdiction that Congress has given it**. In a case in which the presumption is reinforced rather than rebutted by practical considerations bearing on the choice of which court to proceed in – how far advanced the litigation is in one court and which court can by virtue of its jurisdiction or structure render the

more complete justice – abstention would be out of the question. *Allendale v. Bull Data Systems*, 10 F.3d 425, 430 (7th Cir. 1993) (emphasis added).

In point of fact, this proceeding and the Australian proceeding are not "parallel." They do not involve the same parties; they do not involve the same works; they do not involve the same claims; they do not involve the same substantive law. It is for this reason that Defendants are (partially) consenting to personal jurisdiction in Australia, arguing that Australian law governs (the Berne Convention notwithstanding), and seeking leave to amend their Australian complaint to add additional works. Defendants wish to *make* the actions parallel. Moreover, the "practical considerations" bearing on the court – the identical procedural posture of the cases and this Court's superior jurisdictional position over Defendants – only serves to reinforce the presumption making abstention here "out of the question." *Id.* Accordingly, because there are no parallel proceedings and because Defendants have not met their burden to establish the exceptional circumstances necessary to justify abstention, Defendants' Motion to Dismiss should be denied.

### C. Defendants Motion Under Rule 12(b)(6) Should Be Denied

Defendants' motion to dismiss all claims asserted by Heriot and all claims asserted against Defendant Rainone under Rule 12(b)(6) should be denied. Plaintiffs properly plead a claim of Unjust Enrichment against Defendant Rainone. Moreover, Plaintiff Heriot asserts a claim for Unjust Enrichment against all Defendants on the basis of "Heriot and Defendant Byrne's understanding and representations that Heriot was entitled to a net percentage of profits." Cmplt. ¶ 83. Defendants' motion should therefore be denied. Should the Court grant Defendants' motion, Plaintiffs respectfully request leave to amend.

Dated: June 16, 2008

Respectfully submitted,

/s/ Paul L. Price
Paul L. Price
Counsel for Plaintiffs

15