IN THE UNITED STATES DISTRICT COURT'
FOR THE NORTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DREW HERIOT and                              )        Civil Case No: 08CV2272
DREW PICTURES PTY LTD.,                      )        The Honorable Suzanne B. Conlon
                                             )
     Plaintiffs,                             )
                                             )
RHONDA BYRNE, THE SECRET, LLC                )
(AKA TS HOLDINGS LLC), PRIME TIME            )
US INC., TS PRODUCTION HOLDINGS              )
LLC, TS PRODUCTION LLC,                      )
TS MERCHANDISING LTD., AND                   )
ROBERT E. RAINONE, JR.                       )

## NOTICE OF FILING OF EXHIBITS TO RESPONSE TO MOTION TO DISMISS

Plaintiff, DREW HERIOT by and through its attorneys HEPLER, BROOM,
MACDONALD, HEBRANK, TRUE & NOCE, LLC, hereby gives notice of filing of
Exhibits A-E from our Response to Defendants' Motion to Dismiss.


Paul L. Price
HEPLER, BROOM, MACDONALD,
HEBRANK. TRUE & NOCE, LLC,
Attorney for the Plaintiff
150 N. Wacker Drive
Suite 3100
Chicago. IL 60606
plp@heplerbroom.com

# EXHIBIT A

# DECLARATION OF DREW HERIOT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Drew Heriot and Drew Pictures Pty Ltd., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | Civil Case No. 08cv2272 |
| | § | |
| Rhonda Byrne, | § | The Honorable Suzanne B. Conlon |
| The Secret LLC (AKA TS Holdings LLC) | § | |
| Prime Time US Inc., | § | |
| TS Production Holdings LLC, | § | |
| TS Production LLC, | § | |
| TS Merchandising Ltd., And | § | |
| Robert E. Rainone Jr. | § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF DREW HERIOT

I, Drew Heriot, declare under penalty of perjury, under the laws of the United
States of America, that the following is true and correct, and is based upon my personal
knowledge or upon information which has been provided to me by others and which I am
informed and believe to be true, and to which I am competent to testify:

1.      I am a motion picture writer and director located in Los Angeles, California. I am
an Australian citizen but have been a United States resident since March 2006. I am
currently in the United States on an O-1 Visa, which is reserved for foreign nationals of
"extraordinary ability in the sciences, arts, education, business or athletics" and is valid
until January 2010. I am engaged to be married next month to Jennifer Nell Keller, a
United States citizen. I will be applying for permanent residency status and intend to
remain in the United States.

- 1 -

2.      Because of the cost and difficulty involved in travelling to Australia, since I have
lived in the United States, I have only been able to return on two occasions - once for the
wedding of my mother and the other for the wedding of my sister. In total, those trips
cost over $3,000 in airfare alone. I do not have any plans to return to Australia, and
additional trips would be burdensome, both in travel expenses and in time lost from
pursuing my career as a director.

3.      I am a director and the sole shareholder of my company, Drew Pictures Pty, Ltd.
("Drew Pictures"). Drew Pictures is not a going concern. Aside from holding copyright
in my work, Drew Pictures does not conduct any current business operations, has not
conducted business operations in Australia since March 2006, and has no significant
assets. Drew Pictures' "principle place of business" of Unit 1/9 Ashby Grove Ivanhoe,
Victoria 3079 Australia, is the residence of my father, Ian Heriot. Drew Pictures'
business records, including invoices, the "Rundowns," the "2 Hr Paper Edit" and the
"tranSCRIPT" that I created are all located in the United States, not Australia. Any
additional records relating to Drew Pictures, if not in my possession, would be in the
possession of my Australian accountant Arthur Ioannou or my father, Ian Heriot. Those
records are under my control and can be obtained quickly and with little expense.

4.      From January 2005 through March 2006, my company, Drew Pictures, worked
with Prime Time Productions in creating the movie and other works related to *The Secret*.
Prime Time Productions retained my services to develop and Direct *The Secret*. Drew
Pictures invoiced Prime Time Productions for my services in addition to the services of
several employees of Drew Pictures. Drew Pictures paid employment and other taxes for
all of its employees.

- 2 -

5.      The Consultancy Agreement referenced in Mr. Paul Harrington's Declaration was for a prior collaborative project between Prime Time Productions and Drew Pictures, where I was retained as Director.  Under Paragraph 1, the Consultancy Agreement expired on October 15, 2004, before Drew Pictures and its employees commenced work on *The Secret*.  The Consultancy Agreement was not renewed, at any time, by either Drew Pictures, myself, Prime Time Productions, and/or Rhonda Byrne.  Rather, at the insistence of Rhonda Byrne, the work performed by Drew Pictures, both in Australia and the United States, was based on an oral agreement.

6.      At no time did I ever sign (nor would I have signed) an agreement surrendering Drew Pictures or my intellectual property rights.

7.      At no time was I ever an employee of Prime Time Productions or Rhonda Byrne.

8.      From approximately January 2005 through July 2005, Drew Pictures worked with Prime Time Productions to develop a project we named *The Secret*.  During this time, there were only three people involved in that effort: me, Rhonda Byrne, and Paul Harrington.  My work during this time can be confirmed by Skye Byrne, who currently resides in Los Angeles, California, and Leni Mex, who also resides in Los Angeles, California.

9.      From approximately July 2005 to August 2005, I traveled to the United States to film interviews that would constitute the principal footage to be used in the movie.  In the United States, I directed interviews of the following people, who I understand are United States citizens and are currently located in the United States: Bill Bauman, Bill Harris, Bob Doyle, Bob Proctor, Bob Scheinfeld, Chris Attwood, Janet Attwood, Dan Kuschell, Dr. Denis Waitley, Fred Johnson, Hale Dwoskin, Ivan Misner, Jack Canfield, JC Wilhite,

John Assaraf, John DeMartini, Lee Bower, Lisa Nichols, Marcia Martin, Marci Shimoff, Marie Diamond, Marshall Thurber, Jan Thurber, Mike Dooley, Paul Scheele, Pete Bisonnette, Teresa Romain, Morty Lefkoe, Raymond Aaron, Jerry Hicks, and Esther Hicks. I directed two additional interviews in Australia of David Schirmer and David Cameron Gikandi. Of the 32 interviews I personally directed, 15 were included in the *The Secret* (Original Edition).

10.     Aside from the American film crew we used, and the U.S. citizens I directed, my participation in these interviews can be confirmed by Rhonda Byrne, and Leni Mex, who reside in California.

11.     In or around August 2005, Rhonda Byrne conducted interviews of the following people, who I understand are United States citizens and are currently located in the United States: Alan Hickman, Christopher Guerriero, Debbie Ford, Dr Alex Loyd, Dr. Ben Johnson, Dr John Hagelin, Fred Alan Wolf, Gaye Hendricks, Paul Williams, Katie Hendricks, James Ray, Jan Stringer, Jay Abraham, Joe Vitale, John Gray, Judith Orloff, Liz Thompson, Loral Langemeier, Catherine Oxenberg, Casper Oxenberg, Mark Victor Hansen, Michael Beckwith, Morris Goodman, Cathy Goodman, Neale Donald Walsch, Sonia Powers, and Stephen M. R. Covey. Of those interviews, only 10 were included in *The Secret* (Original Edition). Although I did not personally direct the filming of these interviews, they were reviewed, selected, edited, and included in the movie by me.

12.     All interviews were transcribed, under my supervision, by Leni Mex, an employee of Drew Pictures, and by Skye Byrne. Both Leni Mex and Skye Byrne currently reside in California. Some transcription was also done by Jesse Oldfield, who resides in Australia, and a professional transcribing company.

- 4 -

13.     I reviewed the transcripts, selected portions to use, and arranged them in a document called the "2 Hr Paper Edit," largely by myself.  My work on the "2 Hr Paper Edit" can be confirmed by Leni Mex, who resides in California.

14.     The "2 Hr Paper Edit" eventually evolved into a document I called the "tranSCRIPT," where dramatic scenes were written to weave between the interviews. The dramatic writing was done by me, Paul Harrington, and Rhonda Byrne.

15.     With the writing complete, I supervised the filming of dramatic footage.  As the Director, the editing, graphics design, sound, and color grading of the entire movie was supervised by me, in accordance with my creative direction.  My work can be confirmed by Rhonda Byrne, Skye Byrne, and Leni Mex, who all reside in California.  In addition, my work can be confirmed by Paul Harrington, Damien Corboy, Marc Goldenfein, and James Armstrong, who reside in Australia.

16.     *The Secret* (Original Edition) was first offered for commercial sale, through internet streaming technology, in the United States on March 2006.  Sales in Australia were strictly prohibited, and security measures were taken to block users with Internet Protocol (IP) addresses located in Australia from purchasing or otherwise viewing the movie.  My understanding is that sales were not permitted in Australia until on or around February 2007.

17.     To ascertain how much content in *The Secret* (Original Edition) originated in America and how much originated in Australia, I personally reviewed and timed the content in *The Secret* (Original Edition) shot by shot.  The result is that 60.38% of the content is American and only 39.62% of the content is Australian.

- 5 -

18.     In July 2007 my company and I retained the services of Jon Reichman, a copyright attorney based in New York. I engaged Mr. Reichman to pursue any and all claims in the United States that Drew Pictures or I may have relating to my contributions to the screenplay, book, and movie known as *The Secret*, including any and all U.S. copyright claims.

19.     I instructed Mr. Reichman to negotiate a settlement, if any, that could be obtained on my behalf. Barring settlement, Mr. Reichman was to help me find trial counsel to proceed with an action in United States District Court, and to assist such trial counsel.

20.     Mr. Reichman assisted me in registering my and Drew Pictures' copyright interests with the U.S. Copyright office, which was granted in September 2007.

21.     On October 19, 2007, I was informed by my father, Ian Heriot, that he had been served with process in an action that was brought against me and Drew Pictures by TS Production in Federal Magistrates Court in Melbourne. According to the notice, a hearing had been set for November 8, 2007, at 9:30 a.m.

22.     With financial assistance from family and friends, I retained the Australian firm of Mallesons Stephens Jaques to represent me and Drew Pictures in the Australian proceeding. I advised my Australian attorneys that I still wanted to preserve and ultimately assert my and Drew Pictures' rights in the United States.

23.     I asked Jon Reichman, and others, for trial attorney recommendations to assert my rights in the United States, and began actively searching for trial counsel.

24.     Based on those recommendations, in January 2008 I contacted Mark Werbner, of Sayles Werbner PC, who agreed to investigate my claims. In February and March of 2008, I instructed Mr. Reichman and my Australian counsel to provide Sayles Werbner

PC with all documents related to my claims and to assist them in their investigation and due diligence.

25.    On April 15, 2008, I formally retained Sayles Werbner PC as trial counsel and authorized them to initiate a lawsuit on my and Drew Pictures behalf and pursue any and all claims related to my work on "The Secret." They filed this lawsuit on my behalf on April 21, 2008.

26.    I have instructed my Australian counsel to move for a stay of the Australian proceedings.

27.    Since the Australian action was initiated against me and Drew Pictures, my ability to assist in my defense has been constrained given my location in the United States. Given the time difference, my primary means of working with my Australian counsel is through email. Based on my commitments in the United States, it is also unlikely that I can attend any procedural hearings in Australia in person. I understand from my Australian counsel that evidence from the United States will be required to adequately defend my claims, which will increase my legal costs. Moreover, I understand from my Australian counsel that an Australian court is unlikely to accept jurisdiction over the claims that I have asserted in this proceeding and that an Australian court will not recognize a copyright claim for infringement that does not occur in Australia. Should the Australian proceeding go to trial, I will only be able to attend and participate in that trial at enormous financial and personal expense.

Signed on this 16th day of June, 2008, in Los Angeles California.

Drew Heriot

- 7 -

# EXHIBIT B

# DEPOSITION OF RHONDA BYRNE

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


TS Merchandising Ltd., a          )
British Virgin Islands            )
corporation, and TS               )
Production, LLC, a Hungarian      )
limited liability company,        )
                                  )
            Plaintiffs,           )
                                  )
    -vs-                          )          No. 07 C 6518
                                  )
Dan and Loretta Hollings,         )
Arizona residents, and Web        )
Services, LLC, an Arizona         )
limited liability company,        )
                                  )
            Defendants.           )
_____   )


C O N F I D E N T I A L

DEPOSITION OF RHONDA BYRNE

Los Angeles, California

May 6, 2008


CAROL LYNN COX,

CSR No. 5128

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                       EASTERN DIVISION

 4

 5
         TS Merchandising Ltd., a      )
 6       British Virgin Islands        )
         corporation, and TS           )
 7       Production, LLC, a Hungarian )
         limited liability company,    )
 8                                      )
                         Plaintiffs,   )
 9                                      )
             -vs-                       )        No. 07 C 6518
10                                      )
         Dan and Loretta Hollings,     )
11       Arizona residents, and Web    )
         Services, LLC, an Arizona     )
12       limited liability company,    )
                                        )
13                       Defendants.   )
         _____)

14

15

16                   C O N F I D E N T I A L

17            DEPOSITION OF RHONDA BYRNE, taken on

18            behalf of the Defendants, at 11355 West

19            Olympic Boulevard, Suite 900, Los Angeles,

20            California, commencing at 10:00 a.m., on

21            on Tuesday, May 6, 2008, before Carol

22            Lynn Cox, CSR No. 5128.

23

24

25
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 3

```
 1   A P P E A R A N C E S :

 2

 3        FOR THE PLAINTIFFS:

 4             SQUIRE, SANDERS & DEMPSEY, L.L.P.
               BY:  BRIAN A. CABIANCA, Attorney at Law
 5                  CHRISTOPHER I. CEDILLO, Attorney at Law
               Two Renaissance Square, Suite 2700
 6             40 North Central Avenue
               Phoenix, Arizona 85004-4498
 7             602.528.4000

 8

 9        FOR THE DEFENDANTS:

10             MOZLEY, FINLAYSON & LOGGINS LLP
               BY:  CHRISTOPHER E. PARKER, Attorney at Law
11             One Premier Plaza, Suite 900
               5605 Glenridge Drive
12             Atlanta, Georgia 30342
               404.256.0700

13

14
          ALSO PRESENT:
15
               GREG CLUBB, Videographer
16             MIKE GARDINER
               ROBERT RAINONE
17             DAN HOLLINGS

18

19

20

21

22

23

24

25
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

```
                                                        Page 4
 1                          I N D E X

 2

 3

 4    W I T N E S S :

 5                                               Page

 6    RHONDA BYRNE

 7            Examination by Mr. Parker              6

 8

 9

10    INFORMATION TO BE INSERTED:

11              (None)

12

13

14    UNANSWERED QUESTIONS:

15              (None)

16

17

18    EXHIBITS:

19    Defendants'        Description          Marked

20        1       Three-page E-mail chain dated      40
                  at the top 9-26-05
21
          2       Six pages, the first page          46
22                containing an E-mail dated
                  9-24-05
23
          3       One-page E-mail dated 2-28-07      62
24

25
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 5

1          Los Angeles, California; Tuesday, May 6, 2008

2                        10:00 a.m.

3                            *

4                          -o0o-

5                            *

6          THE VIDEOGRAPHER:  This is the deposition of

7      Rhonda Byrne in the matter of TS Merchandising, Ltd.,

8      et al. versus Dan and Loretta Hollings, et al.,

9      pending before the U.S. District Court, Northern

10     District of Illinois, Eastern Division, Case

11     No. 07 C 6518.

12             The deposition is being videotaped on

13     behalf of the defendant.  This recording is taking

14     place at 11355 West Olympic Boulevard on the tenth

15     floor in L.A.

16             My name is Greg Clubb, an associate of

17     Abbott Legal Video, located at 1150 South Olive Street

18     in L.A.  Today's date is May 6, 2008.  The time is

19     10:00 a.m.

20             Counsel, if you would, please, introduce

21     yourselves and state your appearances.

22         MR. CABIANCA:  Brian Cabianca and Christopher

23     Cedillo with Squire, Sanders & Dempsey, representing

24     the plaintiffs.

25         MR. PARKER:  Christopher Parker on behalf of the

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 6

1    defendants, Dan and Loretta Hollings and Web Services,
2    LLC.
3              So the video and audio record is clear, I
4    believe we also have present with the plaintiffs in
5    this case Mr. Mike Gardiner, who is I'm told in-house
6    counsel for Prime Time Productions.  Did I get your
7    title right?
8         MR. GARDINER:  Counsel for TS Production.
9         MR. PARKER:  TS Production.  I'm sorry.  And also
10   Bob Rainone.
11             Would you swear the witness in, please.
12                          *
13                     RHONDA BYRNE,
14             having been placed under oath, was
15             examined and testified as follows:
16                          *
17                     EXAMINATION
18   BY MR. PARKER:
19        Q    Good morning.  To start with, would you
20   state your name for the record, please.
21        A    Rhonda Byrne.
22        Q    And could you spell your last name for us?
23        A    B-y-r-n-e.
24        Q    Ms. Byrne, have you ever given a
25   deposition before?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

|     |   |                                                       |
| --- | - | ----------------------------------------------------- |
| 1   | A | No, not that I'm aware of, no.                        |
| 2   | Q | Have you ever testified in any court or               |
| 3   |   | judicial proceedings of any type?                     |
| 4   | A | No.                                                   |
| 5   | Q | The format today is fairly easy, but just             |

1        A        No, not that I'm aware of, no.

2        Q        Have you ever testified in any court or

3        judicial proceedings of any type?

4        A        No.

5        Q        The format today is fairly easy, but just

6        to make sure that we're both on the same wavelength as

7        we begin --

8        A        Uh-huh.

9        Q        -- I will ask you some questions and I'm

10       limited in the scope of my questioning by an order of

11       the court.  The questions I'll be asking you today

12       will relate to jurisdictional issues in a lawsuit that

13       is pending in Chicago.

