# DECLARATION OF JOHN V. SWINSON

# EXHIBIT E

186

## ATKINSON FOOTWEAR LTD v HODGSKIN INTERNATIONAL SERVICES LTD and ANOTHER

HIGH COURT OF NEW ZEALAND

TIPPING J

19 October 1994 — Christchurch

Copyright — Interlocutory injunction sought restraining acts in New Zealand and Australia — Jurisdiction of court in personam and in rem to restrain acts outside jurisdiction — (NZ) Copyright Act 1962 ss 5, 7, 10.

The plaintiff alleged that the defendants had infringed its copyright in a number of works (comprising drawings and a prototype) for an ankle length boot. In an application for an interlocutory injunction, the plaintiff sought to restrain the defendants from importing, offering for sale or exhibiting in public, not only in New Zealand but also in Australia, any footwear which was a copy or substantial reproduction of the plaintiff's boot design. A primary issue facing the court was the permissible territorial scope of the injunction.

Held, granting the injunction but declining to extend its ambit beyond New Zealand:

(i) As a matter of general principle, the New Zealand court has jurisdiction in personam over any person who is served with the proceeding in New Zealand or who is validly served abroad. Subject to the ambit of the wrong alleged, relief, including an injunction, may be granted against any person properly before the court, even if the act which it is sought to compel or restrain, is to be performed overseas.

*Re: Liddell's Settlement Trusts* [1936] 1 Ch 365, referred to.

(ii) Under the Copyright Act 1962 (NZ), copyright protection only exists in New Zealand. Acts done outside New Zealand do not constitute an infringement of New Zealand copyright; only acts done in New Zealand constitute such infringement.

*Jonathan Cape Ltd v Consolidated Press Ltd* [1954] All ER 253; [1954] 1 WLR 1313; *Def Lepp Music v Stuart-Brown* [1986] RPC 273, referred to.

(iii) An assertion that acts done or threatened to be done outside New Zealand constitute an infringement of the copyright law of another country is not justiciable in the New Zealand courts; nor is an infringement of copyright under foreign law actionable under New Zealand law. Copyright gives a monopoly in the country which grants it. Whether copyright exists in another country and whether the plaintiff has title to it are questions in rem and not in personam. Whether there was an infringement of copyright in Australia was for the courts or Australia to determine.

*Potter v BHP Co Ltd* (1906) 3 CLR 479; *Norbert Steinhardt & Son Ltd v Meth* (1961) 105 CLR 440; *Tyburn Productions Ltd v Conan Doyle* (1990) 19 IPR 455; [1990] 1 All ER 909, referred to.

*M Perpick* for the plaintiff.

*K F Gould* and *P M Howard-Smith* for the defendants.

Tipping J. On 17 October 1994, I heard three interlocutory applications. At the end of the argument I announced the orders which I proposed to make. I

reserved one point which involved conflict of laws or private international law as it is sometimes called. In view of the lateness of the hour I said I would put my reasons in writing which I now do. I will also deal with the reserved point. In the proceeding Atkinson Footwear Ltd (Atkinson) sues Hodgskin International
5   Services Ltd (Hodgskin International) and Mr A V Hodgskin, who is its Governing Director, for breach of copyright. The subject matter of the proceeding is an ankle length boot.

In 1991 Mr Ross Walker, on behalf of Atkinson, designed an ankle boot known as Sasha. The design process from the original conceptual drawing through to the
10  finished Sasha boot is described in Mr Walker's affidavit. There is no need for me to go into the details. In its first amended statement of claim, Atkinson claims copyright in a number of artistic works which include the initial conceptual drawing, the prototype drawing and the sample or prototype boot itself. The latter is claimed to be both a sculpture and a model within the meaning of para (a) of
15  the definition of artistic work set out in s 2 of the Copyright Act 1962 (NZ).

I do not propose to express any opinion on the claims to copyright for the items other than the sample or prototype boot. Nor do I propose to express any opinion on the similarity between those items and Hodgskin International's boot. It is sufficient, for present purposes, to focus on the prototype Sasha boot. I am
20  satisfied that it is seriously arguable that such a prototype is a model and is thus an artistic work irrespective of artistic quality: see *Thornton Hall Manufacturing Ltd v Shanton Apparel (No 2)* (1988) 13 IPR 463; [1989] 1 NZLR 239 at 245 and *Bonz Group (Pty) Ltd v Cooke* [1994] 3 NZLR 216 at 221.

Hodgskin International is an importer of footwear manufactured overseas. It is
25  proposing to import into New Zealand an ankle boot made in China which it calls Dianne. The only visual evidence of the Dianne boot before the court at the moment is a line drawing which Mr Walker has annexed to his first affidavit. Atkinson found out about the proposed importation of the Dianne boot when it went to its retailers a little while ago. It was advised that there was a "knock off"
30  of its Sasha boot which was going to come onto the New Zealand market for the winter 1995 season. The so-called "knock off", this being a reference to the Dianne boot, was said by some to whom Atkinson spoke to be a very good copy of the Sasha boot. A sample of the Dianne boot has been available for inspection by New Zealand footwear retailers. Atkinson's Sasha boot sells to retailers at $79
35  a pair. This represents a profit for Atkinson of $7 per pair. The Dianne boot is going to be sold to retailers at $44 per pair. The precise profit on each pair is not known to Atkinson but it is a reasonable inference that it is not likely to be more than $7 per pair.

Atkinson has brought its proceeding in advance of the importation and sale of
40  the Dianne boot in commercial quantities. Coupled with the proceeding was an application for interim injunction and this was one of the interlocutory applications which I heard on 17 October. There is no need to discuss the principles of copyright law relevant to the present application. I recently reviewed some of them in detail in *Bonz Group (Pty) Ltd v Cooke*, supra.
45  Reference can also be made to the decisions of the Court of Appeal in *Wham-O Manufacturing Co v Lincoln Industries* [1984] 1 NZLR 641 and *Bleiman v News Media (Auckland) Ltd* [1984] 2 NZLR 673. I am satisfied that there is a serious issue to be tried on the proposition that Atkinson owns the copyright in its Sasha boot through the prototype as a model. There is no difficulty, at least for present
50  purposes, about originality. Nor is there any difficulty about Mr Walker having designed and made the prototype as an employee of Atkinson.

