IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DREW HERIOT and<br>DREW PICTURES PTY LTD.,<br><br>    Plaintiffs,<br><br>vs.<br><br>RHONDA BYRNE, THE SECRET LLC<br>(AKA TS HOLDINGS LLC), PRIME TIME<br>US INC., TS PRODUCTION HOLDINGS<br>LLC, TS PRODUCTION LLC,<br>TS MERCHANDISING LTD., and<br>ROBERT E. RAINONE, JR.,<br><br>    Defendants. | Civil Case No. 08CV2272<br><br>The Honorable Suzanne B. Conlon |
| TS PRODUCTION LLC,<br><br>    Counterclaimant,<br><br>vs.<br><br>DREW HERIOT and<br>DREW PICTURES PTY LTD.,<br><br>    Counterclaim Defendants. | |

**TS PRODUCTION LLC'S FIRST AMENDED COUNTERCLAIM**

David S. Elkins
Joseph A. Meckes
Joseph P. Grasser
SQUIRE, SANDERS & DEMPSEY L.L.P.
600 Hansen Way
Palo Alto, CA  94304-1043
Telephone:  (650) 856-6500
Facsimile:   (650) 843-8777

Jack J. Carriglio
James G. Argionis
MECKLER BULGER & TILSON
123 North Wacker Drive, Suite 1800
Chicago, IL  60606
Telephone:  (312) 474-7900
Facsimile:   (312) 474-7898

Attorneys for Defendants
RHONDA BYRNE, TS RER LLC
(erroneously named as "THE SECRET LLC"
and "TS HOLDINGS LLC"), PRIME TIME
US INC., TS PRODUCTION HOLDINGS
LLC, TS MERCHANDISING LTD.,
ROBERT E. RAINONE, JR. and Defendant
and Counterclaimant TS PRODUCTION LLC

Defendant and counterclaimant TS Production LLC ("TSP") counterclaims against plaintiffs and counterclaim defendants Drew Heriot ("Heriot") and Drew Pictures Pty Ltd. ("Drew Pictures") (collectively "Plaintiffs") as follows.

## JURISDICTION AND VENUE[1]

1.  This counterclaim arises under United States Copyright Laws, 17 U.S.C. §101 et seq. This court has subject-matter jurisdiction under 28 U.S.C. §§1331, 1338(a) and 2201.

2.  Venue is proper in this District Court under 28 U.S.C. §1391.

## PARTIES

3.  TSP is a Hungarian limited liability company with a principal place of business at H-1074 Budapest, Dohány utca 12, Hungary. TSP is the owner, by assignment, of the intellectual property in the made-for-television documentary *The Secret*, the book of the same name, and all underlying and related original works of authorship.

4.  TSP is informed and believes and therefore alleges that Heriot is an Australian citizen presently living in Los Angeles, California on a temporary visa.

5.  TSP is informed and believes and therefore alleges that Drew Pictures is a company organized under the laws of Australia, with a principal place of business near Melbourne, Australia.

## BACKGROUND FACTS

### *Byrne and Prime Time Australia first meet Heriot*

6.  In 1994, Rhonda Byrne ("Byrne") co-founded Prime Time Productions Holdings Pty Ltd ("Prime Time Australia") to pursue her own creative vision and approach to television production. At the time, Byrne had been an executive producer for Australia's national Nine Network, with experience in commercial television production spanning over twenty years. Byrne's new company quickly became successful, with Byrne personally originating, creating

---

[1] The assertion of the TS Production LLC's rights in this action should in no way be viewed as a waiver or abandonment of the position that this dispute would be more appropriately and conveniently determined in the Federal Court of Australia.

and producing several successful television programs, including *The World's Greatest Commercials*, *Great Escapes*, *Learners* and *Oz Encounters: UFOs in Australia*. In or around 2000, Prime Time Australia was working on a reality television show called *Australia Behaving Badly* and using FM-TV's production facility to edit the largely unscripted show. One evening, the FM-TV editors that Prime Time Australia requested were not available for a late night editing session. As a substitute, FM-TV made Heriot, then a young video editor recently out of high school, available for that session.