14               As I ask those questions, I will rely upon

15       you to give oral responses, spoken responses.  While

16       the video can help capture gestures, we also have a

17       written transcript being created that requires you to

18       use words so that we're very clear.

19               If at any time you do not understand a

20       question I ask you for whatever reason, if you would,

21       please just let me know and I'll attempt to cure

22       whatever the defect is or offer further explanation.

23       Does that make sense?

24       A        Uh-huh.  Yes, it does.

25       Q        Along those lines, giving an oral response

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 8

1    as opposed to head shakes, if you can use a clear

2    "Yes" or a "No," it makes it easier for the court

3    reporter.  While you and I may understand it --

4         A    Yes.

5         Q    -- someone reading the transcript may not

6    at a later date.

7         A    Yes.

8         Q    Are you taking any types of medications

9    that would affect your ability to answer questions

10   here today?

11        A    No.

12        Q    Have you looked at any documents in

13   preparation for your deposition?

14        A    Can you clarify documents?

15        Q    Things that may be written on paper or

16   electronically in an E-mail or a document.

17        A    Right, okay.  I have seen a couple of

18   E-mails.

19        Q    Do you know what the subject matter or

20   dates of those E-mails were?

21        A    I don't know the dates.

22        Q    Do you know what the subject matter of

23   those documents were?

24        A    They were either -- they were E-mails from

25   me to Dan.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 9

1      Q    At any time have you looked at the
2  complaint in this lawsuit?
3      A    Not that I'm aware of.
4      Q    Now, as we began your testimony, the court
5  reporter gave you an oath.  Just so we're clear, you
6  understand that that is an oath to tell the truth just
7  as if you were in an actual courtroom?
8      A    I do.
9      Q    Under penalty of perjury, correct?
10     A    I do.
11     Q    Along those lines, since we want to be sure
12  that we're getting your testimony very carefully
13  today, if at any time you feel the need to amend or
14  modify a prior response to a question --
15     A    Uh-huh.
16     Q    -- if you would, please, let me know and
17  I'll certainly give you the opportunity to do that.
18  Sound fair?
19     A    Yes.
20     Q    Okay.  I don't think we're going to be here
21  for an extraordinarily long period of time today, but
22  if you need a break at any time, for the rest room or
23  anything along those lines, just let me know and we'll
24  try to accommodate that as well.
25     A    Thank you.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1     Q     Other than looking at these E-mails that
2   you've described, have you done anything else to
3   prepare for your deposition here today?
4     A     Only that I had a conversation with counsel
5   last week which was -- I'm not sure what amount of
6   time -- maybe half an hour to an hour, just so I could
7   become familiar with the proceedings, and yesterday --
8   I met with them yesterday.
9     Q     What is your current address?
10    A     900 Hot Springs Road, Santa Barbara.
11    Q     California?
12    A     Yes.
13    Q     Okay.  And how long have you been at that
14   address?
15    A     Almost one year.
16    Q     And is that a home or apartment?  What kind
17   of dwelling is that?
18    A     That's a home.
19    Q     And what other addresses have you had in
20   the preceding five years?
21    A     Residential addresses, do you mean?
22    Q     Yes, ma'am.  Yes.
23    A     I lived for one year in Santa Monica at
24   Archstone Suites in Santa Monica.  And I can't recall
25   the exact address there.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1        Q       That's Santa Monica, California, correct?

2        A       Santa Monica, California.

3        Q       Okay.

4        A       And prior to that, I lived at No. 2 Hope

5    Street, South Yarra, Victoria, Australia.

6        Q       With those three addresses you've given me,

7    does that encompass the last five years of your

8    dwellings?

9        A       Yes.  Yes.

10       Q       Okay.

11       MR. CABIANCA:  I don't want to interrupt, but I

12   just don't want to get -- I designate this transcript

13   as confidential pursuant to the protective order that

14   we have.  And if we need to work it out after I get a

15   transcript, if you want me to go through certain parts

16   that I'd designate confidential.  But until I get an

17   opportunity to do that, I'd designate the whole thing

18   as confidential.

19       MR. PARKER:  Okay.

20       MR. CABIANCA:  I apologize for the interruption.

21       MR. PARKER:  No.  That's fine.  Based on our

22   discussions prior, I assumed you were doing that.  I

23   will ask you when the transcript is available to go

24   through and make those specific designations.

25       MR. CABIANCA:  Fine.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

```
 1          MR. PARKER:  Also, just so we're clear on the
 2     record, the reporter and videographer have subscribed
 3     to the confidentiality order.  I will leave it to you
 4     to obtain similar subscriptions on behalf of
 5     Mr. Gardiner and Mr. Rainone.
 6          MR. CABIANCA:  Absolutely.
 7     BY MR. PARKER:
 8          Q    Back to you, Ms. Byrne.
 9          A    Yes.
10          Q    Have you ever lived in Illinois?
11          A    Have I lived in Illinois?  I was in
12     Illinois for two months.  So during that two months, I
13     was there for the whole two months.  So I'm not sure
14     if that --
15          Q    When were those two months?
16          A    March and April 2006, I think.
17          Q    During that time did you also maintain your
18     Santa Monica residence that you described before?
19          A    I hadn't taken up that Santa Monica
20     residence at that time.
21          Q    So you moved -- just am I right
22     chronologically that you moved from Australia, spent
23     two months in Chicago, and then moved to Santa Monica?
24          A    That's right.
25          Q    Where in Sant- -- where in Illinois did you
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 13

1   live?

2       A       I stayed at, if I recall, two or three

3   different places, Drake Hotel and another hotel.  I

4   don't remember the name of it.  And at a friend's.

5       Q       Okay.  And was it your intention when you

6   left Australia to reside in Illinois or was that a

7   stopover towards California?

8       A       I didn't have any intention either way.

9       Q       Okay.  Do you maintain any offices in

10  Illinois?

11      MR. CABIANCA:  Objection to form.

12      THE WITNESS:  When you say do I retain offices,

13  do you mean the companies that I'm connected with?

14  BY MR. PARKER:

15      Q       Well, is there any place in Illinois where

16  you have an office that you work out of for yourself

17  personally or any companies with which you're

18  associated?

19      A       There are offices in Illinois of which I'm

20  associated and which people work out of that are

21  associated with me and the company.

22      Q       Okay.  Do you personally have dedicated

23  office space in any of those facilities?

24      A       No, I don't.

25      Q       Now, what companies that you're associated

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

 1   with have offices in Illinois, as you've just

 2   described it?

 3        A    I actually don't know the names of all of

 4   the companies because that particular area, the

 5   business structure and the companies, isn't an area

 6   that I work in, and so I'm not familiar with the names

 7   of them to be able to answer that accurately.

 8        Q    Are they -- are these companies associated

 9   with THE SECRET?

10        A    Yes.

11        Q    Just so we're clear on the record, how

12   would you describe THE SECRET?

13        MR. CABIANCA:  Objection to form.

14   BY MR. PARKER:

15        Q    You just answered a question for me that

16   referenced the word THE SECRET.  I just want to make

17   sure we have the same understanding on, you know, what

18   you answered in terms of what THE SECRET is.

19        A    Well, if you're asking me the philosophy of

20   THE SECRET or the content of THE SECRET --

21        Q    No.  What I'm asking -- and that's a good

22   reason I'm asking because I want to make sure we're

23   clear -- you said you have certain businesses

24   associated with THE SECRET.

25        A    Yes.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

 1      Q      What is the function of those businesses?

 2      A      The function -- the function of those

 3   businesses is to manage and look after the products of

 4   THE SECRET.

 5      Q      And am I correct that THE SECRET is a book

 6   and then related video content that you have published

 7   relating to the philosophies described within that

 8   book?

 9      A      THE SECRET is a book and it is a film that

10   we made, and they're the two main -- two main

11   manifestations, the two main products of THE SECRET.

12      Q      Okay.  There's some peripheral products and

13   things that go along with that as well?

14      A      Well, there's an audio book of the book.

15   There are derivatives.  There is an audio book of the

16   book and there is an audio soundtrack of the film,

17   but those two things are the main two things.

18      Q      Okay.  And the companies that you have that

19   are in Chicago relate to these products, as you've

20   described it, correct?

21      A      The -- I assume they do, yes.

22      Q      All right.  What is your role with THE

23   SECRET?

24      A      If I were to sum it up in one title which

25   would probably be easiest, it would be to say creator.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 16

1       Q      Okay.  And when did you first assume that
2    role?
3       A      Within -- within my heart, end of
4    September, early October 2004.  Within my heart, the
5    concept was realized.  So one could say from that
6    moment, I knew what I was going to do in creating the
7    film.
8       Q      And did that progress to a tangible or
9    business-related enterprise?
10      A      Did THE SECRET evolve into a business
11   enterprise?
12      Q      Yes, ma'am.
13      A      Yes.
14      Q      And when did that occur?
15      A      You know, I can't answer that because I was
16   making a film, and I leave all of those areas to
17   business advisors and the business people, so...
18      Q      Well, let me ask it this way, then.  When
19   did you begin making the film?
20      A      Well, there are various stages of a film.
21   There's pre-production and then there's production and
22   post production.  There's also a period prior to that
23   which is preparation for pitch.  So which particular
24   one would you like to know?
25      Q      The earliest.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 17

```
 1      A      The earliest?

 2      Q      Yes, ma'am.

 3      A      That would have been around about

 4   January -- the following January of the September or

 5   October, so...

 6      Q      January of '05?

 7      A      Yes.

 8      Q      Where were you when you started these

 9   pre-production activities?

10      A      I was in Australia at the time initially.

11      Q      I detect an accent in your voice.  Are you

12   from Australia originally?

13      A      I'm Australian.

14      Q      Prior to THE SECRET, had you ever been

15   involved in a business with offices in the United

16   States?

17      A      Could you repeat the question, please?

18      Q      Uh-huh.  Prior to your creation and the

19   pre-production efforts that you've described to me

20   relating to THE SECRET, did you have any business

21   interests in the United States?

22      A      My immediate answer to that would be no.

23   But because I was a production company, I did deal

24   with businesses all over the world.  So I had

25   relationships with businesses everywhere, including --
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1    including in the United States.  So I just wanted to

2    be sure I was answering the question accurately.

3        Q    Okay.  I appreciate that.

4             What was the name of your production

5    company?  Was it Prime Time?

6        A    Prime Time Productions.

7        Q    Did Prime Time prior to THE SECRET maintain

8    any offices in the United States?

9        A    No, I don't believe so.

10       Q    How often are you at your company's offices

11   in Illinois?

12       A    I visit -- I go there for -- go there a few

13   times a year.

14       Q    Is it for the purpose of meeting with your

15   employees there?

16       A    Yes.

17       Q    Do you recall when you first established

18   offices in Illinois for your companies?

19       A    The business side of -- business side of

20   the companies handled all of that.  I wasn't involved

21   in that.  So I don't recall.

22       Q    One of the plaintiffs in this case is a

23   company named TS Merchandising Limited.  Is that one

24   of your companies?

25       MR. CABIANCA:  Objection to form.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 19

```
 1          THE WITNESS:  One of the entities of THE SECRET,
 2     do you mean?
 3          MR. PARKER:  Yes.  Yes.
 4          THE WITNESS:  Yes, I think it is.  I think it
 5     is.  I'm not familiar with all of the titles, but I
 6     think so.
 7     BY MR. PARKER:
 8          Q     Do you know if you have any ownership
 9     interest in TS Merchandising Limited?
10          A     I would assume that I do, but I don't know
11     absolutely.
12          Q     Who would know that?
13          A     Bob Rainone, CEO.
14          Q     Do you know if you have any titles or
15     offices with TS Merchandising Limited?
16          A     I'm not sure what you mean by titles.
17          Q     Well, I've seen different titles in
18     different documents relating to this litigation that
19     you've used such as executive director.
20          A     Executive producer.
21          Q     Executive producer.  Do you have any
22     titles, like presidency, vice president, anything
23     along those lines that you're aware of with TS
24     Merchandising?
25          A     I think there are probably titles, but I
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 20

1    don't recall what they are.

2         Q    Okay.  According to the complaint, that's

3    listed as a British Virgin Islands corporation.  Do

4    you have any knowledge as to why TS Merchandising is a

5    corporation in the British Virgin Islands?

6         A    All of that whole structure of the business

7    is managed by the people who do the business.

8         Q    Okay.

9         A    So I don't -- I don't involve myself in

10   that.

11        Q    Do you own any properties in the British

12   Virgin Islands?

13        A    Not that I'm aware of.

14        Q    Do you know if you have any offices for any

15   of your companies in the British Virgin Islands?

16        A    I don't know.

17        Q    One of the other plaintiffs in this case is

18   TS Production, LLC, and it's listed as Hungarian

19   limited liability company.  Do you have any knowledge

20   as to why that company is domiciled in Hungary?

21        A    I don't know.

22        Q    Do you know any property in Hungary?

23        A    Not that I'm aware of.

24        Q    Do you know if TS Production, LLC own any

25   property --

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 21

```
1        A      I don't know.

2        Q      -- in Hungary?

3        A      I don't know.

4        Q      Have you ever been to Hungary?

5        A      I haven't.  Or actually have I?  I could

6   have passed through there at the airport.  I'm not too

7   sure.  I don't want to say I haven't without going

8   through my passport, but I don't think so.

9        Q      Do you recall when you first established an

10  office in Illinois?  By "you," I mean your companies.

11       A      Entities.  Because they were- -- because

12  they weren't established by me but established by the

13  business people, that's why I have difficulty in

14  recalling dates.  I can't be sure as I sit here.  I

15  just can't be sure.

16       Q      Do you have any relatives in Illinois?

17       A      Huh.  Not -- no, not what most people would

18  consider relatives, no.

19       Q      You may have close friends or -- I'm not  .

20  sure I understand your answer.

21       A      I don't have blood relatives living in

22  Illinois.  I just -- I just consider us all one family

23  of humanity, so that's --

24       Q      Gotcha.  Do you currently own any property

25  in Illinois?
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1          MR. CABIANCA:  Objection to form.

2          THE WITNESS:  Because I'm not aware of the

3     structures of the business, I don't know.

4     BY MR. PARKER:

5          Q     What is your current role with THE SECRET

6     and the entities that you have created to further that

7     or administer the business side of that?

8          MR. CABIANCA:  Objection to the form.

9              You can go ahead.

10         MR. PARKER:  That's fine.

11         THE WITNESS:  Could I just have the first part

12    of your question again, please?

13    BY MR. PARKER:

14         Q     Yeah.  You've described for me that there

15    are some companies that have offices in Illinois that

16    relate to THE SECRET.  You're familiar in general

17    terms with those, correct?

18         A     Yes.  There are -- I know that there are

19    companies, yes, in Illinois that are connected with

20    THE SECRET.

21         Q     Okay.  And at least two of those are the

22    plaintiffs in this case, TS Merchandising and TS

23    Production, correct?

24         A     I -- I don't know if that's the case.

25         Q     What is your present role with THE SECRET?

Karyn Abbott & Associates
(213) 749-1234 * (800) 266-2268

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1          A        Creator.

2          Q        Do you have involvement in the day-to-day

3      business affairs of the company?

4          A        I don't at all.

5          Q        To the best of your understanding, are you

6      in a position to control the manner in which THE

7      SECRET properties are utilized and marketed?

8               MR. CABIANCA:   Objection to form.

9               THE WITNESS:   I'd just like to be clear on that

10     question.   Could you ask -- could you restate that

11     question for me?

12     BY MR. PARKER:

13         Q        Absolutely.

14         A        Thank you.

15         Q        And if you don't understand something I

16     ask, please just ask me and I'll be happy to rephrase

17     it for you any time.

18         A        Thank you.

19         Q        What I'm trying to understand is to get

20     your understanding as to whether or not you have the

21     ability to control how THE SECRET is marketed and its

22     business objectives.

23         A        The two things that you spoke of then,

24     marketed and business objectives, I see as two areas

25     that are quite different.   So, for example, the whole

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 24

1   philosophy and approach of how THE SECRET would be

2   released was handled by the creative team.  So I see

3   them as slightly separate.

4        Q     Who headed that creative team?

5        A     I headed the creative team because I

6   created THE SECRET.

7        Q     Has there been any change in that

8   relationship since THE SECRET has been released?

9        A     In relationship with?

10       Q     The creative team.  Are you still the head

11  of it?

12       A     Well, it has different divisions.  So I'm

13  head of -- I'm head of the section in California, the

14  creative team in California, and we do have a head in

15  Australia.

16       Q     Is there a creative team in Illinois?

17       A     I consider everyone to be creative.  But to

18  my knowledge, huh, it wouldn't be correct to say no.

19  It's kind of neither yes nor no.  It's there are some

20  people there that I think are doing creative work,

21  so...

22       Q     What type of work that you're aware of is

23  being performed in Illinois?

24       A     What I'm aware of is business, all of the

25  business management and management of distribution and

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1    it would be many, many other things, I'm sure.

2        Q        To put some timing perspective on this, is

3    it an accurate statement to say that the Illinois

4    business functions relating to THE SECRET started

5    either at the time or shortly after you brought

6    Mr. Rainone into the project?

7        MR. CABIANCA:  Could you repeat that just for me?

8    I'm sorry.

9        MR. PARKER:  Do you want the court reporter to?

10   It was longer than my mind permits.  Could you read

11   that back?

12             (At which time the record was read

13         as follows:

14             "Q     To put some timing perspective

15         on this, is it an accurate statement to say

16         that the Illinois business functions relating

17         to THE SECRET started either at the time or

18         shortly after you brought Mr. Rainone into

19         the project?")

20       MR. CABIANCA:  Thank you.

21       THE WITNESS:  I would say most likely that is the

22   case, but I don't know.  I can't be sure.

23   BY MR. PARKER:

24       Q        You don't have any recollection of having

25   any business operations in Illinois before Mr. Rainone

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 26

1    joined your team, do you?

2        A    I did have business associations in

3    Illinois, yes.

4        Q    Did they -- what type of business

5    associations?