The next matter to be considered is whether Atkinson has shown a serious case to be tried that Hodgskin International has infringed or is threatening to infringe its copyright. Section 10 of the Act is relevant. Hodgskin International has no licence from Atkinson. It has already imported into New Zealand sample Dianne boots and it is obviously proposing to import into New Zealand further Dianne boots in commercial quantities because it has entered into contracts with New Zealand retailers to do so. The question becomes whether, to the knowledge of Hodgskin International, the manufacture and sale of the Dianne boots would have constituted an infringement if they had been made in New Zealand: see ss 10(2) and 10(3). There is evidence that Mr Hodgskin, whose mind is the mind of Hodgskin International, knew that the Dianne boot was a "knock off" of Atkinson's Sasha boot. For present purposes Atkinson has demonstrated a serious issue to be tried that Hodgskin International had the necessary knowledge for the purposes of s 10.

As to the similarity between the Dianne boot and the Sasha boot, it is unnecessary for me to express any concluded view. Indeed it would be inappropriate for me to do so. I am satisfied from a comparison of the Sasha prototype boot and the Dianne line drawing that there is sufficient objective similarity between the two to raise a prima facie inference of copying. There is also sufficient evidence to demonstrate the necessary causal connection, at least on an arguable basis. In other words, Atkinson, on the evidence before the court, has raised a serious question to be tried that Hodgskin International has infringed its copyright in the Sasha boot and will, if not restrained, continue to infringe it by the importation and sale of the Dianne boot.

The order sought on the application for interim injunction is an order restraining Hodgskin International and Mr Hodgskin from importing, selling, offering for sale or exhibiting in public, either in New Zealand or in Australia, any footwear which is a copy or a substantial reproduction of the boot which is produced by Atkinson and known as Sasha. The application is of an anticipatory or quia timet nature. It is brought because (quia) Atkinson fears (timet) that Hodgskin International is going to infringe. Mr Gould indicated that the evidence established that his client company was going to ensure that when the Dianne boots arrive in New Zealand in commercial quantities there will be sufficient difference between them and the Sasha boot to avoid infringement. If Hodgskin International does make sure of that then obviously they will be able to import and sell the Dianne boot in New Zealand without difficulty. I am satisfied, however, that Atkinson is entitled to an Interim injunction at this stage to make sure that Hodgskin International avoids infringement. At least prima facie and on the basis of the line drawing, any importation and sale by Hodgskin International of the Dianne boot would seem to me to run a substantial risk of infringement.

I note Mr Hodgskin's evidence that he got the idea for the Dianne boot from a Brazilian boot. Whether that proposition will be sufficient to demonstrate a lack of copying will obviously be something to be examined at trial, if a trial is necessary. There is, however, always the question of indirect copying and there is the evidence that Mr Hodgskin at least knew of the similarity. Further than that it would not be appropriate for me to go.

I am satisfied on the balance of convenience and on the overall justice of the case that a quia timet injunction should be issued. It will be very difficult for Atkinson to demonstrate what sales it has lost if an infringing Dianne boot comes onto the New Zealand market. While previous sales records may be of some relevance, Atkinson obviously hopes and anticipates that its sales will

Case 1:08-cv-02272    Document 29    Filed 06/16/2008    Page 5 of 20

substantially increase from last year. I am mindful of the fact that Hodgskin International has already taken orders from New Zealand retailers. The numbers appear fairly small, some 1267 pairs on the present evidence.

In view of timing factors canvassed in evidence, I am satisfied that for the 1995 winter season, it is unlikely that Hodgskin International will be selling many more pairs than those for which orders have already been taken. If one assumes a loss of sales of the Dianne boot at say 1500 pairs on the grant of an injunction and takes the view that the profit per pair is $5, Hodgskin International's loss of profit as a result of an interim injunction which was not sustained at trial would be in the vicinity of $7500. Atkinson's financial position is such that it can well meet such an amount, if that is the way the case ultimately goes.

I am influenced on matters of balance of convenience and overall justice by the fact that Atkinson already has a market in New Zealand for its Sasha boot. The importation by Hodgskin International of an infringing boot (and the injunction will only restrain the importation and sale of an infringing boot) would unfairly trespass into Atkinson's market. In addition there are, from apparently responsible sources, clear indications (albeit not tested by cross-examination) that Hodgskin International knows full well that its importation and sale of the Dianne boot will or may infringe Atkinson's copyright. In particular, there is the evidence of Mr Carrigan that at a conference Mr Hodgskin put the sample Dianne boot on the table and described it as "an Atkinson knock off".

There is also the evidence of Mr McLaren, who visited the premises of Hodgskin International in late June or early July 1994. While he was there Mr Hodgskin showed him some new footwear lines for the 1995 winter season, Mr McLaren recognised one of the lines, obviously the Dianne sample, as a copy of the Sasha boot. Mr McLaren says he told Mr Hodgskin that it would be unwise to import "knock offs" of other manufacturers' designs. According to Mr McLaren, Mr Hodgskin then told him forcefully that he would knock off any design he wished and nobody was going to tell him how to run his business. It should be noted, of course, that Mr Hodgskin has denied it but, for the purposes of interim relief, this evidence is of some force.

I have carefully considered Mr Gould's submissions suggesting that the balance of convenience favours allowing the importation to take place to be followed by a claim for damages if it is said that the boots, as ultimately imported, infringe. I do not consider that damages would be an adequate remedy for Atkinson. An infringement by Hodgskin International could cause Atkinson a lot of harm which it would be very difficult to assess in money terms. On the other hand if Hodgskin International turns out to have been wrongly restrained the harm to it will not be so great and is more easily quantifiable in money. From the point of view of overall justice, I am mindful of the prima facie strength of Atkinson's case and that copyright is a proprietary thing and, other things being equal, a clear prima facie, albeit anticipatory, breach should be restrained, subject, of course, to Atkinson's undertaking as to damages which, within the likely financial compass, it is well able to meet.

The final matter, and the point which I reserved, is the territorial scope of the injunction. Atkinson wishes it to extend to Australia. The general principle is that this court has jurisdiction in personam over any person who is served with the proceeding in New Zealand or who is validly served abroad. Subject to the ambit of the wrong alleged, relief, including an injunction, may be granted against any person properly before the court, even if the act which it is sought to compel or restrain, is to be performed overseas: see Dicey & Morris, *The Conflict of Laws,*

Case 1:08-cv-02272   Document 29   Filed 06/16/2008   Page 6 of 20

vol 1, 12th ed, Sweet & Maxwell, 1993, at pp 321-2. As Romer LJ said in *Re Liddell's Settlement Trusts* [1936] 1 Ch 365 at 374: "It is plain that this court has jurisdiction to order a person in this country to perform an act abroad ..." Whether any distinction should be drawn between ordering someone to do something abroad and ordering them not to do something abroad does not now have to be considered.