7. Byrne's and Prime Time Australia's next production was *Marry Me*, an original, unscripted reality television series. Byrne created the series, with Prime Time Australia's Paul Harrington ("Harrington") collaborating on the research and execution of the concept. Other than Heriot doing some minor work on a couple of days during the course of the roughly year-long production, he was not involved with the production of *Marry Me* as television network staff editors did the vast majority of the editing for *Marry Me*'s first season.

8. Following strong ratings, a second season of *Marry Me*, renamed *Loves Me, Loves Me Not* but still based on Byrne's original concept, was commissioned. Prime Time Australia's early exposures to Heriot had led it to believe he had potential, and during his employment, the company nurtured the young editor's desire to become a director. In 2002, Prime Time Australia hired Heriot to work on *Loves Me, Loves Me Not* and gave him the roles of video editor and television director for the unscripted reality series' second season. This decision ultimately caused significant financial losses, strain on other personnel and damage to the company's reputation.

*Creative roles in television production are different from similarly titled motion picture roles*

9. The role of a television director is quite different from that of a motion picture director. In motion pictures for the "silver screen," the director is usually a creative force behind a production. Experienced directors such as Cecil B. DeMille, John Ford, Robert Altman, Steven Spielberg, Martin Scorsese and Spike Lee often conceived, sometimes wrote and, in their director role, always transformed the movies they made.

10. Programs or series for television, on the other hand, are typically the creations of television producers or executive producers. Grant Tinker (*The Mary Tyler Moore Show*, *Rhoda*, *The Bob Newhart Show*), Norman Lear (*All in the Family*, *Maude*, *The Jeffersons*), Steven Bochco (*Hill Street Blues*, *LA Law*, *NYPD Blue*), John Wells (*China Beach*, *ER*, *Third Watch*, *The West Wing*) and David Chase (*The Sopranos*) were or are all producers or executive producers.

11. The director of a television series—or, in the case here, a made-for-television documentary—plays a functional role. While a television director might lend a creative eye in staging and shooting scenes, the principal role of a television director is essentially that of a supervisor charged with completing filming on time and on budget, and with seeing that the various personnel involved in filming do their jobs. This was precisely Heriot's role as director for Prime Time Australia in connection with *Loves Me, Loves Me Not*, with a later unscripted documentary named *Sensing Murder*, and with the also unscripted made-for-television documentary series *The Secret*.

**Heriot's initial forays into directing for Prime Time Australia do not meet with success**

12. Heriot's first stint as director for Prime Time Australia was not a success. Unlike the outstanding success of *Marry Me*, production of its follow-up series, *Loves Me, Loves Me Not*, ended six months behind schedule and substantially over budget and was pulled mid-season by the network due to a substantial audience decline. Nevertheless, Prime Time Australia—in the hope that Heriot's initial experience might lead to improved performance—gave him another opportunity. Prime Time Australia and Heriot (through his personal company, Drew Pictures Pty Ltd. ("Drew Pictures")) signed a Consultancy Agreement in October 2003, under which Heriot agreed to work exclusively for Prime Time Australia as directed and supervised by Prime Time Australia personnel, including Byrne. Heriot requested that he be employed through Drew Pictures—which apparently existed only at the home of Heriot's father near Melbourne, Australia—for personal tax reasons. Despite Drew Pictures' existence, Heriot functioned in every way as an employee of Prime Time Australia: he worked at Prime Time Australia full-

time, was paid every second week like other employees, received paid vacation time, paid public holidays and took his directions from Byrne, the company's principal.

13. The Consultancy Agreement required Heriot to work and devote his whole "time, attendance and skills during normal business hours, and at such other times as may be reasonably necessary, to the proper conduct of the affairs of" Prime Time Australia. In addition, the Consultancy Agreement provided that Heriot's pay consist of two components. The first component provided that Heriot, like most employees, would receive a regular salary paid every two weeks. The second component was an incentive payment—typical of that extended to manager-level employees of many companies—that was "'at risk' and performance based." The incentive payment would be in a range of 5-10% of Prime Time Australia's profits on a given project, but was discretionary and capped at AUS$20,000 in any financial year.