6        A    There was a person that I knew in

7    Illinois who -- who I say business associate, but very

8    supportive of THE SECRET and everything that I was

9    doing, and that is the person that I had in mind.

10   So, yeah, I just wanted to be accurate in answering

11   you.

12       Q    Okay.

13       A    So I think your question was did I have

14   any -- I had been to Illinois, visited Illinois, quite

15   a few times, yeah, prior to Bob Rainone.

16       Q    Was it for business purposes relating to

17   THE SECRET?  These prior visits I'm referring to.

18       A    As I sit here, I don't recall.  I would

19   have to spend some time thinking back to be able to do

20   that.  In this moment, I don't recall.

21       Q    Who was the person that you're referring

22   to?

23       A    Edmond Murphy.

24       Q    Is he still involved with THE SECRET?

25       A    I think he may be, but I'm not too sure.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1      Q      In relation to the business operations of

2   THE SECRET, does Mr. Rainone report to you in the

3   hierarchy?

4      A      That wouldn't be -- I don't think that it

5   would be accurate to say that.  We, Bob Rainone and I,

6   communicate I guess is more the -- the reason.  I

7   couldn't say there's a hierarchy at all.

8      Q      Does he consult with you on major

9   decisions -- well, strike that.  Let me ask the

10  question differently.

11          Are you aware of any business decisions

12  Mr. Rainone has made without consulting you relating

13  to THE SECRET?

14     A      Am I aware of any business decisions he has

15  made without consulting me?

16     MR. CABIANCA:  Could I have the question read

17  back?  Because I think what she repeated is different

18  than the question you asked.

19     THE WITNESS:  Oh.

20     MR. PARKER:  Sure.  You can read it back.

21          (At which time the record was read

22     as follows:

23              "Are you aware of any business

24          decisions Mr. Rainone has made without

25          consulting you relating to THE SECRET?")

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1          MR. CABIANCA:   Objection to the form.

2          THE WITNESS:   I don't know either way.

3     BY MR. PARKER:

4          Q     Okay.   You identified before an entity.   I

5     think you described it as Prime Time Productions.

6          A     Prime Time Productions.

7          Q     What is Prime Time productions?

8          A     Well, Prime Time Productions, when I spoke

9     about it, I spoke about it as it was a production

10    company, a film production company.   But to tell you

11    the truth, I'm not sure if that entity exists now.

12         Q     To the best of your knowledge and

13    understanding, did Prime Time Productions produce

14    THE SECRET?

15         A     Because it began that way, but then I'm not

16    sure with the structures and everything, yeah.   So I

17    don't know how -- I'm trying to answer your question

18    accurately.   But I mean that Prime Time Productions

19    was the entity when I first -- in September, October

20    '94 when I first discovered THE SECRET.   But then over

21    the following year, there are many, many business

22    structural changes, so...

23         Q     Just so I'm clear, then, at the time you

24    began the project that became known as THE SECRET --

25         A     Uh-huh.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1    Q    -- you were putting that together through

2    your company Prime Time Productions?

3    A    Yes.  To the best of my knowledge, yes.

4    Q    Where -- at that time where was Prime Time

5    Productions based?

6    A    Australia.

7    Q    And that's where you lived at the time as

8    well, correct?

9    A    Yes.

10   Q    And you're not sure if Prime Time

11   Productions still exists?

12   A    I'm not sure if it still exists in an

13   entity of what it first was because there have been

14   many structural changes.  So I think it would, but I'm

15   not too sure.

16   Q    Who keeps track of that type of stuff for

17   you?

18   A    All of the business people do.  Bob

19   Rainone and all of the people associated with Bob and

20   also all -- yeah, all the business people.

21   Q    Okay.  You've indicated you were the

22   creator of THE SECRET.  Are there other contributors

23   to THE SECRET?

24   A    Well, it gave -- the concept and idea and

25   everything gave birth in me.  Then in terms of

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 30

1    putting -- making the film, there was a production

2    team involved in making the film.

3         Q     Where was that production team based?

4         A     The production team was based initially in

5    Australia but during the making of the film in the

6    United States.

7         Q     Where in the United States?

8         A     Well, we actually filmed everywhere in the

9    United States; in a lot of places.  In Illinois, in

10   California, various other places, Aspen.

11        Q     Aspen, Colorado?

12        A     Yes.

13        Q     Do you know what portions were filmed in

14   Illinois?

15        A     There were various teachers that were

16   filmed in Illinois.  So each of these filmings

17   involved filming various teachers or talent, so to

18   speak.  So there were some filmed in Illinois and some

19   filmed in Los Angeles and some filmed in Aspen.

20              Is there something specific of those that

21   you would like?

22        Q     Well, yes.  Specifically what I was asking

23   is:  Do you have any recollection of which portions

24   were filmed in Illinois?

25        A     Well, I would have to look through my

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 31

1     filming schedule and my diary to give you the exact

2     things that we filmed in Illinois, the exact people

3     that we filmed in Illinois.

4          Q     And where are those documents located?

5          A     I don't know.

6          Q     Do you keep them with you at your residence

7     in California?

8          A     No.

9          Q     Okay.  Are they in Australia?

10         A     Potentially they're in Australia, yeah.

11    They're part of -- that area is under the management

12    of all the production management team.  So they handle

13    all of the schedules, uh-huh.

14         Q     And that team is based out of Australia?

15         A     Well, that information may still be there.

16    I'm not too sure.

17         Q     Was that production team that you described

18    for us based out of Australia?

19         A     Initially, at the beginning of the filming.

20         Q     Are you familiar with the gentleman seated

21    to my left, Dan Hollings?

22         A     I've met Dan, yes.

23         Q     How did you first come to know

24    Mr. Hollings?

25         A     Through Bob O'Connor and Marcy Koltun is

Case 1:08-cv-02272   Document 24-3   Filed 06/16/2008   Page 33 of 40

1     when I -- yeah, that's how I came to know him --

2          Q     Okay.

3          A     -- or know of him, uh-huh.

4          Q     And how did that come about?

5          A     It was either Marcy or Bob who mentioned

6     Dan.  And if I recall, they were looking for -- if I

7     recall, at that time they were going to be involved

8     with THE SECRET, and they had suggested Dan in terms

9     of website and technical -- technical, uh-huh.

10         Q     Is it Bob O'Connor?  Is that what you said?

11         A     I think that was his name, Bob O'Connor.

12         Q     Was he part of your initial production team?

13         A     No.

14         Q     What was his role in THE SECRET to help you

15    locate someone such as Mr. Hollings?

16         A     Bob -- Bob O'Connor and Marcy were wanting

17    to be involved in a forum of THE SECRET, and so -- and

18    so from my recollection, the talks with them were

19    based on that they could do a couple of things early

20    on.  But I don't remember.  Basically, I've given you

21    you exactly what I remember.

22         Q     That's all I can ask.  Thank you.

23         A     Okay.

24         Q     Do you have any recollection of where they

25    were located when you were having these discussions

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 33

1    with them?

2        A      They're both in the United States.  And

3    where they were at the time, I can't be sure.

4        Q      How did you come to know that?

5        A      I actually met them on a cruise ship at a

6    seminar.

7        Q      After the cruise ship, how did you

8    communicate with Bob and Marcy?

9        A      I think -- I don't really recall, but I

10   think it would have been E-mails and phone calls.

11       Q      And after this cruise where you met them --

12   at that time you were still based in Australia,

13   correct?

14       A      Yes.

15       Q      Do you recall when you first had any

16   communications with Mr. Hollings?

17       A      From my recollection, Marcy had suggested

18   to connect Dan in a phone call.  That's it.  But I

19   don't remember if that was the first time at all.

20   That's vaguely something I have in my memory.

21       Q      Just so I'm clear, your best recollection

22   is the first communications you had with Mr. Hollings

23   were in a phone call?

24       A      But I can't be sure, yes.

25       Q      And at that time you were still in

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 34

 1    Australia?
 2         A      I'm not too sure if I was in Australia or
 3    in the United States.
 4         Q      Okay.
 5         A      I'm not too sure.
 6         Q      Do you know where Mr. Hollings was?
 7         A      I don't know absolutely.  I would assume he
 8    was in the United States, but I don't know absolutely.
 9    I didn't ask him.
10         Q      At any point in time in your relationship
11    with Mr. Hollings, did you gain an understanding of
12    where he was located in the United States?
13         A      I think I probably did, but I don't recall.
14    I don't recall where he was in the United States.
15         Q      That was not significant to your dealings,
16    was it?
17         A      No -- well, it's just that those areas --
18    those areas were not the areas that I was focused on,
19    and so I just don't retain that information.
20         Q      That's fine.  That's fine.
21               Do you recall what your purpose in these
22    initial communications with Mr. Hollings was?
23         A      Well, initially it was out of respect to
24    Marcy because Marcy suggested it.  She said, "I think
25    it would be a good idea to speak."  And so it was out

Case 1:08-cv-02272    Document 24-3    Filed 06/16/2008    Page 36 of 40

1    of respect to Marcy.  So that was how that happened.

2        Q    What do you recall about why Marcy thought

3    it would be a good idea for you to speak to

4    Mr. Hollings?

5        A    I'm not too sure.  I think they -- I think

6    at the time that Bob O'Connor didn't -- wasn't too

7    sure that he had enough technical expertise.

8              Now, I'm not even too sure what I -- I

9    can't even really recall what I was talking to them

10   about other than I certainly remember the forum, but I

11   can't -- I know there were other things, but I can't

12   recall because, again, it's in the technical area of

13   which I don't try and understand because I have great

14   people who understand that.

15       Q    Just so I'm following you correctly, Marcy

16   suggested that you contact Mr. Hollings to provide

17   some sort of technical assistance with THE SECRET

18   project?

19       A    No.  Marcy suggested that she introduce Dan

20   to me.

21       Q    Okay.

22       A    And that was how it happened.  So the phone

23   call -- and I think it was a phone call -- and I'm not

24   too sure, but I -- my memory is that she connected me

25   on the phone with Dan.  So that's what I remember, but

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 36

1    I can't be too sure.

2         Q    And your best recollection of the subject

3    matter is it had something to do with the technical

4    side of THE SECRET?

5         A    That --

6         MR. CABIANCA:  Objection to form.

7              Go ahead.

8         THE WITNESS:  It was in an area that I don't

9    really understand.  So I assume that it was something

10   around -- it was something connected with what Marcy

11   and Bob were going to be involved with at that time.

12        MR. PARKER:  Okay.

13        THE WITNESS:  Uh-huh.

14   BY MR. PARKER:

15        Q    Did you later come to an understanding as

16   to some type of services that Mr. Hollings might

17   provide to you in relation to THE SECRET?

18        MR. CABIANCA:  Objection to the form.

19        THE WITNESS:  Well, I didn't because I don't

20   understand that area.  So after -- after that phone

21   call, I would have passed that information onto the

22   relevant people, the business people and the technical

23   people, because I don't have the ability to ascertain

24   that myself.  I don't have enough knowledge.

25   / / /

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1    BY MR. PARKER:

2        Q    In the fall of 2005 --

3        A    Yeah.

4        Q    -- specifically in September of 2005, were

5    you the main person behind the development of THE

6    SECRET?

7        A    In that I was the creator of the film in

8    that the concept was born in me.

9        Q    Do you recall having business-related

10   discussions to the development of THE SECRET book and

11   movie in September of 2005?

12       A    Business-related discussions with anybody

13   in particular?

14       Q    We can start with Mr. Hollings.

15       A    2005.  Well, I don't think the book had

16   been conceived in September 2005.

17       Q    What was the first tangible form in which

18   THE SECRET was made available to the public?  Was it

19   the book?

20       A    No.  It was the film.

21       Q    It was the film, okay.  And did you have

22   any involvement in securing the talent related to the

23   production of the film?

24       A    In the production of the film?

25       Q    Yes.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 38

1          A     I had -- well, there were various people

2     that were involved because production of a film is

3     very, very big.  So in some of the areas, yes.  In

4     others, not.

5          Q     How about in the marketing?  Again, I'm

6     talking about in September of 2005.  Did you have

7     involvement in the initial steps to prepare to market

8     THE SECRET?

9          A     Our marketing was set down at the beginning

10    of 2005.

11         Q     Okay.  Who was involved in that?

12         A     Me and my team.

13         Q     Who was on your team --

14         A     You want --

15         Q     -- for purposes of marketing?

16         A     All of the people who are involved in

17    making the trailer.

18         Q     Okay.  And do you have a listing of those

19    names somewhere?

20         A     I'm sure there is.

21         Q     Do you know where that might be?

22         A     I'm not sure where that would be.  I can

23    recollect some of them.

24         Q     You could or could not?  I'm sorry.  I

25    didn't understand.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 39

1    A    I could recollect some of them.

2    Q    Who?

3    A    The people that worked on the production

4  team:  Paul Harrington, Damian Corboy, Daniel Kerr,

5  Glenda Bell, Drew Heriot.  They're the ones I can

6  recollect as I sit here.

7    Q    You've told me about this initial phone

8  conversation you had with Mr. Hollings, at least the

9  best you could recall of that.

10    A    Uh-huh.

11    Q    Do you recall having any electronic mail

12  communications with him?

13    A    Any E-mails?

14    Q    Yes.

15    A    Do I recall having any E-mails with Dan?

16    Q    Yes.

17    A    I most definitely would have had E-mails

18  with Dan.

19    Q    Earlier you told me that you looked at some

20  E-mails between yourself and Dan in preparation for

21  your deposition.  Does that help refresh your

22  recollection?