The wrong here alleged is breach of copyright. It is necessary to examine the territorial ambit of copyright under New Zealand law. The first step is to note that in terms of s 5 of the Copyright Act 1962 and subject to the provisions of the Act, no copyright subsists in our law otherwise than by virtue of the Act or by virtue of some other enactment. It is not suggested that any other enactment is presently relevant. Section 6 defines the nature of copyright. The owner of copyright has the exclusive right, subject to the provisions of the Act, to do and to license certain acts in relation to the copyright work in New Zealand. Thus copyright protection only exists within New Zealand. No one, who is not the owner or licensee of the copyright in an artistic work, may reproduce that work in any material form: s 7(4). Acts done outside New Zealand do not constitute an infringement of New Zealand copyright; only acts done in New Zealand constitute such infringement: see *Jonathan Cape Ltd v Consolidated Press Ltd* [1954] All ER 253; [1954] 1 WLR 1313 and *Def Lepp Music v Stuart-Brown* [1986] RPC 273. This is reinforced by s 10 which is confined to importing into and stipulated actions in New Zealand.

Similarly an assertion that acts done or threatened to be done outside New Zealand constitute an infringement of the copyright law of another country is not justiciable in the New Zealand courts; nor is an infringement of copyright under foreign law actionable under New Zealand law. Further authority for these and the earlier propositions can be found in two decisions of the High Court of Australia: *Potter v BHP Pty Co Ltd* (1906) 3 CLR 479 at 494 and *Norbert Steinhardt & Son Ltd v Meth* (1961) 105 CLR 440 at 443. These and other authorities were extensively reviewed by Vinelott J in *Tyburn Productions Ltd v Conan Doyle* (1990) 19 IPR 445; [1990] 1 All ER 909. Sir Arthur Conan Doyle's daughter claimed to be entitled under United States law to copyright in the characters of Sherlock Holmes and Dr Watson. Sir Arthur died in 1930 and his United Kingdom copyright had thus expired in 1980. It was held that the claim was not justiciable in the courts of the United Kingdom. The simple principle is that copyright gives a monopoly within the country which grants it. There can be no infringement in Australia of a New Zealand copyright: see Fullagar J in *Steinhardt & Son Ltd v Meth*, supra, at 443-4 cited by Vinelott J in *Tyburn Productions Ltd v Conan Doyle*, supra, at 915. Whether copyright exists in another country and whether the plaintiff has title to it there are treated as questions in rem not in personam and thus outside the general proposition with which I started this discussion. Therefore, whether the importation of Dianne boots and their sale in Australia constitutes a breach of the copyright law of Australia is for the courts of that country to determine: see *Copinger & Skone James on Copyright*, 13th ed, 1991 at pp 318-19, para 11-31. It can be noticed in passing that the position is different with a passing-off action, the basis of which is misrepresentation. There the wrong is not so territorially circumscribed as is copyright: see *Chaplin v Boys* [1969] 2 All ER 1085; [1971] AC 356; *Alfred Dunhill Ltd v Sunoptic SA* [1979] FS 337 and *Intercontex v Schmidt* [1988] FSR 575 at 578. Of course, the passing-off to be actionable in New Zealand must be a tort or civil wrong both under the lex fori and under the lex loci delicti, ie both

under the law where the claim is made and under the law where the alleged wrong took place: *Chaplin v Boys*, supra.

In addition to the territorial ambit of copyright law, it should also be noted that there has always been a reluctance to grant an injunction which will take effect outside the jurisdiction of the court granting it. As *Re Liddell's Settlement Trusts*, supra, shows, there is no absolute jurisdictional bar but there is, naturally, the need to exercise considerable caution. One of the reasons is that it may not necessarily follow that what is a wrong under New Zealand law will necessarily be a wrong under the law of the place where the conduct is threatened: see *Alfred Dunhill Ltd v Sunoptic SA*, supra. I am not aware of any statute in New Zealand which has a bearing on the issue, such as an enactment giving this court jurisdiction in a copyright case over conduct which is threatened in Australia. That is the only cautionary note I enter. In terms of the Copyright Act 1962 and indeed general principles, I do not consider, in respect of the former, that I have jurisdiction and, in respect of the latter, that it would be proper for me to make an order purporting to restrain Hodgskin International from importing and selling the Dianne boots or any boots in Australia.

The second interlocutory matter was an application by Hodgskin International for a change of venue to Auckland. The application was made on the basis of r 479 and turned primarily on the question of convenience for witnesses. The difficulty is that it is not known at the moment what the ultimate issues at trial will be. If Atkinson has to cover all the necessary ground then it may be obliged to call quite a number of witnesses from Christchurch. If, however, the issues are more circumscribed the numbers of witnesses may be able to be reduced. Mr Gould responsibly and realistically accepted that it was not really possible at this early stage to determine whether the case could be more conveniently tried in Auckland or in Christchurch. It was ultimately agreed that the proper course was to dismiss the present application for change of venue but without prejudice to Hodgskin International's right to make a further application when the position had become clearer and a more definitive assessment can be made.

The third matter was an application by Mr Hodgskin personally to be struck out of the proceedings. Mr Howard-Smith argued on his behalf that the only allegation against him was that he had acted as the agent of Hodgskin International. It was suggested, for that reason, he could not be personally liable if there had been infringement. Ms Perpick indicated that the only reason why Mr Hodgskin had been joined in the proceedings was in case he endeavoured personally or through some other entity, to evade an injunction granted against Hodgskin International. Mr Howard-Smith indicated that Mr Hodgskin had no such intention and would be prepared to be included personally in any injunction granted against the company. That injunction, it was accepted, could also properly include any entity controlled by Mr Hodgskin. On that basis Ms Perpick accepted that Mr Hodgskin should be struck out of the proceedings in his personal capacity. That, if I may say so, was a very proper and sensible way of resolving the issue on both sides.

Having heard counsel on the subject of costs, I decided that the preferable course in respect of all three matters was to reserve costs. I do not propose to give any detailed reasons for that course. It seems to me that the interim injunction matter, which was by far the most substantial, should not have a formal award of costs at this stage. I record that Atkinson has a prima facie entitlement to costs and that the argument on all issues took a full day. I am of the view that it would

be better to await developments before making any formal order. If the parties are unable to resolve outstanding issues or if the matter goes to trial, then the costs questions can be revisited.