14. The next Prime Time Australia production after the effective date of the Consultancy Agreement was *Sensing Murder*, a largely unscripted television documentary series dedicated to solving actual unsolved murder cases in Australia. Byrne acquired the rights to a Scandinavian production, made substantial improvements to the concept and pitched it successfully to Australia's Seven Network. Harrington again collaborated on the research and on execution of the concept. A pilot episode was commissioned, and its audience appeal led to the commission of a further six episodes for Australia's Ten Network. Byrne decided to give Heriot a limited director role and, in the hope that he would learn to follow budgets and schedules, also made him the Series Producer.

15. Unfortunately, Heriot's mismanagement made *Sensing Murder* a disaster for Prime Time Australia. Under Heriot, the series went far over budget and off schedule, resulting in a major financial loss for Prime Time Australia. The Ten Network, on which the show had aired, did not broadcast the entire series and did not renew it.

16. Prime Time Australia was not willing to give Heriot a further opportunity as producer. The company was willing to provide Heriot with a final directing opportunity, albeit

one with strict limitations and oversight and one in which he would work with three other television directors: *The Secret*.

### *Conception and creation of The Secret made-for-television documentary*

17.     *The Secret* is a made-for-television documentary conceived by Byrne, Prime Time Australia's principal. By 2004, Byrne had experienced several recent traumatic events in her personal and professional life. These events caused her to begin a journey of personal exploration. On September 9, 2004, while reading *The Science of Getting Rich* by Wallace D. Wattles, Byrne had an epiphany and became aware of an incredible natural law that can and does influence a person's life. While reading *The Master Key System* by Charles Haanel and other works, Byrne realized that this natural law was called the law of attraction. Byrne's epiphany impelled her forward into months of thought, research and investigation, tracing the real and potential effects of the law of attraction—"The Secret." Byrne saw The Secret included in many areas of philosophy and years of writings, incorporating almost every religion and field of human endeavor throughout history. This realization transformed Byrne, and she conceived a new mission for her life: to share with the world what she had learned about The Secret and how to practice it in everyday life. Given her background, Byrne quickly saw that a television documentary about The Secret would be an ideal way to illustrate its principles and share it with the greatest number of people.

18.     Byrne immediately began the work necessary to create *The Secret*. She started several months of research into the teachings of leading experts in the field. In January 2005, Byrne's research had progressed sufficiently far that she called together Harrington and other employees of Prime Time Australia to present her vision for the company's next production. Over the next several weeks, she taught her team—as she had previously taught family and friends—about the law of attraction and its impact on wealth, personal relationships, health and other aspects of one's life. In March 2005, Byrne prepared, with Harrington's support, a detailed pitch document for Australian television networks that contained subject headings that would later become chapters of the documentary.

19.     As Byrne conceived it, *The Secret* made-for-television documentary would be comprised of interviews of prominent present-day adherents and teachers of the law of attraction. These teachers include many accomplished philosophers, authors, doctors and scientists, such as the Rev. Dr. Michael Beckwith, a nonaligned religious teacher of meditation and scientific prayer who conducts retreats and speaks at conferences and seminars, and Jack Canfield, the author of the worldwide bestseller *Chicken Soup for Soul*® who has been called America's "#1 success coach." After filming, the interviews would be edited into segments, or clips, and arranged into the chapter outline that Byrne had conceived. Byrne also conceived the idea of having dramatic sequences that reenacted historical events she had discovered or that dramatized applications of The Secret's precepts. As Byrne developed her vision, *The Secret* turned into a reflection of her life and her search through history for the truth about the law of attraction.

20.     Byrne and Harrington viewed *The Secret* as Heriot's last opportunity to succeed as a director working for Prime Time Australia. Byrne gave Heriot the opportunity only after he committed to improve many aspects of his behavior and performance. Although Heriot's previous directing stints had been unsuccessful, Byrne and Harrington felt that their own extensive experience creating popular and commercially successful programs would allow them to closely supervise Heriot as a director and allow Byrne's vision for *The Secret* to be fulfilled.

21.     In the first few months of 2005, Byrne and her team continued to meet repeatedly about *The Secret* at Prime Time Australia's offices. At one meeting in May 2005, notes concerning Byrne's explanation of the chapters and chapters' contents were made on a white board. Heriot was tasked with being the stenographer, typing the notes on his laptop. The notes became a document that Heriot called the "Episode Precis."