23    A    Of?

24    MR. CABIANCA:  Objection to form.

25        Go ahead.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 40

```
 1    BY MR. PARKER:

 2        Q      You told me in your answer, I believe --

 3        A      Uh-huh.

 4        Q      -- that you think you would have.  That's

 5    my words, not yours.  I'm just trying to be sure.

 6        A      Because I E-mailed with everybody all of

 7    the time, so yeah.

 8        Q      At that time you were still living in

 9    Australia, correct, the initial production stages?

10        MR. CABIANCA:  Objection to form.

11            Go ahead.

12        THE WITNESS:  At the beginning of the -- the

13    initial production stages which are January 2005, I

14    was living in Australia, uh-huh.

15    BY MR. PARKER:

16        Q      Do you recall when you moved away from

17    Australia?

18        A      I think that would have been around early

19    2006 -- 2006, but I can't be sure.

20        MR. PARKER:  I'd like the court reporter to mark

21    a document for me.

22                (Defendants' Exhibit 1 was marked

23            for identification by the reporter and

24            is attached hereto.)

25    / / /
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

 1   BY MR. PARKER:

 2        Q    Ms. Byrne, I've handed you what the court

 3   reporter has marked as Exhibit 1 to your deposition --

 4        A    Right.

 5        Q    -- which I believe is a printout of some

 6   electronic mail communications between yourself and

 7   Mr. Hollings.

 8             Do you recognize this document as being a

 9   printout of that?

10        A    It appears to be, but I don't remember it

11   specifically.

12        Q    On the first page at the top, there is an

13   address for Prime Time Productions in Victoria,

14   Australia.

15             Is that one of your former business

16   addresses?

17        MR. CABIANCA:  Objection to form.

18        THE WITNESS:  That's -- that's an address -- one

19   address that Prime Time Productions held.

20   BY MR. PARKER:

21        Q    Is that the office that you worked out of

22   in Australia in September of 2005?

23        A    Well, I can't be sure.

24        Q    Okay.  Do you have any reason to believe

25   that it's not?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 42

1        A      It was one of our addresses, but I can't --
2    there was -- it was one address that Prime Time
3    Productions held.  But there were a few moves within a
4    short time and so I can't be clear.  I can't recall if
5    this was this particular address at this time.
6        Q      Were the moves all within Victoria,
7    Australia?  You said there were a few moves.  Were
8    they all within the same general area?
9        A      Yes.  Yes, if I recall.
10       Q      There is a mobile phone number of
11   +61 412 339 426.  Do you recognize that phone number?
12       A      I think it might have been an old mobile
13   phone number that I had.
14       Q      Okay.
15       A      But, yeah, I think it may have been a
16   mobile phone number that I once had.  I'm not too
17   sure.
18       Q      Looking to the middle of the first page of
19   Exhibit 1, there is an E-mail.  It indicates an E-mail
20   from Mr. Hollings to you.
21              Do you have any recollection of receiving
22   this?
23       A      As I'm sitting here right now, no, I don't.
24       Q      Do you have any reason to believe that you
25   did not receive this?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1         A       No.  I just don't recall it.

2         Q       Okay.  If you'll look at the second page of

3    Exhibit 1, I believe at the top of that is the text of

4    an E-mail that appears to have been sent by you.

5                 Do you have any recollection of having sent

6    that to Mr. Hollings?

7         A       Can I read this?  This is very tiny, tiny

8    print.

9         Q       Absolutely.  The print is small and I

10   apologize for that.

11        A       Okay.  I've read that.

12        Q       Do you have any recollection of having

13   transmitted that message to Mr. Hollings?

14        A       As I sit here, I don't recall it.

15        Q       Do you have any reason to believe you did

16   not?

17        A       It appears to be something -- an E-mail of

18   mine.

19        Q       Immediately below that message --

20        A       Uh-huh.

21        Q       -- there is what I call a signature block

22   that says, "Regards, Rhonda Bryne, Director, Prime

23   Time Productions" --

24        A       Uh-huh.

25        Q       -- "3rd Floor, 627 Chapel Street, South

1   Yarra, Victoria 3141, Australia," and then it has a

2   series of phone numbers.

3       A    Uh-huh.

4       Q    Do you recall if that is -- that being a

5   signature block that you affixed to electronic mail

6   messages you sent in September of 2005?

7       A    I don't recall.  I don't recall that.

8       Q    Do you recall if at the time it was your

9   habit to affix your signature and address to E-mails

10  that you sent?

11      A    At that time, I think that -- at that time,

12  I think that I may have done that, yeah.  I know there

13  were periods where I did and where I didn't, so...

14      Q    Is the Chapel Street address that I just

15  read --

16      A    Uh-huh.

17      Q    -- is that an address that you worked out

18  of as part of Prime Time Productions in September of

19  2005?

20      A    I can't be sure if in September 2005 I was

21  at Chapel Street address or another address.  I

22  can't -- huh, I'm not too sure.  I'm not too sure.

23      Q    Do you have any reason to believe that that

24  was not an address that you worked out of at that

25  time?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 45

1        A      I would not have thought that Prime Time
2    Productions was in Chapel Street in September 2005.  I
3    wouldn't have thought that they were.
4        Q      Why?
5        A      Because -- because I'm trying to recollect
6    times of making the film.  In September 2005, you
7    know, the film was close to being finished and I
8    remember being at another address when the film was
9    close to being finished.  So I can't be positive about
10   this at all.
11       Q      Was the Chapel Street address one that was
12   at some point in time occupied by Prime Time
13   Productions?
14       A      At a point in time.
15       Q      Okay.  So your confusion is just as to when
16   that became the address?
17       A      The time, yes.
18       Q      Okay.  In September of 2005, did you
19   utilize an electronic mail address of
20   rhondab@primetime.com.au?
21       A      Did I use an E-mail address of that?
22       Q      Yes, ma'am.
23       A      To the best of my recollection, yes.
24       Q      And that was your E-mail address associated
25   with Prime Time Productions in Australia, correct?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 46

1       A      To the best of my memory, yes.

2           MR. PARKER:   That's 2.

3           MR. CABIANCA:  Before you go on to the next, can

4    we take a break, if you're going to a different

5    exhibit?

6           MR. PARKER:   Yeah.   That's fine.

7           THE VIDEOGRAPHER:   It's 11:05.  Off the record.

8               (Defendants' Exhibit 2 was marked

9           for identification by the reporter and

10          is attached hereto.)

11          THE VIDEOGRAPHER:   The time is 11:13.  We're

12   back on the record.

13   BY MR. PARKER:

14      Q      Ms. Byrne, before we took a break, we were

15   discussing Exhibit 1 to your deposition.   Another

16   question on that.

17              On the second page, as part of the

18   signature block we discussed, it indicates a title of

19   "Director" for you for Prime Time Productions.

20              Do you recall in September of 2005 if that

21   is a title that you utilized?

22      A      That's a -- that's a creative production

23   title.

24      Q      Uh-huh.

25      A      That's director, yeah.   That's basically

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1     director of the film.

2          Q     Okay.

3          A     And if I recall, I used it for a little

4     while.  Most of the time, I used executive producer,

5     so...

6          Q     Okay.  I know we just took a break.

7     Sometimes during breaks, witnesses tend to recall

8     things that they've been asked about.

9          A     Uh-huh.

10         Q     Is there anything that you've told me about

11    thus far that you feel you need to modify or change in

12    your testimony?

13         A     I don't -- I don't think so.  When I took

14    the break, I was just trying to recollect where our --

15    where the product- -- where the production offices

16    were in September 2005, but I wasn't successful in

17    doing that.  That was really what I was focused on.

18         Q     Okay.  I was just trying to give you the

19    opportunity if there was something.

20         A     Thank you.

21         Q     I believe you also have in front of you

22    what the reporter has marked as Exhibit 2 to your

23    deposition.  If you would look at that, please.

24               Again, I believe this is a copy of an

25    E-mail from yourself to Mr. Hollings, and it has a

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1    date of September 24, 2005.

2           Do you recognize the document as a

3    communication you sent to Mr. Hollings on that date?

4         A    I don't recollect specifically this E-mail.

5    It's because I write hundreds in a day.  But it

6    appears to be an E-mail -- it appears to be an E-mail

7    written by me.

8         Q    Okay.  And I had asked you before about an

9    E-mail address.  At the very top of the first page of

10   Exhibit 2, I believe it's the same address I gave to

11   you:  rhondab@primetime.com.au.

12        A    Yes, it is the same address.

13        Q    That is an address you recall using in

14   September of 2005?

15        A    Well, it is an address I used.  I assume I

16   would have been using it at that time.

17        Q    Do you have any understanding as to whether

18   the suffix, the last two digits on there, .au, are a

19   designator indicating that it is an Australian E-mail

20   address?

21        A    My understanding is that .au says it's

22   Australian.

23        Q    Is this a document that you looked at in

24   preparation for your deposition today?

25        A    Not that I recall at all, no.  I don't

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 49

1    recall this.

2        Q      Do you recall at any time having any

3    communications with Loretta Hollings?

4        A      I don't recall, no.

5        Q      Do you know who she is?

6        A      She's -- I believe she's Dan's partner.

7        Q      Do you have any recollection as to whether

8    Mr. Hollings ever participated as part of the team

9    relating to THE SECRET?

10           MR. CABIANCA:  Mr. or Mrs.?

11           MR. PARKER:  Mr. Dan Hollings.

12           MR. CABIANCA:  Okay.

13           THE WITNESS:  Oh, okay.

14           MR. PARKER:  I'm sorry.

15           THE WITNESS:  Okay.  From my understanding, Dan's

16    area was to do with the technical website area.  So

17    when you say team, I'm not sure if you mean the

18    creative team that made the film, so...

19    BY MR. PARKER:

20        Q      I'm not sure either.

21        A      Okay.

22        Q      I'm just trying to put it in terms that

23    you've used today.

24        A      Okay.

25        Q      But I think you've answered my question.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 50

1        A     Okay.

2        Q     You recall that he had some involvement in

3    the technical aspects of THE SECRET --

4        A     Yes.

5        Q     -- is that a fair statement?

6        A     Yes, that is a fair statement.

7        Q     Do you recall as to whether his involvement

8    came about as a result of your conversations with him?

9        A     Well, he's final involvement came -- would

10   have come about through -- would have come about

11   through the business people, so -- and I would assume

12   that was Bob Rainone.

13       Q     What do you mean by "final involvement"?

14       A     Well, I'm not a part of finalizing details.

15   That's not my area, finalizing or details of

16   associations in business or whether it be people.  And

17   so all of those areas are handed over to the people

18   that handle those areas to finalize and to follow

19   through and --

20       Q     You would agree that you had taken certain

21   steps towards the production of THE SECRET prior to

22   Mr. Rainone's involvement, would you not?

23       A     In terms of making the film?

24       Q     Yes.

25       A     Yes.  In terms of making the film?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

 1        Q      Yes.

 2        A      Yes, that's the case.

 3        Q      Okay.  How about in terms of retaining

 4   Mr. Hollings?

 5        A      I'm not too sure of the question now.

 6        Q      Do you recall having any communications

 7   with Mr. Hollings relating to his participation in

 8   THE SECRET -- and I think you've identified that as

 9   technical assistance -- prior to Mr. Rainone's

10   involvement in THE SECRET?

11        A      Well, I had a lot of communica- -- I had

12   communications with Bob Rainone before I knew Dan.

13   That's my recollection.  Because I knew of him, whew,

14   many months during the production of the film.

15               Am I answering?  I wasn't exactly sure of

16   your question.  So did I answer your question?

17        Q      I don't think so, so let me try again.

18        A      Oh.

19        Q      I think you're trying, though, and I

20   appreciate that.

21               My question is:  Do you recall having any

22   conversations relating to Mr. Hollings' involvement in

23   THE SECRET prior to Mr. Rainone's involvement in

24   THE SECRET?

25        A      Any conversations with?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 52

1        Q    Mr. Hollings.

2        A    Oh.

3        MR. CABIANCA:  Objection to the form.

4        THE WITNESS:  I'm so sorry.

5        MR. PARKER:  I'll try again.

6        THE WITNESS:  I'm so sorry.  I'm not clear on

7    your question.

8    BY MR. PARKER:

9        Q    Do you recall having some conversations

10   with Dan Hollings about his involvement to provide

11   technical assistance with THE SECRET?  Just let me

12   break it down.

13       A    Okay.  Yes, I would have had initial

14   contact discussions with Dan.  That's my recollection,

15   uh-huh.

16       Q    And do you recall that some of those may

17   have occurred prior to Mr. Rainone's involvement in

18   THE SECRET?

19       A    I can't remember.

20       Q    Do you have any reason to believe that you

21   may not have independently of Mr. Rainone communicated

22   with Mr. Hollings about THE SECRET?

23       A    I didn't understand that question.

24       Q    Do you have any reason to believe that you

25   did not have conver- -- that's not going to help you

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 53

1    out.  Let me try it again, okay?

2            Do you have any recollection of having

3    conversations with Dan Hollings about his involvement

4    in THE SECRET that did not involve or include

5    Mr. Rainone?

6        A    My recollection is that they completely

7    included Bob Rainone.

8        Q    Okay.

9        A    Yeah, that's my recollection.  At that time

10   I would have turned to advisors because it just simply

11   isn't my area at all.  And I would have thought -- I

12   would have assumed that I would have turned to Bob.

13       Q    Prior to THE SECRET, you had been involved

14   in the production of other media presentations, if you

15   will --

16       A    Yes.

17       Q    -- through Prime Time Productions, correct?

18       A    Yes.

19       Q    And those did not involve Mr. Rainone,

20   correct?

21       A    No, they didn't.

22       Q    In essence, Prime Time Productions was

23   involved in activities and products prior to

24   THE SECRET, correct?

25       A    Yes, it was.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 54

 1      Q      And you directed, both creatively and from
 2   a business standpoint on certain levels, those
 3   activities for Prime Time, correct?
 4      A      All the films and shows that we produced, I
 5   created and conceived the majority of those, and I had
 6   business people who handled the business side of the
 7   company.
 8      Q      And did you also involve yourself in the
 9   business of Prime Time Productions in making
10   arrangement with talent, for example?
11      A      Pretty well most of that was done by other
12   people.
13      Q      Are you aware of whether or not -- well,
14   let me ask a prefatory question to make it a little
15   easier for you.
16             Prime Time Productions, I believe you told
17   me, was the entity that originally compiled and began
18   the production efforts on THE SECRET; is that correct?
19      A      Prime Time Productions began making the
20   film.
21      Q      Am I correct that later those duties were
22   assigned or overtaken in some way by other companies
23   that you created?
24      A      That's -- that would be my understanding.
25      Q      And that included TS Production and TS

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 55

1    Merchandising?

2        A    Well, I don't know specifically.

3        Q    Okay.

4        A    But I do know that under advice of the

5    people that were involved in the business part that

6    that was the intention, to create business and --

7    yeah, create other entities that would hold THE

8    SECRET.

9        Q    Okay.  Kind of changing gears, so you know.

10       A    Yeah.

11       Q    I mentioned Loretta Hollings earlier.

12       A    Uh-huh.

13       Q    Do you know if Ms. Hollings, Loretta

14   Hollings, ever performed any services relating to

15   THE SECRET?

16       A    I'm not aware of that, no.

17       Q    I think you mentioned this name earlier.

18   Are you familiar with someone by the name of Paul --

19   an individual by the name of Paul Harrington?

20       A    Yes.

21       Q    And what was Mr. Harrington's role with

22   THE SECRET?

23       A    On the filming of THE SECRET, his role was

24   producer.

25       Q    Okay.  Was he involved in any other aspects

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1   of THE SECRET?

2        A    Many.

3        Q    In general terms, what?

4        A    He was involved in the pitch, constructing

5   the pitch of THE SECRET, the strategy of the pitch,

6   which then became the strategy of the release of the

7   film.

8             He was involved in creating with me all of

9   the marketing materials for the release of the film.

10  And when I say "marketing," it's not a word we -- it's

11  our strategy of how we would release the film into the

12  world.

13            He was involved very closely with all

14  technical aspects, with the website, because I didn't

15  understand how websites work but he's very technically

16  minded.  So, actually, many areas.

17       Q    Do you know where he was based at the time

18  he was performing these activities?

19       A    Well, they would vary because at some point

20  he was in Australia and at some point he was in the

21  United States.  We were in the United States a great

22  deal during filming.

23       Q    Okay.  Was he originally based out of

24  Australia?  I mean did he come to the United States as

25  part of the filming of the project?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 57

1        A       Yes, he did, from my memory.  From my
2     recollection, yes.
3        Q       Now, you've indicated to me and we've
4     looked at a couple of these documents that you on
5     occasion would communicate with Mr. Hollings by
6     electronic mail.  Do you recall that being the case?
7        A       I just -- I don't remember specific
8     E-mails, but I know that I E-mailed everybody all of
9     the time.  So I have no doubt that I E-mailed Dan.
10       Q       Okay.  In any of -- in the E-mails that you
11    would have sent to Mr. Hollings --
12       A       Uh-huh.
13       Q       -- was it your intention to be accurate and
14    forthright with your intention and his involvement?
15       A       My intention in life is to be as clear and
16    as accurate as I can be.
17       Q       And did that also apply to these electronic
18    mail messages you would correspond with Mr. Hollings
19    on?
20       A       That would have been my intention to be
21    accurate.
22       Q       Are you aware of any agreements that you or
23    any companies you were involved with may have made
24    with Mr. Hollings that would require him to litigate
25    disputes in courts sitting in Illinois?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 58

 1          MR. CABIANCA:   Objection to the form.
 2          THE WITNESS:   I'm not aware of any -- I'm not
 3     aware of agreements or not agreement.   I'm not aware
 4     of any of those things.   I'm not involved.
 5     BY MR. PARKER:
 6          Q     Okay.   You indicated earlier that you spoke
 7     with Mr. Hollings by telephone on at least one
 8     occasion.
 9          A     Yes, I think -- I think I did.   That was my
10     recollection.
11          Q     Do you recall what -- was it your cell
12     phone or phone you used?
13          A     I don't recall.
14          Q     Are you familiar with an entity known as
15     9 Networks?
16          A     The 9 Network, yes.
17          Q     Okay.
18          A     I'm familiar with that entity.
19          Q     Okay.   What is your understanding of the --
20                (At which time telephone interruption
21          in the proceedings.)
22     BY MR. PARKER:
23          Q     Before the phone rang, I think I asked you
24     or was in the process of asking:   You're familiar with
25     the 9 Network?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 59

1        A       Yes.

2        Q       What is the 9 Network?

3        A       The 9 Network is a commercial-free

4    television network in Australia.

5        Q       Did the 9 Network have any involvement in

6    THE SECRET?

7        A       The 9 Network did initially have some

8    involvement in THE SECRET.  However, that dissipated

9    over time.

10       Q       Who was your primary contact with 9

11   Network?

12       A       Well, there were -- several networks

13   operate in there's one lot of people that you pitch

14   to.  There's one lot of people that commission.

15   There's one lot of people that oversee production.

16   There's one lot of people that look at cuts.  So it

17   just depends which stage you're at as to which people.

18       Q       Are they all based in Australia?

19       A       Actually, no, they're not.

20       Q       Okay.

21       A       They have United States offices.  And one

22   of the executives that I dealt with, yeah, she was

23   here in the United States.

24       Q       Do you know where?

25       A       I think in Los Angeles.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1        Q       Do you know her name?

2        A       Her name is Andrea Keir.

3        Q       Are you aware of anyone else affiliated

4    with 9 Network that had any involvement in THE SECRET

5    that is domiciled or based in the United States?

6        A       I wouldn't be able to answer that because

7    it's a network that has many offices and I don't know

8    whose stationed at them.  I just know I pitched to

9    eight executives, and she was one of the eight

10   executives that I pitched to.

11       Q       And that pitch took place in Australia?

12       A       That pitch took place in France.

13       Q       In France, okay.

14       A       And -- well, it was a unique pitch.  It was

15   a pitch that lasted over four weeks or so.  And so,

16   yeah, it was in -- the major part of the pitch was in

17   Canne or the final was in Canne at MIP T.V.

18       Q       Were there portions of the pitch that

19   occurred somewhere other than France?

20       A       There was -- I had initial contact, from my

21   recollection, to let the network know that I wanted to

22   pitch.  It wasn't just that network.  It was the

23   10 Network as well.  And the full presentation of that

24   pitch I did in an apartment in Canne at MIP T.V.

25       Q       Do you recall ever advising Mr. Hollings

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 61

1    that you had assumed a U.S. address at the Archstone
2    Citrus Suites here in Santa Monica?
3         A     I don't recall if I did or if I didn't.
4         Q     Do you recall receiving any mail or
5    packages from Mr. Hollings at that address?
6         A     I'm not too sure, but I think -- I think he
7    may have -- I think he may have, but I don't remem- --
8    he may have sent a CD to me.  I don't know if he sent
9    other things or --
10        Q     Do you recall if he sent you a musical CD
11   at that address?
12        A     He may have sent me a musical CD at that
13   address.  He may have.  But I don't remember exactly,
14   but it's possible.
15        Q     Do you recall him sending you a music CD at
16   some point?
17        A     I remember him sending me a music CD at
18   some point, yes.
19        Q     Did that --
20        A     I just don't quite remember where.
21        Q     Did that occur on more than one occasion?
22        A     Not to my recollection, but I can't be sure.
23        Q     Okay.  And do you recall listening to that
24   CD in Santa Monica?
25        A     I do.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 62

1       Q      Let me show you Exhibit 3 to your
2   deposition.
3              (Defendants' Exhibit 3 was marked
4        for identification by the reporter and
5        is attached hereto.)
6   BY MR. PARKER:
7       Q      I believe this is an E-mail of which you
8   received a carbon copy.  Do you recognize your address
9   in the cc line?
10      A      Yes, I do.
11      Q      And I notice this is a different address
12  than what we identified before.  This one is
13  rhondab@primetime-us.com.
14      A      That's right.
15      Q      Did Prime Time establish some operations in
16  the United States at some point in time?
17      A      Well, in terms of the -- I had two website
18  addresses.  So one was AU and one was U.S.
19             But if you're asking me about the business
20  entities and Prime Time and the business entities,
21  then that's an area where I don't understand or it's
22  an area I'm not equipped to answer.
23      Q      Do you know why you established a U.S.
24  E-mail address?
25      A      I -- the technical people do it and I

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

 1    assume that it's for ease for me.  I don't know what

 2    it's affiliated with or connected to.

 3         Q    Do you know an individual by the name of

 4    Don Zyck, Z-y-c-k?

 5         A    Yes, I do.

 6         Q    And does he work for you?

 7         A    Well, he works for one of the entities.

 8         Q    An entity that you control?

 9         MR. CABIANCA:  Objection to form.

10         THE WITNESS:  Oh --

11    BY MR. PARKER:

12         Q    Do you know?

13         A    An entity that I control.  That really

14    wouldn't be correct.

15         Q    Okay.  In what way would it not be correct?

16         A    Well, because I don't control anything I

17    create.

18         Q    Okay.

19         A    So I'm not actively involved in business

20    and controlling things.  I'm actively involved in

21    creating things.

22         Q    You're aware that there are certain

23    businesses that have been established to assist with

24    the business aspects of the things that you create,

25    correct?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

```
 1       A     Yes.  And I trust that people that
 2    establish those and I'm grateful so that I can do my
 3    own work.
 4       Q     Is it fair to say that your understanding
 5    of the reason for the creation of those businesses is
 6    to assist you in the distribution and business aspects
 7    of the products that you create?
 8       A     Well, the reason for them, and this is
 9    very differ- --
10       MR. CABIANCA:  Objection to form.
11            Go ahead.
12       THE WITNESS:  -- and this is very different from
13    most business and most people wouldn't -- most
14    businesses wouldn't understand, but the business side
15    and all of that part is the caretaker.  And the film
16    and the book creates its own market as it changes one
17    person's life to another.
18            And so the business and all of those areas
19    are involved in being caretakers of that, not, you
20    know, the way most businesses would consider in terms
21    of driving it because that is simply not the way that
22    THE SECRET works.
23            THE SECRET changes one person's life, and
24    then they pass it to another.
25    / / /
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 65

1    BY MR. PARKER:

2        Q    So if I understand your answer correctly,

3    the businesses function as a caretaker for the content

4    that you create?