The formal orders made, for the reasons which I have given, are as follows:

1. Pending the trial of this proceeding both the first defendant an Mr A V Hodgskin, and any entity controlled by him, are restrained from importing into, selling, by way of trade offering for sale or exhibiting in public in New Zealand, any footwear which is a copy or a substantial reproduction of the boot which is produced by the plaintiff and known as Sasha.
2. The second defendant is struck out of the proceeding.
3. The first defendant's application for change of venue is dismissed without prejudice to a further application.
4. Costs on all issues are reserved.

ANDREW BROWN
BARRISTER & SOLICITOR

455

## TYBURN PRODUCTIONS LTD v CONAN DOYLE

HIGH COURT OF ENGLAND – CHANCERY DIVISION

VINELOTT J

2 February 1990

Copyright in literary characters — Application for declaration of no subsisting copyright in US and injunction to prevent defendant from making such assertions — Whether justiciable in England — Transitory and local actions — Civil Jurisdiction and Judgment Act 1982 (UK) s.30.

The plaintiff was a UK company producing and distributing cinematograph films and television programmes. The defendant was the only surviving child of the late Sir Arthur Conan Doyle. Sir Arthur had died in 1930 and accordingly United Kingdom copyright in all his works had expired in 1980.

The plaintiff was currently producing a television film entitled "The Abbot's Cry" which was original in all respects except for the characters Sherlock Holmes and Dr Watson. In 1984 the plaintiff had produced another television film entitled "The Masks of Death" which was also "original" except for the characters Sherlock Holmes and Dr Watson. The plaintiff had sought to distribute that film in the United States of America through its distributor but had received a letter from the defendant's agents claiming that she was entitled to copyright in the characters of Sherlock Holmes and Dr Watson and that distribution of the film in the USA would be an infringement. On that occasion the plaintiff's distributor agreed upon a settlement figure with the defendant, an agreement which the plaintiff claims was entered into by its distributor without its approval.

Completion of "The Abbot's Cry" would have involved the plaintiff in considerable expense and it feared that it would be unable to recoup that expense unless it was able to distribute the film in the USA. Any threat by the defendant to take proceedings in the USA would have been likely to make it impossible to distribute the film in the USA. The plaintiff could not have obtained a declaration in the USA that "The Abbot's Cry" did not infringe any right of the defendant and therefore applied to the English courts seeking first a declaration that the defendant had no rights in the characters Sherlock Holmes and Dr Watson under US law and secondly an injunction restraining the defendant from making to any third party any such assertion.

The defendant applied to strike the statement of claim in the action.

Held, striking out the action:

(i) The distinction between transitory and local actions which precludes an English court from deciding questions as to title to immovable property situated abroad should also apply to intellectual property rights.

*British South Africa Co v Cia de Moçambique* [1893] AC 602; [1891-4] All ER Rep 640, applied.

(ii) The question whether the defendant had any rights in the characters Sherlock Holmes and Dr Watson under the copyright, unfair competition or trade mark laws of the USA or an individual state thereof was not justiciable in the English courts.

(iii) Since there was no allegation that the defendant had threatened to assert these rights without any bona fide belief that she was entitled to them the claim for an injunction had to fail.

*Granby Marketing Services Ltd v Interlego AG* [1984] RPC 209 referred to.

(iv) *Per curiam*: Since there was no evidence that if the validity of the rights claimed were justiciable in the English courts, the decision of the English courts would be treated as binding on any of the States of the United States of America it would be an exercise in futility to allow these claims which raised complex issues to continue.

*J E Rayner James QC* for the plaintiff.

*G W Hobbs* for the defendant.

*Cur. adv. vult.*

Vineloit J. This is an application to strike out the statement of claim in this action on each of the grounds set out in the Rules of the Supreme Court O 18, r 19(1).

The background to the action can be shortly stated and is not in dispute. The defendant, Lady Bromet, is the only surviving child of the late Sir Arthur Conan Doyle. She is commonly known as and is sued as Dame Jean Conan Doyle, though she was formerly married to the late Air Vice-Marshal Sir Geoffrey Bromet, who died in 1983. Lady Bromet, who was at one time Director of the Women's Royal Air Force, was created a Dame of the British Empire in 1963. She resides in England. Sir Arthur died in 1930 and accordingly United Kingdom copyright in all his works expired in 1980.

The plaintiff company, Tyburn Productions Ltd (Tyburn), was incorporated under United Kingdom Companies Acts. It carries on the business of producing and distributing cinematograph films and television programmes. In 1984 Tyburn produced a television film "The Masks of Death" which was made from a script written for Tyburn and based on a story also written for Tyburn. It is claimed and is not in dispute that the script and story were original in every respect save that they featured the characters Sherlock Holmes and Dr Watson.

Tyburn sought to distribute the film in the United States of America through its distributor, Lorimar Distribution International Inc (Lorimar). Before distribution had commenced in the United States of America Lorimar received a letter from the agents acting for Lady Bromet claiming that she was entitled to copyright in the characters of Sherlock Holmes and Dr Watson and that distribution of the film in the United States of America would be an infringement.

By an agreement dated 10 July 1985 Lorimar agreed to pay Lady Bromet $US30,000 in consideration of a waiver by Lady Bromet of her right to sue Tyburn and Lorimar for infringement under "copyright laws, unfair competition laws, trade mark laws or other laws relating to the protection of literary characters"; in consideration of the waiver Lorimar and Tyburn also agreed that the picture would not be released until 31 January 1986. Tyburn claims that that agreement which was entered into by Lorimar purportedly on its behalf as well as on its own behalf was entered into without its approval.

Tyburn is now producing another television film, "The Abbot's Cry". The script and the book are again said to be based on original work commissioned by Tyburn save only that they feature the characters of Sherlock Holmes and Dr Watson. Completion of the television film will

involve Tyburn in considerable expense and it fears that it may not be able to recoup the expense unless it can distribute the film in the United States of America. A threat by Lady Bromet to take proceedings in the United States or in one of the States of the United States would be likely to make it
5  impossible to distribute the film in the United States unless a further payment satisfactory to Lady Bromet were made. It is common ground also that Tyburn cannot obtain a declaration in the United States that the television film does not infringe any right of Lady Bromet, whether under copyright law, unfair competition law or trade mark law, or any anticipatory
10  or quia timet injunction.