22.     The work involved in preparing for filming continued, with Harrington leading a team engaged in detailed research into the work and beliefs of each of the teachers. During this time and the rest of the production process, Prime Time Australia paid for salaries, actors, travel, music rights, stock footage, facilities, rental equipment and other production costs, using all of its resources to do so.

23.     When the team reached the point of being able to start filming, Prime Time Australia engaged an Australian film crew and Byrne, Harrington and Heriot traveled with the film crew to the United States, the residence of most of the teachers Byrne wanted to interview for the documentary. Byrne had learned of the teachers through her research or because Byrne had made direct, personal contact with the teachers. Of the 55 interviews planned, Byrne had identified 54. As head of the production, Byrne was present for 53 of the 55 total interviews.

24.     Byrne and, sometimes Heriot, interviewed the teachers. Byrne drew upon her months of research about the teachers and her years of interview experience in preparing interview questions and structuring each interview, whether conducted by her or Heriot. The questions were intended to create a flow of guided but unscripted thoughts and ideas from the teachers. The teachers' responses, after being edited, would form the backbone of *The Secret* made-for-television documentary. (The questions do not appear and were never intended to appear in the documentary itself.)

25.     Unfortunately, Heriot's presence at the interviews proved unhelpful. After only eleven days of filming, with only a portion of the interviews completed, Byrne instructed Heriot to return to Australia to help with the editing process while she remained in the United States to finish filming. A majority of the interviews at which Heriot was present were not usable in the final documentary. After Heriot's departure, the remaining interviews were successfully conducted by Byrne; the vast majority of these were used in *The Secret*.

26.     Byrne specifically instructed Heriot to prepare a "paper edit." A "paper edit" is a written document used to plan an edit session to reduce the amount of time spent in the edit suite, typically because such facilities are expensive to operate. To prepare for the paper edit, interview tapes are transcribed into a document. The paper editor then inserts comments, noting the precise time on the tape for each. The resulting document is used as a starting point by the video editor to arrange the video (here, interview segments) in some rational sequence.

27.     Byrne instructed Heriot to prepare a paper edit as a vehicle to monitor and control Heriot's work. Without a paper edit, she felt that Heriot would waste the editor's time and

would fail to capture her vision for the documentary. Unfortunately, the paper edit that Heriot developed did not reflect Byrne's concept for *The Secret*. Heriot lacked both the experience needed to orchestrate a complex editing project and the understanding of The Secret necessary to implement Byrne's vision—his paper edit proved to be of little or no use. *The Secret* made-for-television documentary was eventually assembled in strict accordance with Byrne's vision by a team consisting of Byrne, Harrington, Heriot and the editors in the edit suite, along with continuing input from the rest of the production team.

28.     Once the editing process for *The Secret* made-for-television documentary commenced, the video draft that resulted from each editing round was transcribed. Several Prime Time Australia employees shared the transcription task. Heriot bestowed the transcribed edits with the title "tranSCRIPT." The tranSCRIPT was updated at regular intervals as the editing team completed new rounds of edits. Heriot contends that the tranSCRIPT is a "screenplay" for *The Secret* made-for-television documentary. It is not. A screenplay is prepared *before* production or filming and is the written form of a story for a motion-picture production, including descriptions of characters, details of scenes and settings, dialogue and stage directions.[2] By contrast, the tranSCRIPT was a reactive document that simply reflected the work performed in the edit suite. While Heriot claims to be the "author" of the tranSCRIPT, it is not an original work of authorship nor is he an "author" of the document in any sense of the word.

29.     Under Byrne's guidance and direction, *The Secret* became an allegory for her life and for her journey of discovery in learning about The Secret and sharing it with the world.

### Launch of The Secret

30.     In January 2006, the Nine Network decided to defer broadcasting *The Secret* made-for-television documentary. Byrne, who by this time had exhausted all of her company's

---

[2] See for example *Webster's New Collegiate Dictionary* at 1030 (1981).

financial resources and even mortgaged her home to produce *The Secret*, investigated alternative avenues for distribution of the documentary.