5        A    That's right, caretaker and a channel, a

6    channel for it to go out into the world.

7        Q    At the same time, it's also the channel to

8    direct any revenues or funds back to you in return for

9    your creative efforts; is that correct?

10       MR. CABIANCA:  Objection to form.

11       THE WITNESS:  I -- I receive revenues from some

12   entity somehow.  But you see, that isn't important to

13   me.  Ask me how many people's lives have changed and

14   I'll talk to you about it.

15   BY MR. PARKER:

16       Q    But these business entities you've

17   established -- and I'm not asking you how much or

18   anything along those lines -- your understanding is

19   those also facilitate supporting your efforts to

20   endeavor in these creative activities?

21       A    They -- in terms of continuing to create,

22   yeah, they would help in terms of funding and being

23   able to continue to create.

24       Q    Okay.  Turning back to Exhibit 3 --

25       A    Yes.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 66

1       Q       -- and Mr. Zyck, do you recall receiving
2    this?
3       A       No, I don't, but my name is on there.  So I
4    just don't recollect it specifically.
5       Q       Mr. -- well, the substance of the E-mail
6    indicates that Mr. Hollings and Web Services would no
7    longer provide services to THE SECRET.
8               Is Mr. Zyck, to the best of your
9    understanding, an individual affiliated with
10   THE SECRET who would be in a position to make that
11   communication?
12      A       Well, he's based in the Chicago offices,
13   and so -- based with Bob Rainone.  So, therefore, I
14   would say that he sent this out in consultation with
15   Bob Rainone.
16      Q       He would be a -- it's your understanding he
17   would be in a position in Chicago to make that
18   decision or communicate this to other individuals,
19   correct?
20      A       Well, I'm not clear from this E-mail that
21   he made that decision.  I'm only clear from this
22   E-mail that he's notified -- it's notification.  So,
23   no, I don't know if he was involved in that
24   decision-making or not.
25      Q       Okay.  Do you know who was involved in the

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 67

1    decision to terminate Mr. Hollings and Web Services
2    from providing services to THE SECRET?
3         A    I would assume -- assume it was Bob, but
4    I'm not too sure.
5         Q    Do you have any recollection of involvement
6    in that decision?
7         A    Huh.  My recollection is that Bob presented
8    to me that this was the decision that he wanted to
9    make.  And because I have total utter trust in my CEO
10   and I have total trust in all of the business people,
11   yeah.  And it just -- that was not an area that I was
12   involved in.  I wasn't equipped to say.
13        Q    But you do recall that Mr. Rainone
14   presented that to you as a decision that he wished to
15   make?
16        A    To the best of my recollection.
17        Q    In your book, THE SECRET, at the beginning
18   of it, you have a number of acknowledgments,
19   expressing gratitude to various individuals.
20        A    Uh-huh.
21        Q    Do you generally recall that?  I can show
22   it to you, if you would like.  I'm just asking a very
23   general question.
24        A    Oh, I recall.  I recall it, absolutely,
25   yes.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 68

1      Q      Included in those acknowledgments is an

2   individual identified as Dan Hollings.  Do you

3   understand that to be the same individual who is the

4   defendant in this lawsuit?

5      A      I would think so.  I didn't remember that

6   his name was in there.

7      MR. PARKER:  Okay.  Why don't we take a quick

8   break?

9      MR. CABIANCA:  Okay.

10     THE VIDEOGRAPHER:  It's 11:46.  Off the record.

11           (At which time a brief recess was taken.)

12     THE VIDEOGRAPHER:  It's 11:56.  We're back on the

13   record.

14   BY MR. PARKER:

15     Q      Ms. Byrne, as I asked you before, is there

16   anything that you feel the need to amend or modify

17   with the testimony that you've given here today?

18     A      No.  No.

19     Q      At the beginning of your deposition or the

20   early part of it, I asked you for your current

21   address, and I believe you indicated it was 900 Hot

22   Springs Road in Santa Barbara.

23     A      Uh-huh.

24     Q      What is the zip code there?

25     A      93108.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 69

1    Q    Is that your residence or is it a business

2    address?

3        MR. CABIANCA:  I'd rather just limit her

4    conversation about her residence to a city.  There's

5    no reason to need her specific address.

6            I'm glad, Chris, to talk to you off the

7    record if you want to talk about why and other things

8    like that.

9        MR. PARKER:  Well, I mean I think you've got the

10   authority under the protective order that you

11   suggested and that we've executed this morning to

12   designate that as confidential.

13           So I'll note your objection.  I'm just --

14   she gave me an address.  I'm simply asking is that a

15   business or a residence.

16       MR. CABIANCA:  I'm going to -- I'm going to

17   instruct her not to answer.  I'm glad -- the reason

18   why I want to do it is because I will -- if I have to,

19   I'll ask the court for a different protective order.

20   But I think giving out her residential address to

21   Mr. Hollings is something I don't want to do and I

22   don't want her to do.

23       MR. PARKER:  Well, I think you're --

24       MR. CABIANCA:  And there's no reason to get it

25   for purposes of this motion.  So I'm going to instruct

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1    her not to answer that.

2        MR. PARKER:  Well, we can disagree about that.

3        MR. CABIANCA:  Do you need her specific street

4    address for purposes of this motion?

5    BY MR. PARKER:

6        Q    Is the 900 Hot Springs address, is that a

7    business address?

8        MR. CABIANCA:  I'm going to ask you not to answer

9    that question.  If you want to limit it to the city in

10   which she lives or the city in which her business and

11   the creative people at THE SECRET operate, I'm fine

12   with that.

13            But there's no specific reason that Dan

14   Hollings needs to know or that you need to know for

15   purposes of the motion what her personal residence

16   address is.

17       MR. PARKER:  Well, she has already given me an

18   address, Counsel.  I'm simply trying to clarify is

19   that a residential or a business address.

20            The question immediately pending is:  Is

21   that address a business address?  She can answer that

22   question without divulging what you object to as being

23   a residential address.

24            The address is in the record already.

25   You've already got the right through the protective

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

1  order that you requested to designate this as
2  confidential.  My client has signed off on that which
3  provides you with the protections that you asked for.
4          I think it's improper for you to advise her
5  not to answer.  I'm going to ask it again.  If I have
6  to compel, you know, an answer to it with the court,
7  we'll reconvene the deposition for purposes of doing
8  that.  I think that's a lot of extra work, given the
9  protections that we already have.
10         Now, if she has a separate residential
11  address that she doesn't want to give, I will ask the
12  appropriate questions for that, and we can -- you
13  know, we can deal with that.  I asked for her address
14  earlier and I'm simply trying to clarify whether that
15  is a business or residence.
16      MR. CABIANCA:  The question pending is whether
17  that's a business address.  And you can answer with a
18  "Yes" or a "No."  Go ahead.  It's a yes or no
19  question.
20      THE WITNESS:  Huh.  No.
21  BY MR. PARKER:
22      Q    That is not -- I'm sorry.  The answer is
23  that's not your business address?
24      A    That's not my business address.
25      Q    Okay.  Do you maintain any other California

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 72

 1    addresses presently?
 2         A     In --
 3         MR. CABIANCA:  Objection to form.
 4         THE WITNESS:  In terms of business or in terms of
 5    personal addresses?
 6    BY MR. PARKER:
 7         Q     Let me ask it as -- do you maintain any
 8    business addresses in California other than the one
 9    you gave me before?
10         A     There's -- there is another address, and
11    I know --
12         Q     I'm trying to be respectful of your
13    counsel's objection and your privacy needs as well.
14         A     Oh, yes.  Yes.
15         Q     The other address, before you give it, is
16    it a business address or is it a non-business address?
17         A     The other address is a business address.
18         Q     Okay.  What is that other -- what is that
19    business address?
20         A     I can't remember the number of the street,
21    but it's Hunt Drive in Summerland.
22         Q     Summerland where?
23         A     Summerland, California.
24         Q     I'm not as familiar with the geography as I
25    likely should be.  Is that near Santa Barbara?

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 73

1        A       It's about fifteen minutes or so.

2        Q       Okay.  Do you know what the name of the

3    business that operates out of that is?

4        A       Good question.  And I don't.

5        Q       Okay.  That's fine.  But that is what you

6    consider to be your business address?

7        A       That is one of them.

8        Q       Okay.  In California.  I'm sorry.

9        A       Yeah.

10       MR. PARKER:  Subject to the right to recall the

11   witness on the merits of the case, consistent with the

12   limitations we agreed to for this deposition, I'm

13   passing witness to you for further examination.

14       MR. CABIANCA:  I have no questions.  Thank you.

15       MR. PARKER:  Thank you, Ms. Byrne.

16       THE WITNESS:  Thank you so much.

17       MR. PARKER:  I guess for the court reporter's

18   benefit, I assume she will want to read and sign her

19   deposition.

20       MR. CABIANCA:  Correct.

21       MR. PARKER:  Okay.  He can explain that to you

22   later.

23       THE WITNESS:  Okay.

24       THE VIDEOGRAPHER:  It's 12:02.  This ends

25   videotape 1.  Off the record.

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 74

1        MR. CABIANCA:   We do want a copy of the

2     transcript.

3              (At the time of 12:02 p.m., the deposition

4        was adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 75

1

2

3

4

5    STATE OF CALIFORNIA      )
                             )      ss.
6    COUNTY OF LOS ANGELES   )

7

8             I, RHONDA BYRNE, having appeared for my

9    deposition on May 6, 2008, do this date declare

10   under penalty of perjury that I have read the

11   foregoing deposition and that I have made any

12   corrections, additions, and/or deletions that I was

13   desirous of in order to render the within transcript

14   true and correct.

15

16            IN WITNESS WHEREOF, I have hereunto subscribed

17   my name on this _____ day of _____, 2008.

18

19

20                              _____

21                                   RHONDA BYRNE

22

23

24

25

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 76

1          DEPONENT'S CHANGES AND/OR CORRECTIONS

2              NOTE:  If you are adding to your testimony,

3      print the exact words you want to add.  If you are

4      deleting from your testimony, print the exact words

5      you want to delete.  Specify with "Add" or "Delete"

6      and sign and date the bottom of this form.

7

8      DEPOSITION OF:          RHONDA BYRNE

9      CASE:                   TS Merchandising, Ltd., etc.,

10                             et al. vs. Dan and Loretta

11                             Hollings, etc., et al.

12     DATE OF DEPOSITION:    May 6, 2008

13

14     PAGE    LINE    CHANGE/ADD/DELETE

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25     Deponent's Signature_____Date_____

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

```
 1    STATE OF CALIFORNIA    )

 2                           )    ss

 3    COUNTY OF LOS ANGELES )

 4

 5              I, CAROL LYNN COX, CSR No. 5128, a

 6    Certified Shorthand Reporter in and for the State of

 7    California, do hereby certify as follows:

 8              That RHONDA BYRNE, the witness named in the

 9    foregoing deposition, at the commencement of said

10    deposition, was first placed under oath to testify the

11    truth, the whole truth, and nothing but the truth;

12              That said deposition was taken down by me

13    stenographically and thereafter reduced to

14    computerized transcription under my direction;

15              I hereby certify the foregoing deposition

16    is a full, true, and correct transcript of my

17    shorthand notes so taken;

18              I further certify that I am neither counsel

19    for nor related to any party to said action, nor in

20    anywise interested in the outcome thereof.

21              DATED THIS 8TH DAY OF MAY, 2008.

22

23

24                        _____
                             Certified Shorthand Reporter
                          In and for the State of California
25
```

Rhonda Byrne, May 6, 2008, TS Merchandising vs. Dan and Loretta Hollings

Page 78

```
 1  STATE OF CALIFORNIA    )
 2                         )   ss
 3  COUNTY OF LOS ANGELES  )
 4
 5            I, CAROL LYNN COX, CSR No. 5128, a
 6  Certified Shorthand Reporter in and for the State of
 7  California, do hereby certify that the attached
 8  transcript is a true and correct copy of the original
 9  transcript of the deposition of RHONDA BYRNE, taken
10  before me on the 6th day of May, 2008.
11
12            I DECLARE UNDER PENALTY OF PERJURY THAT THE
13  FOREGOING IS TRUE AND CORRECT.
14            EXECUTED AT LOS ANGELES, CALIFORNIA, THIS
15  8TH DAY OF MAY, 2008.
16
17                    _____
18                    CAROL LYNN COX, CSR NO. 5128
19
20
21
22
23
24
25
```

# EXHIBIT C

# DECLARATION OF
# ROBERT E. RAINONE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | |
|---|---|
| TS Merchandising Ltd., a British Virgin Islands corporation, and TS Production LLC, a Hungarian limited liability company, | Case No. 07 C 6518 |
| Plaintiffs, | Hon. Ronald A. Guzman |
| vs. | |
| Dan and Loretta Hollings, Arizona residents, and Web Services, LLC, an Arizona limited liability company, | |
| Defendants. | |

## DECLARATION OF ROBERT E. RAINONE, JR., IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION

I, Robert E. Rainone, Jr., hereby submit this declaration in support of plaintiffs' response to defendants' motion to dismiss for lack of jurisdiction (Dkt. No. 21), and declare as follows:

1.      I am presently a managing director of plaintiff TS Production LLC and have personal knowledge of the facts herein. I have resided in Chicago, Illinois for approximately 16 years, and I presently reside in Chicago, Illinois.

2.      From approximately October 2005 through the date of this declaration, I have served as Chief Executive Officer of The Secret LLC (now known as TS RER LLC), which was an affiliate of plaintiff TS Merchandising Ltd. I was president of TS Merchandising Ltd. and was its primary operational executive from October 2005 through December 2006. The principal place of business for both entities is Chicago, Illinois.

3.      From October 2005 through December 2006, I was responsible for overseeing distribution operations relating to the movie *The Secret*, including the use of the Web site located at <www.thesecret.tv> and other Internet-based means for disseminating information concerning *The Secret*.

4.    In connection with his work on the Web site at <www.thesecret.tv> and other Internet-based activities on behalf of *The Secret*, defendant Dan Hollings made and received dozens of telephone calls to and from TS Merchandising representatives, including myself, located in Chicago, Illinois.

5.    In connection with his work on the Web site at <www.thesecret.tv> and other Internet-based activities on behalf of *The Secret*, defendant Hollings also regularly sent over 1500 emails to TS Merchandising representatives, including myself, in Chicago, Illinois, throughout his tenure.

6.    Furthermore, in connection with the services he was engaged to provide on behalf of *The Secret*, Hollings traveled to Chicago, Illinois in December 2006 to meet with TS Merchandising representatives, including myself, and others to discuss his engagement and Website operations going forward.

7.    During his engagement, Hollings regularly invoiced The Secret LLC and subsequently TS Merchandising for his services. Both entities were located in Chicago, Illinois, and Hollings' invoices were sent to them there.

8.    The Secret LLC and subsequently TS Merchandising paid Hollings invoices, some of which were issued in his own name, and others of which were issued in the name of Defendant Web Services LLC. These invoices were paid by check. These checks and the 1099 forms summarizing the payments made to Hollings or Web Services came from Chicago, Illinois and bore the Chicago, Illinois address of the entity paying his invoices. Copies of selected invoices and the checks paying them are attached to this declaration as Exhibit A.

I declare under penalty of perjury, that to the best of my knowledge and recollection, the foregoing is true and correct.

_5 - 14 - 08_
Date

_Robert E. Rainone_
Robert E. Rainone

# EXHIBIT D

# DECLARATION OF
# JONATHAN D. REICHMAN

Attached Exhibits:

Ex. A – August 31, 2007 U.S. Copyright Registration Application

Ex. B – September 10, 2007 U.S. Copyright Registration

Ex. C – September 25, 2007 letter from Squire Sanders & Dempsey

Ex. D – October 11, 2007 letter from Jonathan Reichman

Ex. E – October 29, 2007 letter from Mallesons Stephens Jacques (Redacted)

Ex. F – May 23, 2008 Notice of Motion by Drew Heriot and Drew Pictures Pty Ltd.