Tyburn thus finds iself in an unenviable position. If it completes the film it may be unable to distribute it in the United States if these claims are advanced again. At the same time there is no way in which Tyburn can compel Lady Bromet to initiate proceedings in which the existence of her
15  claimed rights can be tested. The mere assertion of her rights may be enough to frustrate the distribution of the film in the United States.

It is in these circumstances that Tyburn seeks the assistance of the English courts. On 23 March 1989 Tyburn, having sought and having failed to obtain an assurance from Lady Bromet that she was not entitled to
20  prevent it from making and distributing a film based on an original story and script but containing characters called Sherlock Holmes and Dr Watson, issued the writ in this action with a statement of claim indorsed on it. The relief sought is, first, a declaration that Lady Bromet has no rights in the characters Sherlock Holmes and Dr Watson under the copyright, unfair
25  competition or trade mark laws of the United States of America such as would entitle her to prevent distribution in the United States of America of "The Abbot's Cry" or of any other cinematograph film or television programme which may hereafter be produced by Tyburn from an original story featuring the characters Sherlock Holmes or Dr Watson and, secondly,
30  an injunction restraining Lady Bromet from making to any third party any assertion to the effect that she is entitled to prevent the distribution in the United States of America of any such film or programme by reason of any interest or right claimed by her under the laws of the United States of America in those characters.

35  A considerable volume of evidence has been filed by the parties directed to the question whether the characterisation and not the name of a literary character alone is entitled to protection under United States law under any of the heads I have mentioned. It is common ground that copyright law is Federal law while unfair competition and trade mark law are at least in part
40  State law.

As regards copyright law Lady Bromet has apparently been registered under provisions entitling the surviving child of an author to be registered as the person entitled to copyright in some of the late Sir Arthur Conan Doyle's work, the last 14 out of a total of some 60. There is considerable
45  dispute whether the claim that the characterisation of Sherlock Holmes and Dr Watson if and so far as repeated in the later 14 works but derived from the earlier works attracts copyright protection; the claim if valid would seem to have the consequence of indirectly affording a measure of copyright protection to the earlier works in that they could not be reproduced without
50  using those characters. It is not necessary and it would be wrong for me to form any opinion whether the claims by Lady Bromet are or are not well

founded or as to the likelihood or otherwise that she could successfully assert them in any of the States of the United States of America. Counsel for Tyburn, while making it clear that Tyburn and its advisers take the view that the claims asserted are little more than fanciful, was not prepared to go so far as to say that I should disregard them altogether.

The central issue in this case is whether the distinction between transitory and local actions which was considered by the House of Lords in *British South Africa Co v Cia de Moçambique* [1893] AC 602; [1891-4] All ER Rep 640 was fundamental to their decision and if it was whether an action raising questions as to the validity or infringement of patent rights, copyrights, rights to trade marks and other intellectual property rights are properly to be considered actions of a local nature or whether this distinction was, as it were, an historical prologue setting out the basis of the narrower rule that the English courts will not entertain proceedings raising questions as to the title to or for damages for trespass to land.

Lord Herschell LC gave the leading judgment. Lord Morris expressed his agreement with it. Much of the speech of Lord Herschell LC is concerned with the history of the distinction between transitory and local actions and the consequence of that distinction in domestic law. However, he cited with approval a passage in the judgment of Buller J in *Doulson v Matthews* (1792) 4 Term Rep 503 at 504; [1775-1802] All ER Rep 144 and said (AC at 621; All ER Rep at 646): "'It is now too late for us to inquire whether it were wise or politic to make a distinction between transitory and local actions: it is sufficient for the courts that the law has settled the distinction, and that an action quare clausum fregit is local. We may try actions here which are in their nature transitory, though arising out of a transaction abroad; but not such as are in their nature local. In saying that we may not try actions here arising out of transactions abroad which are in their nature local, I do not think that the learned judge was referring to the mere technical difficulty of there being no venue in this country in which those transactions could be laid, but to the fact that our courts did not exercise jurisdiction in matters arising abroad "which were in their nature local".' The case of *Doulson v Matthews* has ever since been regarded as law, and I do not think it has been considered as founded merely on the technical difficulty but in this country a local venue was requisite in a local action."

He concluded that "the grounds upon which the courts have hitherto refused to exercise jurisdiction in actions of trespass to land situated abroad were substantial and not technical" and that the distinction was not accordingly affected by the Judicature Acts: see AC at 629; All ER Rep at 650.

Lord Halsbury, having cited *Story's Conflict of Laws* § 553, in which Vattel is cited, added (AC at 631; All ER Rep at 651): "That very learned lawyer proceeds to point out that the distinction between local and transitory actions is one which is known to the common law." Then after a review of earlier authorities he concluded (AC at 632; All ER Rep at 652): "Where therefore the actual place of, for instance, a debt or contract was alleged (though contrary to the fact) to be some place in England, the defendant was not at liberty to deny that the place alleged was in England, since in such matters the place was immaterial. But wherever the place was material, as the unvarying current of authorities establishes that it was in all

controversies relating to land, the defendant might traverse the place, and, even if he did not, if it appeared in proof that the place was out of England, the plaintiff was nonsuited."

Lord Macnaghten concurred in the motion reversing the decision of the Court of Appeal.

The submission of counsel for Tyburn was that the analysis of the distinction between transitory and local actions although relied on to justify the conclusion than an action bringing into issue the title to or for damages for trespass to foreign land would not be entertained in the English courts should not be given any wider scope. He submitted that the decision of the House of Lords in the *Moçambique* case has always been treated as restricted to actions bringing into issue title to or for damages for trespass to land. In *Hesperides Hotels Ltd v Muftizade* [1979] AC 508 at 534; [1978] 2 All ER 1168 at 1173 Lord Wilberforce referred to the ruling in the *Moçambique* case in the following terms: "The rule in the *Moçambique* case can be conveniently stated in the form in which it is generally accepted; viz, in Dicey and Morris's *The Conflict of Laws*, r 79. I quote from the ninth edition (1973) p 516 but it appears as r 53 in the same form (except for one letter) in the third edition (1922) p 223 edited by Professor Dicey himself and Dr Berriedale Keith — 'Subject to the Exceptions hereinafter mentioned, the court has no jurisdiction to entertain an action for (1) the determination of the title to, or the right to the possession of, any immovable situate out of England (foreign land); or (2) the recovery of damages for trespass to such immovable.' The exceptions later mentioned relate to actions in equity (*Penn v Lord Baltimore* (1750) 1 Ves Sen 444; [1558-1774] All ER Rep 99) and other special cases on which reliance cannot be placed in this appeal."