31. In the meantime, Byrne had struck up a friendship with defendant Robert E. Rainone, Jr. ("Rainone"), an experienced businessman based in Chicago. Rainone recognized the potential of *The Secret* to enhance the lives of many and matched Byrne's enthusiasm for making *The Secret* available to as many people across the globe as possible. Together, Byrne and Rainone decided to seek distribution of *The Secret* in DVD format and in a "pay-per-view" stream over the Internet. They contacted Melbourne-based Vividas Pty Ltd. about converting *The Secret* to a format suitable for streaming over the Internet.

32. Determined to find a way to share *The Secret* with the world, Byrne founded a new company, TSP, to control licensing and bear its risks. To facilitate distribution of *The Secret* through TSP, Prime Time Australia assigned its copyright interests in *The Secret* documentary and in any related works to Byrne, who in turn contributed by assignment her sole copyright interest in the works to TSP.

33. *The Secret*'s Internet launch took place on March 26, 2006 and almost immediately was viewed by customers in multiple countries around the world. Internet sales of *The Secret* initially averaged five purchases per minute.

### *Heriot separates from Prime Time Australia and moves to the U.S.*

34. By the time of the March 26, 2006 launch, Prime Time Australia had depleted all of its financial resources and had released virtually all of the employees and other personnel who had worked on the production of *The Secret*. At about the same time, Heriot unilaterally had decided to move to the United States, apparently to further his career. Prime Time Australia had not asked him to move—production on *The Secret* was finished, the company had no plans for an additional production and it had no production facilities in the United States. More fundamentally, Heriot had failed in virtually every aspect of his role as a director for Prime Time Australia. His attempts at creative input were consistently overruled by Byrne and Harrington. Moreover, instead of focusing on his job, Heriot wasted time on unnecessary and unauthorized

side projects. Heriot had also clashed constantly with others at Prime Time Australia. His decision to move became a natural point of separation, and the company was relieved to see him leave.

35. Nonetheless, Heriot continued to seek Prime Time Australia's sponsorship for visa purposes, which the company declined. Heriot proceeded with his move without a valid visa sponsorship from Prime Time Australia. He maintained contact with Byrne and Harrington, among others, and after *The Secret* became a commercial success, he asked to become a distributor of *The Secret* DVDs.

36. In June 2005, during production of *The Secret* made-for-television documentary, Heriot had provided Prime Time Australia, through Byrne, with an unsolicited gift of AUS$10,000. Prime Time Australia deposited his check but, unsure of what to do with the gift, kept it segregated from its financing sources. After launch, Prime Time Australia returned the AUS$10,000 to Heriot.

*Byrne and Prime Time Australia controlled production of The Secret documentary*

37. Byrne was the originator of the idea for *The Secret* and the owner of Prime Time Australia. At all times, she exercised complete creative control over the concept, writing, filming, editing and post-production work on *The Secret.*

38. In contrast, Heriot had no independent creative control over *The Secret*. His work was always subject to Byrne's close supervision and was almost always revised or changed by Byrne or another member of the team.

39. Throughout the course of production of *The Secret* documentary, Prime Time Australia controlled all aspects of production, including without limitation planning, filming, editing and post-production work.

    a. All equipment used in the production of *The Secret* documentary was owned or leased by Prime Time Australia or by third party contractors hired by Prime Time Australia.

   b. Neither Drew Pictures nor Heriot furnished any motion picture or television equipment used in production of *The Secret* documentary.

   c. Heriot worked full time on *The Secret* documentary during its production.

   d. Heriot was not engaged in any projects other than *The Secret* documentary during its production.

   e. Prime Time Australia and Heriot understood that Prime Time Australia could assign work projects to Heriot during production of *The Secret* documentary.

   f. Although he sometimes worked late or on weekends with the rest of the production team, Heriot typically worked during Prime Time Australia's normal business hours while *The Secret* documentary was in production.

   g. Prime Time Australia paid for Heriot's services on a bi-weekly basis during production of *The Secret* documentary.

   h. Neither Heriot nor Drew Pictures was permitted to hire assistants to work on *The Secret* documentary without the permission of Prime Time Australia.

  40. In October 2007—19 months after release of *The Secret* documentary—Heriot asserted that he is the "co-author" or co-owner of copyrights for *The Secret* documentary, *The Secret* book and related materials. To TSP's knowledge, the assertion had never been made, by Heriot or anyone else, before October 2007. Indeed, Heriot's sudden assertion took TSP and the Defendants in this action by surprise—because it is entirely false.