Ex. G – May 23, 2008 Notice of Motion by TS Production LLC

Ex. H - June 13, 2008 Expert Report of Paul Geller

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Drew Heriot and Drew Pictures Pty Ltd., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | Civil Case No. 08cv2272 |
| | § | |
| Rhonda Byrne, | § | The Honorable Suzanne B. Conlon |
| The Secret LLC (AKA TS Holdings LLC) | § | |
| Prime Time US Inc., | § | |
| TS Production Holdings LLC, | § | |
| TS Production LLC, | § | |
| TS Merchandising Ltd., And | § | |
| Robert E. Rainone Jr. | § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF JONATHAN D. REICHMAN

I, Jonathan D. Reichman, declare under penalty of perjury, under the laws of the

United States of America, that the following is true and correct, and is based upon my

personal knowledge or upon information which has been provided to me by others and

which I am informed and believe to be true, and to which I am competent to testify:

1.    I am a copyright attorney and partner at the law firm Kenyon & Kenyon LLP at

One Broadway, New York, NY 10004-1007.

2.    On or around July 2007, Plaintiffs Drew Heriot and Drew Pictures Pty Ltd.

("Drew Pictures") engaged my services to pursue any and all claims in the United States

that they may have relating to their contributions to the screenplay, book, and movie

known as *The Secret*, including any and all U.S. copyright claims.

3.    My role was to provide advice to Mr. Heriot and Drew Pictures and to negotiate a

settlement, if any, that could be obtained on their behalf. Barring settlement, I was to

help them find trial counsel to proceed with an action in United States District Court, and to assist such trial counsel.

4.      On August 31, 2007, I filed on behalf of Drew Pictures and Mr. Heriot, an application for copyright registration with the U.S. Copyright Office, asserting Drew Pictures' ownership interests in the screenplay and movie *The Secret*. A true and correct copy of that application is attached as **Exhibit A.** Under 17 U.S.C. § 411, registration is only required for U.S. works, not foreign works. The application for registration was filed, in part, because I believed that Plaintiffs' works constituted U.S. works as defined in the Copyright Act. The application was filed on an expedited basis because of anticipated litigation in the United States.

5.      Registration was issued by the U.S. Copyright Office on September 10, 2007, a true and correct copy of which is attached as **Exhibit B.**

6.      On September 25, 2007, I received a letter from Suzanne K. Kelter of Squire, Sanders & Dempsey L.L.P. on behalf TS Production LLC. A true and correct copy of that letter is attached as **Exhibit C.** Ms. Kelter asserted that "[b]y virtue of the Australian Copyright Act 1968" Mr. Heriot and Drew Pictures did not "currently own – or have ever owned – any copyrights or other rights in 'The Secret Original Edition.'"

7.      On October 11, 2007, I responded to Ms. Kelter's letter and assertions under Australian law. A true and correct copy of that letter is attached as **Exhibit D.** I noted that Ms. Kelter's "citations to the Australian Copyright Act 1968 [were] inapposite" because that Act clearly provides that Drew Pictures and Mr. Heriot retain an ownership interest in the screenplay to *The Secret* (under Sections 35, 78) and an ownership interest in the film itself (under Sections 98(4), 98(6)). Thus, even if TS Production's reliance on

Australian law were correct, Drew Pictures and Mr. Heriot retained their copyright interests in the works. I did not, at any time, assert or concede that Australian law applied to the ownership of Plaintiffs' work. In fact, I expressly advised Ms. Kelter that "[t]he foregoing is without prejudice to all of DPPL's rights and remedies in connection with this matter, which are hereby expressly reserved." I suggested that the parties negotiate.

8.       Ms. Kelter did not respond to my letter of October 11, 2007, or otherwise provide me notice that TS Production was initiating an action against Mr. Heriot and Drew Pictures. On October 19, 2007, I received word from Mr. Heriot that TS Production had initiated a lawsuit against him in Australia by filing a Statement of Claim. That Statement of Claim asserts TS Production's alleged copyright interests in the book *The Secret* and the movie *The Secret* (Original Edition), but did not and has not asserted a copyright claim in the screenplay to *The Secret* or to the movie *The Secret* (Extended Edition).

9.       Although we planned to proceed with an action in the United States, I worked with Plaintiff's Australian counsel, Mallesons Stephens Jaques, to ensure that Plaintiffs did not have a default judgment entered against them and to prepare a defense to the Statement of Claim.

10.      On October 29, 2007, Plaintiffs' Australian counsel informed TS Production explicitly that "Our clients are considering which individuals and entities should be joined in the Australian lawsuit, and whether to also commence a lawsuit in the United States relating to these issues." A redacted copy of that letter is attached as **Exhibit E.**

The letter has been redacted because it contains information covered under the Australian "without prejudice" privilege.

11.     During this time, Mr. Heriot asked me for attorney references and began searching for United States trial counsel to represent Plaintiffs in an action to be brought in a United States District Court. In or around January 2008, Mr. Heriot informed me that he was pursuing several leads for trial counsel, including a trial law firm in Dallas, Texas.

12.     My understanding from Plaintiffs' Australian counsel is that TS Production's original Statement of Claim was insufficient and did not plead an adequate basis for the granting of an injunction. On November 8, 2007, TS Production was ordered by the Australian court to file an Amended Statement of Claim by November 15, 2007. TS Production moved for multiple extensions of time and did not file an Amended Statement of Claim for over three months.

13.     On February 8, 2008, Plaintiffs' Australian counsel filed an application to transfer the Australian proceeding from the Federal Magistrates Court of Australia to the Federal Court of Australia. My understanding is that this transfer was requested because the Federal Court of Australia is the more appropriate venue to address intellectual property disputes. After Plaintiffs' Australian counsel moved to transfer, TS Production filed its Amended Statement of Claim on February 11, 2008. On March 28, 2008, the Australian proceeding was listed for a "directions hearing" before the Honorable Justice Sundberg on April 24, 2008. At no time have Plaintiffs filed (or been required to file) a defense or cross-claim in response to TS Production's Amended Statement of Claim.

14.     In March 2008, I began coordinating with the law firm of Sayles Werbner PC, which was asked by Mr. Heriot to investigate and conduct due diligence in pursuit of Plaintiffs' potential claims in the United States.  I assisted Sayles Werbner PC in their investigation and assisted Mr. Heriot in negotiating a retainer agreement with Sayles Werbner PC, which was finalized on April 15, 2008.  On April 21, 2008, Sayles Werbner PC initiated this proceeding on behalf of Plaintiffs.

15.     My understanding from Plaintiffs' Australian counsel is that, at the directions hearing on April 24, 2008, Justice Sunberg set a briefing schedule for the parties to file any motions in light of the initiation of this proceeding.  On May 23, 2008, Plaintiffs filed a Notice of Motion for the Australian action to be stayed pending resolution of this case, a true and correct copy of which is attached as **Exhibit F.**

16.     On May 23, 2008, TS Production filed a Notice of Motion requesting an anti-suit injunction be issued against Mr. Heriot and TS Production "from taking or causing to be taken any step in the proceedings commenced by them in the United States District Court for the Northern District of Illinois, Eastern Division, numbered 08cv2272."  A true and correct copy of that Notice of Motion is attached as **Exhibit G.**  In addition, TS Production has moved to amend its Statement of Claim, yet again, to now assert copyright claims in the screenplay to "The Secret" and the movie "The Secret (Extended Edition)."  Justice Sunberg has set these motions for a hearing on July 11, 2008.

17.     On June 13, 2008, in support of its Notice of Motion for an anti-suit injunction, TS Production submitted the expert report of Paul Geller, a true and correct copy of which is attached as **Exhibit H.**  Mr. Geller's report purports to advise the court as to what "choice-of-law rule would guide an Illinois federal district court."  Mr. Geller

concludes that "a U.S. district court, in Illinois, is likely to apply Australian law to determine ownership of copyright, and perhaps concomitant interests, in the case posited here."

18.    Procedurally, there is no difference between the Australian proceeding and the present one. In both, a Complaint or Statement of Claim has been filed, but no Answer, Defense, or Cross Claim has been filed, no discovery has been started, no trial date has been set, and motions to stay are pending before both.

Signed this 16th Day of June, 2008, in New York, New York.

Jonathan D. Reichman

*file copy*
*M2771*

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at *www.copyright.gov*, write the Copy-
right Office, or call (202) 707-3000.

**Form PA**
For a Work of Performing Arts
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

PA                    PAU

EFFECTIVE DATE OF REGISTRATION

Month          Day          Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

TITLE OF THIS WORK ▼

The Secret

PREVIOUS OR ALTERNATIVE TITLES ▼

NATURE OF THIS WORK ▼ See instructions

Motion Picture

**2**

**a** NAME OF AUTHOR ▼

Drew Pictures Pty. Ltd.

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a
"work made for hire"?
☑ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of _____
      Domiciled in Australia

WAS THIS AUTHOR'S CONTRIBUTION TO
THE WORK
Anonymous?        ☐ Yes ☑ No
Pseudonymous?     ☐ Yes ☑ No

If the answer to either
of these questions is
"Yes," see detailed
instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼
Director and Co-author of Screen Play

NOTE

Under the law,
the "author" of
a "work made
for hire" is
generally the
employer, not
the employee
(see instruc-
tions). For any
part of this
work that was
"made for hire"
check "Yes" in
the space
provided, give
the employer
(or other
person for
whom the work
was prepared)
as "Author" of
that part, and
leave the
space for dates
of birth and
death blank.

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a
"work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of _____
      Domiciled in _____

WAS THIS AUTHOR'S CONTRIBUTION TO
THE WORK
Anonymous?        ☐ Yes ☐ No
Pseudonymous?     ☐ Yes ☐ No

If the answer to either
of these questions is
"Yes," see detailed
instructions.

NATURE OF AUTHORSHIP  Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a
"work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of _____
      Domiciled in _____

WAS THIS AUTHOR'S CONTRIBUTION TO
THE WORK
Anonymous?        ☐ Yes ☐ No
Pseudonymous?     ☐ Yes ☐ No

If the answer to either
of these questions is
"Yes," see detailed
instructions.

NATURE OF AUTHORSHIP  Briefly describe the nature of material created by this author in which copyright is claimed. ▼

**3**

**a** YEAR IN WHICH CREATION OF THIS
WORK WAS COMPLETED  This information
2006        must be given
            Year in all cases.

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information   Month March   Day 26   Year 2006
ONLY if this work
has been published.        U.S.A.                        Nation

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as
the author given in space 2. ▼

Drew Pictures Pty. Ltd.
Unit 1/9 Ashby Grove, Ivanhoe 3079, Victoria, Australia

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in
space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

See instructions
before completing
this space.

---

MORE ON BACK ▶  • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
                • See detailed instructions.          • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ___ pages

EXHIBIT
A
tabbies

EXAMINED BY                                    FORM PA

CHECKED BY

☐ CORRESPONDENCE                               FOR
    Yes                                        COPYRIGHT
                                               OFFICE
                                               USE
                                               ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☑ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is No, do not check boxes A, B, or C.

a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▼          **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**
a

b

See instructions
before completing
this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                         Account Number ▼

Kenyon & Kenyon LLP                            016543

**7**
a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip ▼
Jonathan D. Reichman, Esq.
Kenyon & Kenyon LLP
One Broadway, New York, NY 10004

b

Area code and daytime telephone number ( 212 ) 425-7200          Fax number ( 212 ) 425-5288
Email  tmdocketny@kenyon.com

**CERTIFICATION** I, the undersigned, hereby certify that I am the
Check only one ▶   ☐ author
                   ☐ other copyright claimant
                   ☐ owner of exclusive right(s)
                   ☑ authorized agent of Drew Pictures Pty. Ltd.
                        Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Drew Hariot                                    Date  AUGUST 23, 2007

Handwritten signature (X) ▼
☞   X _____

Certificate
will be
mailed in
window
envelope
to this
address:
Name ▼
Jonathan D. Reichman, Esq./Kenyon & Kenyon LLP
Number/Street/Apt ▼
One Broadway
City/State/Zip ▼
New York, NY 10004

**9**

*17 USC §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form PA—Full    Rev: 07/2006    Print: 10/2006 — 50,000    Printed on recycled paper                    U.S. Government Printing Office: 2006—xxx-xxx/xx,xxx

## Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

## PA 1-355-437

**Effective date of registration:**

September 10, 2007

### Title

**Title of Work:** The Secret

**Nature of Work:** Motion Picture

### Completion/Publication

**Year of Completion:** 2006

**Date of 1st Publication:** March 26, 2006     **Nation of 1st Publication:** United States

### Author

■     **Author:** Drew Pictures Pty. Ltd.

**Author Created:** screenplay and motion picture production

**Work made for hire:** Yes

**Domiciled in:** Australia

**Anonymous:** No     **Pseudonymous:** No

### Copyright claimant

**Copyright Claimant:** Drew Pictures Pty. Ltd.

Unit 1/9 Ashby Grove, Ivanhoe 3079, Victoria, Australia

### Limitation of copyright claim

**Previously registered:** No

### Certification

**Name:** Drew Heriot

**Date:** August 23, 2007

**Correspondence:** Yes



Page 1 of 1

SQUIRE, SANDERS & DEMPSEY L.L.P.

4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304

Office: +1.216.479.8500
Fax: +1.216.479.8780



SQUIRE
SANDERS | LEGAL
COUNSEL
WORLDWIDE

Direct: +1.216.479.8468
sketler@ssd.com

September 25, 2007

**VIA U.S. MAIL AND EMAIL**

Mr. Jonathan D. Reichman
Kenyon & Kenyon LLP
One Broadway
New York, NY 10004-1007

jreichman@kenyon.com

**Re:    THE SECRET (ORIGINAL EDITION)**

Dear Mr. Reichman:

We represent TS Production LLC ("TS Production"), owner of the proprietary and copyrighted work "The Secret Original Edition." TS Production filed an application to register the copyright in "The Secret Original Edition" in the U.S. earlier this year.

The U.S. Copyright Office has recently brought to our attention the fact that you have also filed an application to register the copyright in "The Secret Original Edition" on behalf of Drew Pictures Pty. Ltd. ("Drew Pictures"). Drew Pictures, an Australian company, was formerly engaged in Melbourne, Australia by Prime Time Productions Holdings Pty Ltd ("Prime Time Productions"), also an Australian company, to provide various services in Australia – including filming and film editing – related to "The Secret Original Edition."

Prime Time Productions is a wholly-owned subsidiary of TS Production, and it created "The Secret Original Edition" and originally owned the copyright in that motion picture prior to the transfer of such copyright to TS Production. Pursuant to the engagement between Prime Time Productions and Drew Pictures, Mr. Heriot worked as one of four directors of "The Secret Original Edition." In addition, numerous other persons – writers, producers, artists, photographers, and others – were involved in the creation of the original work of "The Secret Original Edition."

By virtue of the Australian Copyright Act 1968 and in particular section 98, which states "(2) Subject to the next succeeding subsection, the maker of a cinematograph film is the owner of any copyright subsisting in the film by virtue of this Part...." and, in section 22(4) defines "maker" as "the person by whom the arrangements necessary for the making of the film were

CINCINNATI · CLEVELAND · COLUMBUS · HOUSTON · LOS ANGELES · MIAMI · NEW YORK · PALO ALTO · PHOENIX · SAN FRANCISCO · TALLAHASSEE · TAMPA · TYSONS CORNER
WASHINGTON DC · WEST PALM BEACH | CARACAS · RIO DE JANEIRO · SANTO DOMINGO | BRATISLAVA · BRUSSELS · BUDAPEST · FRANKF
PRAGUE · WARSAW | BEIJING · HONG KONG · SHANGHAI · TOKYO | ASSOCIATED OFFICES: BUCHAREST · BUENOS AIRES · DUBLIN · KY
www.ssd.com

EXHIBIT

C

SQUIRE, SANDERS & DEMPSEY L.L.P.

undertaken," Prime Time Productions was the first owner of the copyright in "The Secret Original Edition." As a consequence "The Secret Original Edition" is *not* the original work of Mr. Heriot or of Drew Pictures, and neither he nor his company currently own – or have ever owned -- any copyrights or other rights in "The Secret Original Edition."

Furthermore, neither Prime Time Productions nor TS Production ever entered into any sort of agreement with Drew Pictures providing that Mr. Heriot or his company would own any copyright in "The Secret Original Edition." As such, all ownership of and rights in and to "The Secret Original Edition" were held by Prime Time Productions until the time of their transfer to TS Production.

Accordingly, Mr. Heriot does not have any legitimate claim to ownership of the copyright in "The Secret Original Edition," and thus, neither he nor his company has any legitimate basis for filing an application to register any such copyright. We therefore ask that you (1) immediately withdraw the application to register the copyright in "The Secret Original Edition" in the U.S. that you filed on behalf of Drew Pictures, and (2) provide us with written confirmation of such withdrawal no later than Friday, September 28, 2007.

While TS Production prefers to resolve this matter amicably, it nonetheless reserves all of its rights, and in the event that you do not withdraw the application as requested in this letter, TS Production is prepared to initiate litigation, bringing any and all claims available to it under Australian law and U.S. law and seeking all remedies, damages, fees, and costs provided for under any and all applicable laws.

Sincerely,

Suzanne K. Ketler

cc:     Michael B. Gardiner, Esq.
        Bryce Menzies, Esq.



Jonathan D. Reichman
Direct 212.908.6256
jreichman@kenyon.com

One Broadway
New York, NY 10004-1007
212.425.7200
Fax 212.425.5288

October 11, 2007

<u>VIA FACSIMILE (216-479-8780)</u>

Suzanne K. Ketler, Esq.
Squire, Sanders & Dempsey L.L.P.
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304

Re:    "The Secret" (Original Edition)

Dear Ms. Ketler:

This is in further response to your September 25, 2007 letter.

We believe that Drew Pictures Pty. Ltd. ("DPPL") has the right to register its copyright interest in "The Secret Original Edition" based upon the contributions of its employee Drew Heriot. (A photocopy of this registration is attached hereto as Exhibit "A".)