That again was a case where damages were claimed for trespass to land outside the United Kingdom. The House of Lords declined to depart from this rule or to limit it to cases where title is in dispute. Lord Fraser questioned the utility of the rule, which has since been modified by statute. Section 30 of the Civil Jurisdiction and Judgments Act 1982 (UK) provides, subject to an exception in sub-s (2) which is not material to this case, that the jurisdiction of any court in England and Wales or Northern Ireland to entertain proceedings for trepass to or any other tort affecting immovable property shall extend to cases in which the property in question is situated outside that part of the United Kingdom unless the proceedings are principally concerned with the question of the title to or the right to the possession of property.

However, in *Potter v Broken Hill Pty Co Ltd* (1906) 3 CLR 479 the High Court of Australia (Griffith CJ, Barton and O'Connor JJ) held that the rule applies when the validity of or infringement of a patent is in issue; it held that the validity of a patent granted in exercise of a sovereign power conferred on the State of New South Wales was not justiciable in the courts of the State of Victoria.

Griffith CJ, having referred to Lord Herschell LC's description in *Steers v Rogers* [1893] AC 232 at 235 of the right conferred by a patent as "the right to exclude others from manufacturing in a particular way, and using a particular invention" and to a similar description of a patent in the United States case of *Bloomer v McQuewan* (1852) 55 US (14 How) 539 at 549, said (CLR at 494): "There is no doubt, also, that this franchise or monopoly has no effective operation beyond the territory of the State under whose laws it

is granted and exercised. In this respect it partakes of the nature of an immoveable as distinguished from a moveable. It is true that the distinction taken between moveables and immoveables by writers on international law has never, so far as I know, been expressly applied to the case of patent rights. Yet there can be no doubt that, as the right is the creation of the State, the title to it must devolve, as in the case of land, according to the laws imposed by the State. In two important particulars, therefore, it is analogous to an immoveable. It differs from an immoveable in that it is neither itself visible nor appurtenant to any particular thing that is visible and fixed within the State. It may perhaps be regarded as, in a sense, appurtenant to the whole territory."

Then, having referred to an argument advanced on behalf of the appellant that the grant of a patent right is not an act of government within the rule, he concluded (CLR at 496-7): "The first objection requires more serious attention. There is no doubt, for some purposes a great difference between an act of State, such as that involved in *Underhill v Hernandez* (1897) 168 US 250 (which was an exercise of physical force) and the grant of a monopoly. But I apprehend that any exercise by a de facto repository of any power of sovereignty, which results in the creation of a right of property that can only be created by such an exercise, must be regarded as an act of the State itself. This appears to be the foundation of the document referred to in the passage cited by Story J from Vattel, and quoted both by Lord Herschell LC and Lord Halsbury in *British South Africa Co v Cia de Moçambique* [1893] AC 602 at 623, 631; [1891-4] All ER Rep 640 at 647, 651. 'The defendant's judge (that is, the competent judge), says he,' referring to Vattel, 'is the judge of the place where the defendant has his settled abode, or the judge of the place where the defendant is when any sudden difficulty arises, provided it does not relate to an estate in land, or to a right annexed to such an estate. In such a case, inasmuch as property of this kind is to be held according to the laws of the country where it is situated, and as the right of granting it is vested in the ruler of the country, controversies relating to such property can only be decided in the State in which it depends.' Story, *Conflict of Laws*, sec 553). In Chitty's edition of Vattel, p.173, the words 'as the right of granting it is vested' are translated as 'as the right of granting the possession is vested'. We have not had an opportunity of considering the original text of Vattel, but I can conceive that the variation in language makes no difference to the argument, which is, that the right of creating a title to such property as land, being vested in the ruler, that is in the sovereign power, of the country, controversies relating to such property can only be decided in the State in which the property is situated. The reason appears equally applicable to patent rights, which, as already pointed out, are created by a similar exercise of the sovereign power."

Barton and O'Connor JJ similarly treated the question as concluded by the *Moçambique* decision. O'Connor J said (CLR at 510): "The principles of international law, which systematises the comity of nations, generally recognise that the courts of a country will not inquire into the validity of the acts of a foreign State, except subject to certain well-known limitations. The principles upon which the limitations rest are concisely stated as follows in *Cia de Moçambique v British South Africa Co* [1892] 2 QB 358 at 395 by Lord Esher MR in his judgment in the Queen's Bench Division — a judgment

which was afterwards upheld in the Court of Appeal. 'With regard, then, to acts done within the territory of a nation, we are all agreed that such nation has without more jurisdiction to determine the resulting rights growing out of those acts; but, with regard to acts done outside its territory it has no jurisdiction to determine the resulting rights growing out of those acts; unless such jurisdiction has been allowed to it by the comity of nations.' For instance, the courts of most nations will refuse to adjudicate upon claims of title to foreign land in proceedings founded upon an alleged invasion of the proprietary rights attached to it."

It is accepted by counsel for Tyburn that no distinction can be drawn for this purpose between patent rights, copyright and rights to trade marks and other intellectual property rights. He submitted that in the light of the decision of the House of Lords in *Hesperides Hotels Ltd v Muftizade* [1979] AC 508; [1978] 2 All ER 1168 and of s 30 of the 1982 Act, the principle laid down in *British South Africa Co v Cia de Moçambique* [1893] AC 602; [1891-4] All ER Rep 640, even if it was originally capable of extending beyond actions bringing into issue the title to or for damages for trespass to foreign land, should now be confined within that scope. The legislature, he said, must have so understood the rule and it would create an intolerable anomaly if the rule were now held to apply to intellectual property rights of the nature in question. He accordingly invited me not to follow *Potter v Broken Hill Pty Co* (1906) 3 CLR 479 or the more recent decision in *Norbert Steinhardt & Son Ltd v Meth* (1961) 105 CLR 440 where the High Court of Australia applied the same principle to the "threats" section of the Australian patent statute (which corresponds to the provision first introduced by s 6 of the Patents and Designs Act 1932 (UK)) and held that an action is not maintainable in Australia in respect of a threat of proceedings for infringement of an Australian patent made in England.