### ***Byrne writes The Secret book***

  41. While distribution of *The Secret* over the Internet and in DVD format garnered quick success, Byrne anticipated that her vision could be shared even more broadly if she could convey it in book form. In July and August 2006, Byrne wrote *The Secret* book. While the book contains excerpts from the words of the teachers, including some quotations featured in *The Secret* documentary, the book is Byrne's original work of authorship and consists primarily of her original writing.

42.  *The Secret* book was published by Atria Books/Beyond Words, a division of well known publisher Simon & Schuster, in November 2006.  Many people have found the book to be an important inspirational tool in their lives, as evidenced by its appearance for weeks at the top of many bestseller lists.  Even today, almost two years after release, *The Secret* book's sales rank is 39 on www.amazon.com.

**First Counterclaim for Relief**
**(Declaratory Judgment that TS Production is Sole Owner of Copyright in *The Secret* documentary, book and related materials)**

43.  TSP incorporates by reference the allegations of paragraphs 1 through 42 of this Counterclaim as if fully stated herein.

44.  TSP counterclaims against Plaintiffs pursuant to the copyright laws of the United States, 17 U.S.C. §101 *et seq.*, and the Declaratory Judgments Act, 28 U.S.C. §§2201-2202.

45.  In their Complaint against Defendants filed on April 21, 2008, Plaintiffs and Counterclaim Defendants allege that they own an interest in the "Works," including *The Secret* documentary, book and related materials.

46.  An actual controversy exists between TSP and Plaintiffs and Counterclaim Defendants as to ownership of copyright in *The Secret* documentary, book and related materials.

47.  TSP, by virtue of assignment, is entitled to a declaration that it is the sole owner of the copyrights in *The Secret* made-for-television documentary, book and related materials, including without limitation all versions of *The Secret* made-for-television documentary, *The Secret* book and any documents related to the process of creating *The Secret*.  TSP is also entitled to an injunction requiring that (a) Plaintiffs and Counterclaim Defendants assign to TSP any copyright registration(s) that Plaintiffs and Counterclaim Defendants have obtained in *The Secret* documentary, book and related materials and (b) restraining Plaintiffs and Counterclaim Defendants from taking any other action inconsistent with TSP's sole ownership interest in *The Secret* documentary, book and related materials

## PRAYER

WHEREFORE, Defendants pray for judgment as follows:

1. That judgment be entered in favor of TSP on its Counterclaim;

2. That TSP be declared the sole owner of copyright for *The Secret* documentary, book and related materials;

3. That Plaintiffs/Counterclaim Defendants be required to assign to TSP any copyright registrations related to *The Secret* documentary, book and related materials;

4. That the Court enter a permanent injunction preventing Plaintiffs/Counterclaim Defendants from seeking Copyright registrations in *The Secret* documentary, book and related materials or any derivatives thereof in the United States or any other jurisdiction;

5. That the Court enter a permanent injunction restraining Plaintiffs/Counterclaim Defendants, and all persons acting on their behalf or in concert with them, from taking any other action inconsistent with TSP's sole ownership interest in *The Secret* documentary, book and related materials, including without limitation asserting or threatening to assert any charge of infringement against any third person with respect to *The Secret* documentary, book and related materials;

6. That Plaintiffs/Counterclaim Defendants be required to pay TSP's costs of suit; and

7. That TSP be awarded such other relief as the Court may deem just and proper.

-14-

## **JURY DEMAND**

Defendant /Counterclaimant TSP hereby demands a trial by jury on all issues and claims so triable.

Dated:  August 11, 2008

By: /s/ David S. Elkins
David S. Elkins
Joseph A. Meckes
Joseph P. Grasser
SQUIRE, SANDERS & DEMPSEY L.L.P.

Jack J. Carriglio
James G. Argionis
MECKLER BULGER & TILSON

Attorneys for Defendants
RHONDA BYRNE, TS RER LLC
(erroneously named as "THE SECRET LLC"
and "TS HOLDINGS LLC"), PRIME TIME
US INC., TS PRODUCTION HOLDINGS
LLC, TS MERCHANDISING LTD.,
ROBERT E. RAINONE, JR. and Defendant
and Counterclaimant TS PRODUCTION LLC