As you acknowledge, DPPL, acting through Mr. Heriot, contributed services as director and editor of "The Secret Original Edition." [1] Mr. Heriot, acting on behalf of DPPL, was also co-author of the screenplay. Neither Mr. Heriot nor DPPL was ever an employee of Prime Time Productions Pty Ltd ("PTP"), or any other entity associated with Rhonda Byrne. Rather, DPPL was an independent contractor, and Mr. Heriot was an employee of DPPL, not PTP. Moreover, at no time did Mr. Heriot or DPPL enter into a written assignment with PTP (or any other entity associated with Ms. Byrne) with respect to the above-described contributions.

We regard your citations to the Australian Copyright Act 1968 as inapposite. The Act makes clear that, absent an employer/employee relationship or a written assignment, DPPL is (i) a co-owner of the copyright comprised in the screenplay (Sections 35, 78) and (ii) the owner of part of the copyright in the film itself (Sections 98(4), 98(6)). Additionally, Section 21 of the Act gives DPPL, as co-owner of the screenplay's copyright, an interest in adaptation of the screenplay into a film. Furthermore, DPPL's copyright interests would apply to any and all

---

[1]    While you state that "Mr. Heriot worked as one of four directors of 'The Secret Original Edition,'" the contributions of the other three directors -- Damian McLindon, Sean Byrne and Marc Goldenfein -- were minor in relation to Mr. Heriot's. Consistent with their relative contributions, only Mr. Heriot was given full page credit as director.



**EXHIBIT**

D

Suzanne K. Ketler, Esq.
October 11, 2007
Page 2



derivative works, including without limitation "The Secret Extended Edition," and "The Secret" book published by Atria Books.

Mr. Heriot's contributions were made based upon DPPL's and Ms. Byrne's agreement and understanding that DPPL would share in the back-end. However, Ms. Byrne never followed through on her commitment in this regard, and she subsequently cut off all further communications with Mr. Heriot -- after Mr. Heriot took a number of steps on her behalf, including relocating from Australia to Los Angeles.

Consequently, we believe that DPPL is entitled to compensation from exploitation of "The Secret", in all its forms, based upon its above-described copyright interests, and the above-described agreement. We therefore request an accounting of all revenues derived from such exploitation, so that DPPL can make a determination of such appropriate compensation.

Finally, please note that we too would prefer to resolve this matter amicably, and therefore look forward to your favorable response.

The foregoing is without prejudice to all of DPPL's rights and remedies in connection with this matter, which are hereby expressly reserved.

Very truly yours,

Jonathan D. Reichman

Enclosure
cc: Mr. Drew Heriot

# MALLESONS STEPHEN JAQUES

WITHOUT PREJUDICE

Confidential communication

Attn: Mr Bryce Menzies and Judy Heeps                    29 October 2007
Marshalls & Dent
Level 13
459 Little Collins Street
MELBOURNE   VIC   3000
Fax 03 9642 0409

Dear Sirs

**The Secret - Drew Pictures Pty Ltd & anor ats TS Production LLC, Federal Magistrates
Court File No. 1435/07**

We refer to your letter of 18 October 2007 to Drew Pictures Pty Ltd ("DPPL") enclosing an
Application and Statement of Claim.

As you know, we represent DPPL and Drew Heriot.

# REDACTED



Solicitors

Level 30 Waterfront Place 1 Eagle Street Brisbane QLD 4000 Australia
DX 311 Brisbane ABN 55 001 462 299 bris@mallesons.com www.mallesons.com
9166261_3 // CNAGY / <NEW> 000

T +61 7  3244 8000
F +61 7  3244 8999
Page 1 of 4

MALLESONS STEPHEN JAQUES

Marshalls & Dent                                                29 October 2007

REDACTED

# MALLESONS STEPHEN JAQUES

Marshalls & Dent
29 October 2007

**REDACTED**

Our clients are considering which individuals and entities should be joined in the Australian lawsuit, and whether to also commence a lawsuit in the United States relating to these issues. It would appear, for example, that the publishers of "The Secret" book are infringing Mr Heriot's/DPPL's copyright.

**REDACTED**

You will appreciate that our clients believe that Australian Federal Magistrates Court is not the appropriate forum to resolve these issues. We anticipate that our clients will be seeking the transfer of this matter to the Federal Court of Australia. Will you please let us know, in open correspondence, if you will consent to such transfer.

**REDACTED**

# MALLESONS STEPHEN JAQUES

Marshalls & Dent                                                    29 October 2007

We look forward to your response.

Yours sincerely

John Swinson
Partner
Direct line +61 7 3244 8050
Email john.swinson@mallesons.com

IN THE FEDERAL COURT OF AUSTRALIA
VICTORIA DISTRICT REGISTRY

VID 122 of 2008

TS PRODUCTION LLC
Applicant

DREW PICTURES PTY LTD
(ACN 088 783 000)
First Respondent

DREW HERIOT
Second Respondent

NOTICE OF MOTION

The abovenamed Respondents will at **10.15 am** on **11 July 2008** at the Federal Court of Australia, 305 William Street, Melbourne, Victoria, move the Court for orders that:

1.    The proceeding be stayed pending the outcome of the proceedings commenced by the Respondents in the United States District Court for the Northern District of Illinois, Eastern Division.

2.    The parties have liberty to apply to lift or vary the stay on seven days notice.

3.    The Applicant pay the Respondents' costs of the Motion.

4.    Such further orders as the Court thinks fit.

Dated: 23 May 2008

MALLESONS STEPHEN JAQUES
Solicitors for the Respondents

TO:    The Applicant
C/- Arnold Bloch Leibler
Level 21
333 Collins Street
Melbourne Victoria 3000

Filed on behalf of the Respondents by:
MALLESONS STEPHEN JAQUES

| Level 50 | Telephone | : | T +61 3 9643 4000 |
| Bourke Place | Facsimile | : | F +61 3 9643 5999 |
| 600 Bourke Street | DX | : | 101 Melbourne |
| Melbourne  Vic  3000 | Reference | : | P Selvay / N Hickey |

EXHIBIT

tables

F

1

IN THE FEDERAL COURT OF AUSTRALIA
VICTORIA DISTRICT REGISTRY

No. VID 122 of 2008

TS PRODUCTION LLC

Applicant

DREW PICTURES PTY LTD
(ACN 088 783 000)

First Respondent

DREW HERIOT

Second Respondent

NOTICE OF MOTION

(Order 19, rule 2)

The abovenamed Applicant will at *10.15* am/pm on 11 July 2008, at the Federal Court of
Australia, 305 William Street, Melbourne Victoria 3000 move the Court for orders that:

1     From the date of this order, the First and Second Respondents be and are hereby
      restrained, until determination of this proceeding (including any appeal) or until
      further order, from taking or causing to be taken any step in the proceedings
      commenced by them in the United States District Court for the Northern District of
      Illinois, Eastern Division, numbered 08CV2272 and captioned *Drew Heriot and
      Drew Pictures v Rhonda Byrne, The Secret LLC (AKA TS Holdings LLC), Prime
      Time US Inc., TS Production Holdings LLC, TS Production LLC, TS Merchandising
      Ltd. and Robert E Rainone Jr.*

2     That the Respondents pay the Applicant's costs of and incidental to this Notice of
      Motion.

3     Such further or other orders as the Court considers appropriate.

Filed on behalf of the Applicant

**ARNOLD BLOCH LEIBLER**
Lawyers and Advisers
Level 21, 333 Collins Street
Melbourne VIC 3000
DX: 38455 Melbourne

Solicitor's Code: 54
Tel: 61 3 9229 9999
Fax: 61 3 9229 9900
Ref: LZ:JTV 011451706
(Leon Zwier)



EXHIBIT

G

2

The time before which this notice of motion is to be served has not been abridged.


Date: 23 April 2008

.......................... -
ARNOLD BLOCH LEIBLER
Solicitors for the Applicant


TO:          The Respondents.

             C/o The Respondents' Solicitors
             Mallesons Stephen Jaques
             Level 50 Bourke Place
             Melbourne VIC 3000


Version 1

**Paul Edward Geller**
Attorney at Law

12100 Wilshire Bl., Ste.905
Los Angeles, CA 90025 USA
Telephone: 1.310.440.0047
Facsimile: 1.310.440.0048
Email: paul@pgeller.com
Web: http://www.pgeller.com

June 12, 2008

Mr. Leon Zwier
Arnold Bloch Leibler
Lawyers and Advisors
333 Collins Street, Level 21
Melbourne Victoria 3000
Australia

Re: *TS Production LLC v Drew Pictures Pty Ltd & Anor*, Federal Court of Australia Proceeding
No VID 122 of 2008; *Heriot v. Byrne*, U.S. Federal Court, N.D. Illinois, case no. 08CV2272

Dear Mr. Zwier:

I am in receipt of your letter dated June 11, 2008. You have premised a case of an audiovisual work, which I shall here call the "Film" and which was made by an Australian production company with Australian members of the creative team. You ask: In such a case, what choice-of-law rule would guide an Illinois federal district court, thus in the Seventh Circuit, in determining the ownership of copyright? Would it be bound or likely to apply Australian law for that purpose? In my opinion, yes, such a U.S. court is likely thus to apply Australian law.

### I.   My Background

Since the mid-1980s, I have served both as expert counsel in cross-border copyright cases and as the General Editor of *International Copyright Law and Practice*.[1] This treatise, published by LexisNexis and annually updated, includes over twenty chapters in which experts respectively explain their national copyright laws in depth. In that treatise, I contribute the lead framework

---

[1]    *See* LexisNexis webpage for INTERNATIONAL COPYRIGHT LAW AND PRACTICE *available at*
http://bookstore.lexis.com/bookstore/product/10440.html *and attached hereto as* Exhibit A.



Mr. Leon Zwier
June 12, 2008
page 2

chapter which, 286 pages long as updated for 2007, systematically analyzes the choice of laws in cross-border cases and international treaty obligations in the field. In specialized journals worldwide, I have published articles on point, most downloadable from my résumé online.[2] I have taught at the Stanford Law School and at the University of Southern California Law School.

Neither I nor any company with which I am or have been associated has any prior or present relationship to any of the parties to the Australian Proceeding or to the U.S. Proceeding.

## II.  The Factual Premises of this Opinion

I have read the Complaint filed in the U.S. District Court for the Northern District of Illinois under the short case name *Heriot v. Byrne*.[3] Any decision of this court would be subject to review by the court of appeals of the Seventh Circuit, which would look to the case law of other circuits for precedents, especially given facts and issues on which it had no fully reasoned precedent of its own. I am apprised that an Australian court has been asked to adjudge ownership of copyright.

I here take the following as further factual premises: According to paragraphs 16 *et seq.* of the Complaint, an Australian production company, Prime Time, is alleged to have contracted on an ongoing basis with the Australian director and editor Drew Heriot, sometimes through the latter's Australian company Drew Pictures. In the course of these dealings, as amplified in paragraphs 19 *et seq.*, and as framed by a third-party contract with the Australian Nine Network, according to paragraph 26 of the Complaint, *The Secret* works, including the Film, were generated. Considered as a whole, the Complaint suggests that the Film was substantially created in Australia, with some scenes shot on location in the United States and possibly some elements

---

[2]    *See* Paul Edward Geller, Résumé, *available at* http://www.pgeller.com/resume.htm *and attached hereto as* Exhibit B. Note that references below are articulated in the standard U.S. citation form, most often with the following syntax: volume, source, starting page, year, etc.

[3]    Complaint, Heriot v. Byrne, No. 08CV2272 (N.D. Ill.), *attached hereto as* Exhibit C.

2

Mr. Leon Zwier
June 12, 2008
page 3

then created on the spot. However, Mr. Heriot was an Australian national and resident, as Drew
Pictures was an Australian company, throughout the time when the Film was created.

### III. Key U.S. Decisions Applying Foreign Laws to the Ownership of Copyright

U.S. courts have applied foreign laws to impute the ownership of copyrights in works and are
likely increasingly to do so. Copyright cases are frequent in media centers, and New York City
has long been the center of the U.S. publishing and other media industries. Thus the Second
Circuit, which handles appeals from New York City, has a rich and authoritative copyright case
law. This case law has resolved conflicts of copyright laws that globalized media tend to bring.

In the *Itar-Tass* case, claimants' ownership of U.S. copyright in journalistic works published in
Russia was challenged.[4] The court of appeals for the Second Circuit faced this conflict of laws:
Should U.S. or Russian law govern such ownership? The court reviewed the different lines of
U.S. decisions on laws applicable on point, but found none engaging in an "explicit consideration
of the conflicts issue."[5] U.S. courts often find guidance in the American Law Institute's
*Restatements*, in which leading scholars and jurists have crystallized principles for given fields of
the common law. The *Itar-Tass* court started its conflicts analysis with section 222 of the
*Restatement (Second) of Conflict of Laws*, which contemplates governing ownership issues by
the law of the state with the "most significant relationship" to the property at issue and the parties
claiming ownership.[6] The court then applied Russian law, that of the "country of origin" of the

---

[4]    Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82 (2d Cir. 1998),
       *attached hereto as* Exhibit D.

[5]    *Id.* at 88-89. Bracketed single-star numbers in the attached print-outs of U.S. case reports,
       for example, as in [*88] or in [*476], refer to the page numbers in the reports as cited.

[6]    *Id.* at 90, *citing* 1 RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 222 (1971), *attached
       hereto as* Exhibit E. The court here also invoked the U.S. Copyright Act, which applies the
       law of the "source country" of a work to vest ownership of restored U.S. copyright: 17
       U.S.C. § 104A(b), *attached hereto as* Exhibit F.

3

Mr. Leon Zwier
June 12, 2008
page 4

works at issue, to hold that claimants had sufficient ownership of U.S. copyright to obtain relief.[7]
The *Itar-Tass* precedent is binding in the Second Circuit, as ample case law there shows.[8]

If we move West from the Second Circuit, we see the Fifth Circuit following the *Itar-Tass*
*precedent* on issues related to the choice-of-law issue we are here considering.[9] Often, the
influence of the Second Circuit does not extend to the Ninth Circuit which, in the Far West, with
its media centers, Hollywood and Silicon Valley, also handles manifold copyright cases.
Nonetheless, in the *Lahiri* case, brought in an important California district court, an Indian
national sued for infringement of his U.S. copyright in a song which he claimed to have written
in India. On summary judgment, the court here simply followed the *Itar-Tass* rule, which it
paraphrased as follows: "Initial ownership of a copyright work is determined by the laws in the
work's country of origin."[10] Applying provisions of the Indian Copyright Act, as construed by the
Indian Supreme Court, the court held that the Indian film production company, which had the
song written for a film, owned U.S. copyright in the song. To reach this result under Indian law,
the *Lahiri* court construed the claimant's "two-page agreement with Pramod, the producer of the
film," and found no "agreement to the contrary" of the producer's ownership.[11]

---

[7]   Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 91-94 (2d Cir. 1998).

[8]   *See, e.g.,* Films by Jove, Inc. v. Berov, 154 F. Supp. 2d 432, 448 (E.D.N.Y. 2001) (taking
*Itar-Tass* as binding precedent on choice of law), *attached hereto as* Exhibit G,
*reconsideration denied*, 250 F. Supp. 2d 156, 193-95 (2003) (analyzing *Itar-Tass* with
regard to establishing, not choosing, foreign law), *attached hereto as* Exhibit H. In this epic
litigation, the New York court had to research, in detail and in depth, Soviet and Russian
law, as well as foreign decisions, to determine ownership of U.S. copyright in animated
films created in the ex-U.S.S.R., now Russia. *Cf* .Films by Jove, Inc. v. Berov, 341 F. Supp.
2d 199, 210 (E.D.N.Y. 2004) (distinguishing *Itar-Tass*), *attached hereto as* Exhibit I.

[9]   *See* Alameda Films S.A. de C.V. v. Authors Rights Restoration Corp., 331 F.3d 472, 476-79
(5th Cir. 2003) (applying Mexican law to copyright ownership per 17 U.S.C. § 104A(b) to
find copyrights in films held by producers), *attached hereto as* Exhibit J.

[10]  Lahiri v. Universal Music & Video Distribution, Inc., 513 Supp. 2d 1172, 1176 n. 4 (C.D.
Cal. 2007), *attached hereto as* Exhibit K.

[11]  *Id.* at 1176-79.

4

Mr. Leon Zwier
June 12, 2008
page 5

The *Lahiri* precedent is significant, not only because a major district court in the Ninth Circuit adopted the *Itar-Tass* precedent coming out of the Second Circuit, but because this court relied on this precedent to resolve an issue of standing that would normally turn on U.S. copyright law. In the *Lahiri* matter, after learning of the alleged infringement, the claimant had obtained, from the U.S. Copyright Office, a certificate of registration of his claims to U.S. copyright in the song at issue. The court noted that, as a matter of U.S. law, such a certificate raised a presumption of sufficient ownership to justify standing to sue on U.S. copyright. However, it held that presumption rebutted by the showing that the claimant did not own copyright under Indian law.[12]

## IV. Rationales of Such U.S. Choice-of-Law Rulings: Likely Results In New Cases

I have here been asked to ascertain, not to evaluate, the trend of U.S. courts choosing laws to govern the ownership of copyright in foreign works. These courts have seen the *Itar-Tass* rule crafted in binding precedent in the Second Circuit and, in less than a decade, applied as a matter of course on the other side of the country in the Ninth Circuit.[13] Furthermore, the *Itar-Tass* court applied the *Restatement* choice-of-law criterion of the "most significant relationship," which most U.S. courts would also take as a starting point for their choice-of-law decisions. In particular, for the Seventh Circuit where the case of *Heriot v. Byrne* is now pending in an Illinois district court, Judge Posner has explained that "default rules" are useful for specifying the effect of "nebulous" *Restatement* choice-of-law criteria that Illinois courts take as "orthodox."[14] The Second Circuit, in *Itar-Tass*, supplied just such a default rule in the attempt to specify the impact of such a criterion set out in *Restatement* section 222. But how a court may adopt and adapt that rule may turn on how the court sees the rationales of the rule coming into play in a given case.