In that case the principle is very shortly stated by Fullagar J as follows (CLR at 443-4): "A patent for an invention gives a monopoly within the territory of the country which grants it. Outside that territory it has no force or effect. The English Patents Act relates exclusively to English patents, and the infringements which it makes unlawful are infringements of English patents only. In the same way, the Australian Patents Act relates exclusively to Australian patents, and the infringements which it makes unlawful are infringements of Australian patents only. 'If, therefore, an Australian patentee sues in Australia for an infringement alleged to have been committed in England, and it is asked whether the act complained of was actionable in England, the answer must be: No. For his Australian patent gives him no monopoly in England, and what the defendant has done in England is perfectly lawful according to English law. There can, in truth, be no such thing as an infringement in England of an Australian patent: see *Potter's* case [1905] VLR 612 at 638 per Hodges J."

These decisions are not of course binding on me. I should none the less be reluctant to decline to follow decisions of the High Court of Australia reached after very full argument unless I felt convinced that they do not reflect the law of England or that circumstances have so changed as a result of social or economic developments or statutory intervention that the rule should now be confined to actions in which title to land is in issue: Moreover, the application of the rule to intellectual property rights of this nature can I think be supported by other authority.

. It should be noted first that Willes J, giving the decision of the Exchequer Chamber in *Phillips v Eyre* (1870) LR 6 QB 1 at 28, stated the rule in the following terms: "There are restrictions in respect of locality which exclude some foreign causes of action altogether, namely, those which would be local if they arose in England *such as* trespass to land and even with respect to those not falling within that description our courts do not undertake, universal jurisdiction." (My emphasis.)

Lord Herschell LC similarly founded his decision on a distinction between transitory actions and "actions here arising out of transactions abroad which are in their nature local"; see *British South Africa Co v Cia de Moçambique* [1893] AC 602 at 621; [1891-4] All ER Rep 640 at 646. He did not in terms restrict it to actions claiming title to or damages for trespass to land. The two Australian decisions are, I think also supported by the recent decision of Sir Nicolas Browne-Wilkinson V-C in *Def Lepp Music v Stuart-Brown* [1986] RPC 273. In that case one question was whether the plaintiffs could bring themselves within the "double actionability" rule which is stated in *Dicey and Morris on the Conflict of Laws* (1980) 10th ed, vol 2, p 935 in the following terms (r 172): "(1) As a general rule, an act done in a foreign country is a tort and actionable as such in England, only if it is both (a) actionable as a tort according to English law, or in other words is an act which, if done in England, would be a tort; and (b) actionable according to the law of the foreign country where it was done."

The rule so stated was approved by the House of Lords in *Chaplin v Boys* [1971] AC 356; [1969] 2 All ER 1085.

In the *Def Lepp* case the plaintiffs claimed to be the owners of the United Kingdom copyright in a tape recording. It was said that the sixth defendant, a company incorporated and resident in Luxembourg, had manufactured records from the recording and had sold them to the eighth defendant, a Dutch company, and that the eighth defendant in turn had sold them to the ninth defendant who had imported a number of them into the United Kingdom. Leave to serve the sixth and eighth defendants having been obtained ex parte they applied to set aside the order granting leave or alternatively to strike out the claim as against themselves. The evidence before the court was that the manufacture took place outside the United Kingdom and that the sales by the sixth defendant to the eighth defendant and by the eighth defendant to the ninth defendant took place outside the United Kingdom and that the eighth defendant had not imported the records into the United Kingdom. Sir Nicolas Browne-Wilkinson V-C accordingly treated the plaintiffs' primary claim as a claim for infringement of a United Kingdom copyright by acts done outside the United Kingdom. He held that that claim was bound to fail (at 275): ". . . only acts done in the United Kingdom constitute infringement either direct or indirect of such right." However, counsel for the plaintiffs also relied on r 172. The judgment of Sir Nicolas Browne-Wilkinson V-C, after citing r 172, records (at 276): "[Counsel for the plaintiffs] says that 'it is common ground that under the law of Luxembourg and Holland the making of the records and their sale constitute legal wrongs." As I understand it there was no allegation in the statement of claim that these acts constituted legal wrongs and no evidence of Dutch or Luxembourg law. However, Sir Nicolas Browne-Wilkinson V-C went on to dismiss this further contention on the ground that even if these acts had constituted legal wrongs under Dutch and

Luxembourg law they would not have been justiciable in the English courts. He said (at 276): "In my judgment, this conclusion is supported by considering what would happen if the action were to proceed in the English courts. The majority decision in *Chaplin v Boys* ... seems to me to show that r 172 is a rule for regulation of choice of law to be applied to the tort. In cases brought in England under r 172, the court generally gives effect to the substantive law of England (*lexi fori*) as opposed to the law of the place where the act is committed (*lex delicti*): see per Lord Donovan; Lord Wilberforce; and Lord Pearson [1969] 2 All ER 1085 at 1097-8, 1100, 1102, 1111; [1971] AC 356 at 383, 385, 387, 389, 400. Having once applied r 172 to establish which law is applicable and found that the applicable law is the law of England, the question must be whether under English law those acts constitute an actionable wrong. For that purpose, if under English law the plaintiff's right is to complain of acts done in England alone (the place of the doing of the act being of the very essence of the claim) it could not be right for the trial judge to proceed on the footing that acts in fact done abroad were done in the United Kingdom. In other words, although for the purpose of establishing what is the appropriate law the acts may have to be deemed to have been done in England, on the trial of a substantive case the court must be bound to have regard to the actual facts and not to any deemed facts."

It is I think clear that in characterising the alleged infringements as acts "the place of the doing of" which was "of the very essence of the claim" Sir Nicolas Browne-Wilkinson V-C had in mind the distinction drawn in the *Moçambique* case [1893] AC 602 at 621; [1891-4] All ER Rep 640 at 646 and in *Potter v Broken Hill Pty Co Ltd* (1906) 3 CLR 479 at 496, 510 between transitory actions and actions such as are in their nature local. *Potter's* case and *Norbert Steinhardt & Son Ltd v Meth* (1961) 105 CLR 440 had both been cited to him. In my judgment, although *Def Lepp Music v Stuart-Brown* [1986] RPC 273 is complicated by the claim that acts done outside the United Kingdom constituted infringement of the United Kingdom copyright and by reliance on r 172, it is authority for the proposition that a claim that acts done outside the United Kingdom constitute an infringement of the copyright law of a foreign country is not justiciable in the English courts. The first limb of r 172 cannot be satisfied because an infringement of a foreign copyright cannot constitute a tort under English law; the fact that the act complained of if done in England would have constituted a breach of an English copyright law, if any, is then irrelevant; for the locality of the act is inseparable from the wrong. By contrast, although goodwill is local an action for passing off is an application of the tort of misrepresentation and the court can grant an injunction to restrain passing off in a foreign jurisdiction if the threatened conduct of the plaintiff is unlawful in that jurisdiction: see *Alfred Dunhill Ltd v Sunoptic SA* [1979] FSR 337.