---

[12] *Id.* at 1178.
[13] Much commentary has focused on the *Itar-Tass* case. *See, e.g.,* Paul Edward Geller, *Conflicts of Laws in Copyright Cases: Infringement and Ownership Issues,* 51 J. COPR. SOC'Y 315, 325-28, 358-61 (2004) (critiquing reasoning in the *Itar-Tass* decision at points, but not its result), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=602901 *and attached hereto as* Exhibit L.

5

Mr. Leon Zwier
June 12, 2008
page 6

For example, the *Itar-Tass* rule applies the law of the "country of origin" of a work to the issue of ownership of copyright in the work. The Berne Convention defines the term "country of origin" for sundry purposes, notably for applying the rule of the shorter term.[15] However, even as the *Itar-Tass* court fastened on this term in formulating its choice-of-law rule concerning copyright ownership, it noted that the Berne Convention "does not purport to settle issues of ownership."[16] Adjudicating just such issues in following the *Itar-Tass* rule, U.S. courts are then likely to adjust the meaning of the "country of origin" case by case by looking, not to any strict Berne definition, but to the rationales behind the rule itself. That said, consider a film, that is, in Berne terms, a cinematographic work: its Berne country of origin would be the Berne country of "first publication"; absent which, it would be the country where "the maker ... has its headquarters or his habitual residence."[17] Suppose a case in which our hypothetical film was initially made available to a test audience in Australia in video recordings and later streamed, and recordings marketed, via the Internet all over the world all at once. In that event, a U.S. court would have the alternative Berne definitions of the "country of origin" at hand: either the country of "first publication" or that where "the maker ... has its headquarters or his habitual residence."[18] The latter definition would better accord with the *Restatement* criterion of the "most significant

[14] Spinozzi v. ITT Sheraton Corp., 174 F.3d 842, 843-46 (7th Cir 1999) (applying Mexican law), *attached hereto as* Exhibit M.

[15] Berne Convention for the Protection of Literary and Artistic Works, arts. 5(4), 7(8) (Paris Act of 1971), *available at* http://www.wipo.int/treaties/en/ip/berne/index.html, *and attached hereto as* Exhibit N.

[16] Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 91 (2d Cir. 1998). Indeed, seminal commentary, which guided the Stockholm and thus the Paris revision of the Berne Convention with regard to this technical term, clearly shows that it is used in the Berne context for completely different purposes. *See* Eugen Ulmer, *Points de rattachement et Pays d'origine dans le système de la Convention de Berne*, 36 NORDISKT IMMATERIELLT RÄTTSSKYDD (NIR) 208, 212-16 (1967), *attached hereto as* Exhibit O.

[17] Berne Convention, art. 5(4).

[18] Note that the Berne Convention may not be invoked to create new U.S. rights, so that, for purposes of the ownership of U.S. copyright, the Berne definition of the "country of origin" would not be binding, but could merely provide a hook on which to hang a *Restatement*-based choice-of-law analysis. *See* 17 U.S.C. § 104(c), *attached hereto as* Exhibit P.

6

Mr. Leon Zwier
June 12, 2008
page 7

relationship," the common basis for choice-of-law decisions by the *Itar-Tass* court and by other U.S. courts. Absent any "statutory directive" on point, the *Restatement* compels finding such relationships by looking to overriding rationales, including "the protection of justified expectations" and "uniformity of result."[19] Such rationales support finding applicable law in the contractual environment in which, given their relations to one producer, members of a creative team contribute to a film. The same rationales support a proposal of the American Law Institute to govern, by such a single law, the ownership of copyright in any work by multiple creators.[20]

There is always the chance of aberrational decisions. I believe that, under the facts premised here, the Seventh Circuit would follow the *Itar-Tass* precedent and apply Australian law. That said, before concluding, I shall explore the parameters within which another decision is theoretically conceivable, if only to show that it would make little difference in practice. As the *Itar-Tass* court acknowledged, the Berne Convention provides that "[o]wnership of copyright in a cinematographic work shall be a matter for legislation in the country where protection is claimed."[21] We here face the tension between what has sometimes been called the "centrifugal" and "centripetal" approaches to the choice of laws governing ownership of copyright in any given work worldwide. Following the former approach, copyright effective within each jurisdiction would be owned pursuant to that jurisdiction's law, so that copyrights could vest differently in the same work country by country; following the latter approach, as did the *Itar-Tass* court, copyright ownership in a work would be governed by one central law. To avoid applying multiple laws to single issues, U.S. courts may also employ the method of finding "false conflicts": where a number of different laws may arguably apply to dispose of a given issue, but

---

[19]  1 RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(d), (f) (1971), *attached hereto as* Exhibit Q.

[20]  *See, generally,* INTELLECTUAL PROPERTY: PRINCIPLES GOVERNING JURISDICTION, CHOICE OF LAW, AND JUDGMENTS IN TRANSNATIONAL DISPUTES § 313(1)(b)-(c), cmts. a-f, at 224-33 (2007) (favoring the law of the state where most creators reside or the law governing their employment or commission arrangements), *attached hereto as* Exhibit R.

[21]  Berne Convention, art. 14*bis*(2)(a), *cited*, Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 91 n. 12 (2d Cir. 1998).

Mr. Leon Zwier
June 12, 2008
page 8

all with the same result, a court may simply enforce that result.[22] Thus, even if, in theory,
copyrights were deemed to vest in the same work according to different rules country by country,
in practice a court could find false conflicts whenever these rules compelled the same result in
the case at bar. In my treatise, I edit annually updated chapters that explain different ownership
rules in major jurisdictions: most copyright laws tend toward converging results with regard to
the ownership of copyright in film works. These laws tend to entitle film producers to exploit
copyright, absent contracts to the contrary and subject to conditions with regard, for example, to
equitable shares in revenues, to moral rights, etc.[23] However, in searching for false conflicts of
laws in the premised case, the court would have to take serious account of Australian law for the
very reasons that the *Itar-Tass* rule would compel applying it.

## V. Application to the Fact Pattern Predicated Here

The Complaint filed in *Heriot v. Byrne* before an Illinois federal district court, raises issues
regarding the legal and equitable relationships between an Australian production company and an
Australian director and editor relative to the Film. The Complaint alleges, in paragraphs 16 *et
seq.* of this complaint, that the production company, Prime Time, contracted with Mr. Heriot and
Drew Pictures over a period of years, but it remains disputed what impact their ongoing
arrangements had, if any, on ownership interests in *The Secret* works, notably in the Film.
Specifically, paragraph 22 raises the issue of equitable consequences of Mr. Heriot's "trust,"
paragraph 23 broaches a possible equity share resulting from a $10,000 investment, and
paragraph 26 invokes a background agreement with a third party, Nine Network.

---

[22]  *See, generally,* Brainerd Currie, *Notes on Methods and Objectives in the Conflict of Laws,*
1959 DUKE L.J. 171 (seminally broaching this and related methods), *attached hereto as*
Exhibit S; Peter Kay Weston, *False Conflicts,* 55 CAL. L. REV. 74 (1967) (analyzing various
forms and uses of this method), *attached hereto as* Exhibit T.

[23]  *See, e.g., in* INTERNATIONAL COPYRIGHT LAW AND PRACTICE (Paul Edward Geller ed. 2007):
André Lucas & Pascal Kamina, *France* § 4[1][a][ii]; S. Ramaiah, *India* § 4[1][b]; Teruo

Mr. Leon Zwier
June 12, 2008
page 9

The Illinois district court, in the Seventh Circuit, shares with the Second Circuit a common basis for any choice-of-law determination: the *Restatement (Second) of Conflict of Laws*. In the case of a work made for a film, a California district court, within the Ninth Circuit, has adopted the Second Circuit's rule in the *Itar-Tass* precedent, one based on that *Restatement*. The Illinois district court has been directed by the court of appeals for the Seventh Circuit to apply "default rules" that would adapt *Restatement* choice-of-law criteria to particular cases. I conclude that the district court would apply the *Itar-Tass* rule to avoid any volatile fragmentation of copyright interests in the Film, focusing on a "country of origin" with the most significant relationship to the Film and the parties. I further conclude that, for purposes of applying the *Itar-Tass* rule, the court would consider as a "country of origin" that where Prime Time, the Film "maker," was headquartered: Australia. The reason is simple: Australia is the jurisdiction whose law provided the contractual environment for the expectations of the Australian parties.

## VI. Conclusion

In reaching my opinion set out above, I have made all the inquiries which I believe are desirable and appropriate, and no matters of significance which I regard as relevant, to my knowledge, have been withheld from the Court. For the foregoing reasons, I believe that a U.S. district court, in Illinois, is likely to apply Australian law to determine ownership of copyright, and perhaps of concomitant interests, in the case posited here.

Sincerely yours,

*Paul Edward Geller*

Paul Edward Geller

---

Doi, *Japan* § 4[1][a]; Lionel Bently, *United Kingdom* § 4[1][a][ii]-[b] (providing for presumptive transfers to, or vesting of rights in, producers), *attached hereto as* Exhibit U.

9

# EXHIBIT E

# DECLARATION OF
# JOHN V. SWINSON

Attached Exhibits:

Ex. A – Section 101(1) of the Australian Copyright Act.

Ex. B – *British South Africa Co v Companhia de Moçambique* [1893] AC 602

Ex. C – *Potter v BHP* (1906) 3 CLR 479

Ex. D – *Norbert Steinhardt & Son Ltd v Meth* (1961) 105 CLR 440

Ex. E – *Atkinson Footwear Ltd v Hodgskin International Services Ltd* (1994) 31 IPR 186 and *Tyburn Productions Ltd v Conan Doyle* (1990) 19 IPR 455

Ex. F – Staniforth Ricketson, *The Law of Intellectual Property: Copyright, Designs & Confidential Information* (Excerpted)

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Drew Heriot and Drew Pictures Pty Ltd., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Civil Case No. 08cv2272 |
| | § | |
| Rhonda Byrne, | § | The Honorable Suzanne B. Conlon |
| The Secret LLC (AKA TS Holdings LLC) | § | |
| Prime Time US Inc., | § | |
| TS Production Holdings LLC, | § | |
| TS Production LLC, | § | |
| TS Merchandising Ltd., And | § | |
| Robert E. Rainone Jr. | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF JOHN V. SWINSON

I, John V. Swinson, declare under penalty of perjury, under the laws of the United States of America, that the following is true and correct, and is based upon my personal knowledge or upon information which has been provided to me by others and which I am informed and believe to be true, and to which I am competent to testify:

1.     I am an intellectual property lawyer and partner at the law firm Mallesons Stephen Jaques located at Level 30, Waterfront Place, 1 Eagle Street, Brisbane, Queensland, Australia. I have obtained law degrees from the University of Queensland and Harvard Law School. In Australia, I am admitted to practise in the Federal Court of Australia and the High Court of Australia, as well as in various State jurisdictions. In the United States of America, I am admitted to practise in New York State, as well as in United States District Courts for the Southern District of New York, the Eastern District of New York and the Northern District of California.

- 1 -

2.      I have been admitted to practise law for 20 years, during which time I have primarily focussed on intellectual property disputes. I have acted in a number of cross-jurisdictional intellectual property disputes.

3.      Mallesons Stephen Jaques represents Plaintiffs Drew Heriot and Drew Pictures Pty Ltd in legal proceedings known as *TS Productions LLC v. Drew Pictures Pty Ltd and Drew Heriot*, No. VID 122 of 2008 ("Australian Proceedings"). The Australian Proceedings were originally started by TS Productions LLC in the Australian Federal Magistrates Court but were moved to the Federal Court of Australia. Plaintiffs Drew Heriot and Drew Pictures Pty Ltd are defendants in the Australian Proceedings.

4.      The Australian Proceedings have been moving at a very slow pace, and TS Productions LLC has not complied with past court timetable orders.

5.      I have reviewed the Complaint filed by Plaintiffs Drew Heriot and Drew Pictures Pty Ltd on April 21, 2008 in the United States District Court for the Northern District of Illinois (Eastern Division) ("U.S. Complaint"). I have also reviewed Declarations of Robert E. Ranoine dated June 4, 2008, Donald J Zyck dated June 4, 2008 and Rhonda Byrne dated June 3, 2008 ("the Declarations") filed in the U.S. proceedings.

6.      Pursuant to the Declarations, the Defendants named in the U.S. Complaint purport to submit to personal jurisdiction in the courts of Australia in connection with the claims "based on alleged ownership" in "*The Secret* or any part thereof."

7.      I note that the "submission to jurisdiction" paragraphs of the Declarations do not explicitly refer to copyright ownership. Moreover, these paragraphs only deal with ownership and it is unclear whether the Defendants named in the U.S. Complaint submit to personal jurisdiction of the Federal Court of Australia in relation to copyright

- 2 -

infringement, especially copyright infringement taking place (or that has taken place in the past) outside of Australia.

8.      The Declarations are silent as to whether the Defendants will make relevant witnesses and documents, located outside of Australia, available for the purposes of the Australian Proceedings.

9.      The Federal Court of Australia has the discretion whether or not to accept a submission to its jurisdiction.

10.     It is my opinion that it is unlikely that an Australian court will accept jurisdiction in respect of any infringements of copyright which have occurred in the United States.

11.     Under the terms of the Australian *Copyright Act 1968* (Cth) ("the Act"), the jurisdiction of the Australian courts in respect of infringement of copyright in a cinematograph film (or other work) is expressly limited to acts of infringement occurring in Australia. This follows from section 101(1) of the Act, which provides that: "Subject to this Act, a copyright subsisting by virtue of this Part is infringed by a person who, not being the owner of the copyright, and without the licence of the owner of the copyright, does **in Australia**, or authorizes the doing **in Australia** of, any act comprised in the copyright" (emphasis added).

12.     Attached hereto as Exhibit A is a true and correct copy of section 101(1) of the Act.

13.     Further, the High Court of Australia, which is the highest court in the Australian judicial system -- the decisions of which are binding on all Federal and State Courts -- has previously held that Australian courts do not have jurisdiction over foreign intellectual property rights.

- 3 -

14.    This follows from the application of a principle known as the *Moçambique* rule. which has its origins in a decision of the House of Lords in *British South Africa Co v Companhia de Moçambique* [1893] AC 602, where it was held that an English court did not have jurisdiction to determine a claim for trespass to a mine in South Africa. The *Moçambique* rule, which is applied by Australian courts, states that a claimant is barred from bringing an action involving claims to the title or possession of foreign land or other immovables.

15.    Attached hereto as Exhibit B is a true and correct copy of the decision in *British South Africa Co v Companhia de Moçambique* [1893] AC 602.

16.    In *Potter v BHP* (1906) 3 CLR 479, the High Court of Australia applied the *Moçambique* rule to a claim for an alleged infringement of a patent occurring outside of the court's jurisdiction. In that case, Chief Justice Griffith held that: "There is no doubt. also. that this franchise or monopoly has no effective operation beyond the territory of the State under whose laws it is granted and exercised. In this respect it partakes of the nature of an immoveable as distinguished from a moveable."

17.    Attached hereto as Exhibit C is a true and correct copy of the decision in *Potter v BHP* (1906) 3 CLR 479.

18.    Subsequently, in *Norbert Steinhardt & Son Ltd v Meth* (1961) 105 CLR 440, the High Court of Australia approved the decision in *Potter* in the context of a threat of infringement proceedings of an Australian patent in England.

19.    Attached hereto as Exhibit D is a true and correct copy of the decision in *Norbert Steinhardt & Son Ltd v Meth* (1961) 105 CLR 440.

- 4 -

20.     Although the preceding High Court of Australia decisions do not expressly apply
the *Moçambique* rule to copyright infringement proceedings, the *Moçambique* rule has
been so applied in recent first instance copyright decisions in New Zealand (*Atkinson
Footwear Ltd v Hodgskin International Services Ltd* (1994) 31 IPR 186) and England
(*Tyburn Productions Ltd v Conan Doyle* (1990) 19 IPR 455). I consider that it is likely
that Australian courts would have regard to, and follow, these decisions.

21.     Attached hereto as Exhibit E are true and correct copies of the decisions in
*Atkinson Footwear Ltd v Hodgskin International Services Ltd* (1994) 31 IPR 186 and
*Tyburn Productions Ltd v Conan Doyle* (1990) 19 IPR 455.

22.     The opinion set out above is consistent with that set out by a leading commentator
in relation to copyright law in Australia, Dr Staniforth Ricketson.

23.     Attached hereto as Exhibit F is a true and correct copy of an extract from a book
published by Dr Ricketson in relation to general principles of jurisdiction over foreign
copyright under Australian law.

24.     In Australia, a foreign plaintiff that does not have assets in Australia can be
required to provide security for the defendant's legal costs. This is because Australia
follows the "English rule" in relation to costs – the unsuccessful party is usually required
to pay to the successfully party the legal costs of the successful party. Security can be
provided by way of bank guarantee or other appropriate methods. TS Productions LLC
has been requested to provide security for costs in relation to the Australian Proceedings,
but has refused to provide such security. I note that the "submission to jurisdiction"
paragraphs of the Declarations do not offer to provide any security for costs or state that
the Defendants named in the U.S. Complaint have assets in Australia.

25.    Moreover, even if an Australian court was to accept jurisdiction in respect of infringements of copyright occurring in the United States, an Australian court is highly unlikely to grant injunctive relief against a person or entity not located in Australia in relation to conduct not taking place in Australia. It also would be very difficult to enforce an award of damages or costs against the Defendants, despite the Declarations, if neither the Defendants, nor their assets, are within Australia.

26.    Accordingly, for the above reasons, it is my opinion that Australia is not an adequate or appropriate forum for decision of matters raised in the U.S. Complaint.


Signed this 16th day of June, 2008, in Brisbane, Australia.



John V. Swinson

- 6 -