Counsel for Lady Bromet also relied on the decisions of the Court of Appeal and the House of Lords in *Rey v Lecouturier* [1908] 2 Ch 715; affd [1910] AC 262. The plaintiff represented the monks who formerly lived at the monastery of Grande Chartreuse and manufactured the liqueur Chartreuse. A trade mark was registered here in the name of the procureur. A French statute called the Law of Associations passed in 1901 enacted that if a religious association failed to obtain the authorisation of a minister its

dissolution should be decreed by the civil tribunal and its property should pass to a judicial liquidator. Authorisation having been refused the community at La Grande Chartreuse was dissolved and a judicial liquidator was appointed. In 1903 it was held by the French courts that the goodwill and ownership of the trade marks of the business passed to the liquidator and that decision was affirmed by the Cour de Cassation. The liquidator successfully applied to be substituted for the procureur as the proprietor of the English trade marks. The action was to restrain the liquidator and his assignees from passing off liqueur of their manufacturer as that of the monks; but it was heard together with a motion to expunge the registration of the name of the liquidator as proprietor of the marks. The judgments in the Court of Appeal and the House of Lords are largely concerned with the passing off claim, which succeeded. The claim to rectify the register also succeeded.

Buckley LJ observed (Ch at 731): "The French judgment was subject to these limitations: first, the French court was not adjudicating upon matters over which it had no jurisdiction; it was adjudicating upon this business as carried on in France, upon its goodwill, and the trade marks as there enjoyed; but that court had no jurisdiction to determine what ought to be the entries in the register of trade marks in England, nor could its order affect the goodwill, if any, in England."

As Lord Macnaghten pointed out in the House of Lords, the liquidator's title to be entitled to the English trade marks faced the equally fundamental difficulty that the 1901 Act was a penal law which could not have any extra-territorial effect (see AC at 265). Lord Shaw similarly observed (at 271): "It is accordingly clear that, when the English courts are appealed to on the ground that the law of the Republic referred to operated a transfer of foreign trade marks, that is, done in face of a judicial declaration by high French authority, that the law sought to be enforced abroad was an exceptional and police law."

However, the decision of Buckley LJ that the French courts had no jurisdiction to determine the title to the English trade marks lends further support to the proposition that the question of the validity of title to and of infringement of a trade mark fall exclusively within the jurisdiction of the courts of the country by the laws of which the trade mark was created. Again there can be no distinction for this purpose between copyright, patent rights and trade marks.

In my judgment therefore the question whether Lady Bromet is entitled to copyright under the law of the United States of America or of any of the states of the United States of America is not justiciable in the English courts. Counsel for Tyburn accepted, rightly, I think, that if this question is not justiciable in the English courts then in the light of the decision of the House of Lords in *British Airways Board v Laker Airways Ltd* [1985] AC 58; [1984] 3 All ER 39 the claims for an injunction and a declaration must fail.

Counsel for Lady Bromet relied on a further ground. Assuming in favour of Tyburn that questions of the validity of and of infringement of the rights asserted by Lady Bromet were justiciable in the English courts Tyburn has not shown that there is any present issue between the parties on which the courts can be asked to adjudicate or any threatened act capable of being

restrained by injunction. All that is said in the statement of claim is that Lady Bromet claims rights in the characters or characterisation of Sherlock Holmes and Dr Watson under the several heads of United States law that I have mentioned and intends to assert those claims if the new film "The Abbot's Cry" is completed and if steps are taken to distribute it in the United States of America.

In the absence of any allegation that Lady Bromet has threatened to assert these rights without any bona fide belief that she is entitled to them the claim for injunctive relief must fail. Counsel relied in support of that proposition on my decision in *Granby Marketing Services Ltd v Interlego AG* [1984] RPC 209.

Counsel for Tyburn, while reserving the right to contend that the principle is too widely stated in my judgment (in particular that I was not referred to a decision of the House of Lords in *White v Mellin* [1895] AC 154), did not seek to dissuade me from following my own decision. He submitted that even if the statement of claim does not support a claim for injunctive relief he is entitled to pursue his claim for declaratory relief and then if that succeeds he may be entitled to injunctive relief at the trial on the footing that no claim to those rights could thereafter be made by Lady Bromet in the honest belief that she is entitled to them. In support of his submission that the claim for declaratory relief should not be struck out he relied primarily on the decison of the Court of Appeal in *Guaranty Trust Co of New York v Hannay & Co* [1915] 2 KB 536; [1914-15] All ER Rep 24. Lord Wilberforce in *Camilla Cotton Oil Co v Granadex SA* [1976] 2 Lloyd's Rep 10 at 14 referred to the *Hannay* case as a "well-known but confused case". In *Re Clay, Clay v Booth* [1919] 1 Ch 66 at 79; [1918-19] All ER Rep 94 at 97 Duke LJ observed of the judgments in the *Hannay* case: "I cannot doubt that any of the Lords Justices who were parties to that decision would have been greatly surprised to hear some of the conclusions which are founded upon it here today."

In the *Camilla Cotton* case [1976] 2 Lloyd's Rep 10 at 14 Lord Wilberforce, after referring to the judgment of Lord Sterndale MR in *Hanson v Radcliffe UDC* [1922] 2 Ch 490 at 506; All ER Rep 160 at 162, pointed out that in *Hannay* "Lord Sterndale himself had said (KB at 564; All ER Rep at 36): '... a declaration that a person is not liable in an existing or possible action is one that will hardly ever be made.'" Lord Wilberforce went on to observe: "'Hardly ever' is not the same as 'never' but the words warn us that we must apply some careful scrutiny. So I inquire whether to grant such a negative declaration would be useful."

In the instant case there is no evidence that if the validity of the rights claimed were justiciable in the English courts the decision of the English courts would be treated as binding on any of the States of the United States of America and it would in my judgment be an exercise in futility to allow these claims, which raise complex issues which may require a survey by the English courts with the assistance of experts of the laws of each of the States of the United States of America, to continue.

In my judgment, therefore, this application succeeds. The statement of claim must be struck out in its entirety.

Solicitors for the plaintiff: *Marriott Harrison Bloom & Norris*.

Solicitors for the defendant: *Norton Rose*.

MOBY RAHMAN
BARRISTER