IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **DREW HERIOT and**<br>**DREW PICTURES PTY LTD.,** ) | ) |
| ) | |
| Plaintiffs and ) | Case N. 08 C 2272 |
| Counterdefendants, ) | |
| ) | |
| v. ) | Judge Suzanne B. Conlon |
| ) | |
| **RHONDA BYRNE, THE SECRET LLC** ) | Magistrate Judge |
| **(a/k/a TS HOLDINGS LLC)** ) | Martin C. Ashman |
| **PRIME TIME US INC.,** ) | |
| **TS PRODUCTION HOLDINGS LLC,** ) | |
| **TS PRODUCTIONS LLC, and** ) | |
| **TS MERCHANDISING LTD.,** ) | |
| ) | |
| Defendants and ) | |
| Counterclaimants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Drew Heriot ("Heriot") and Drew Pictures Pty Ltd. ("Drew Pictures")

(collectively "Plaintiffs"), sued defendants Rhonda Byrne, The Secret LLC (a/k/a TS Holdings

LLC), Prime Time US Inc., TS Production Holdings LLC, TS Production LLC, and TS

Merchandising Ltd. (collectively "Defendants"). Currently before this Court are Defendants'

Motion to Compel Production of Documents Plaintiffs Contend are Privileged ("Defendants'

Motion") and Plaintiffs' Motion to Compel Production of Documents Concerning Joan Kaufman,

Martin Goodrich and Cheryl Durham ("Plaintiffs' Motion"). This Court rules on these Motions

under Judge Suzanne B. Conlon's referral of this case for discovery supervision pursuant to Local

Rule 72.1. For the reasons stated below, this Court denies in part and grants in part Defendants'

Motion. This Court also denies in part Plaintiffs' Motion and withholds its ruling on the remainder of Plaintiffs' Motion until after Defendants comply with this Order.

## I. **Background**

This Court has limited the procedural and factual history to the information relevant to the disputes involving Plaintiffs' and Defendants' Motions. For the sake of brevity, this section omits some facts discussed in later sections of this Order. The two separate sections below deal with the facts concerning each Motion. Before reaching those sections, however, this Court recounts the basic facts underlying this lawsuit.

This case involves a controversy over *The Secret*, a made-for-television documentary that purports to reveal the "most powerful law in the universe." The Secret, http://www.thesecret.tv/ (last visited Mar. 17, 2009). As if that declaration was not grandiose enough, the website further claims that, "[b]y applying the knowledge of this law, you can change every aspect of your life." *Id.* Heriot is an Australian citizen who directed *The Secret*. (Compl. ¶ 1; Answer ¶ 1). Drew Pictures is an organization organized under the laws of Australia (Answer ¶ 2), and allegedly employs Heriot and holds the rights to his works (Compl. ¶ 2). Defendants are various individuals and entities involved in *The Secret*'s development. (Answer at ¶¶ 3-9.)

Plaintiffs sued Defendants on April 21, 2008, in the United States District Court for Northern District of Illinois. (Compl. ¶ 1.) In their complaint, Plaintiffs sought a declaratory judgment of copyright ownership (which, they claim, results in Defendants' "duty to account") and an equitable accounting. (*Id.* at ¶¶ 60-75.) Plaintiffs also claimed Defendant infringed their copyrights and were unjustly enriched. (*Id.* at ¶¶ 76-84.) Defendants answered the complaint on August 4, 2008, denying Plaintiffs' claims and asserting affirmative defenses. (*See* Answer.)

-2-

Additionally, in the answer, defendant TS Production LLC asserted a counterclaim, which prayed for a declaratory judgment that TS Production LLC was the sole owner of the copyright in the disputed works Defendants claimed "Drew Pictures wrongfully registered with the United States Copyright Office on September 10, 2007." (Answer 1 at ¶ 2, 14 at ¶¶ 1-10.) Discovery ensued.

## A. Facts Concerning Defendants' Motion

Defendants' Motion concerns documents Plaintiffs produced pursuant to Defendants' request. On July 25, 2008, Defendants served Plaintiffs with their First Request for Production of Documents, which included a request for "[a]ll documents relating to United States visa applications filed by or on behalf of Heriot." (Pls.' Resp. to Defs.' Mot. 4.) To comply with Defendants' production request, Plaintiffs hired Open Door Solutions LLP, a "document vendor" (the "Vendor"), which "provide[d] electronic scanning, [Optical Character Recognition], and other discovery related services for this case." (*Id.* at 3-4.) The subsequent process by which Plaintiffs eventually produced the documents had several steps.

First, the Vendor created a database of the documents provided to it by Plaintiffs ("Master Database"), which Plaintiffs then could review. (*Id.* at 3-4.) Second, during April and May of 2008, Plaintiffs "had paralegals and other non-lawyers conduct a preliminary review [of] the documents in the Master Database," assigning documents "general, pretrial discovery codes." (*Id.* at 4.) One general code was "immigration," which Plaintiffs "used to flag documents (primarily e[-]mails) that had anything to do with Mr. Heriot's immigration to the United States." (*Id.*)

Third, Plaintiffs searched for responsive documents in their Master Database. (*Id.*) Fourth, once identified, these responsive documents would be "coded for subsequent copying and inclusion in the Production Database." (*Id.*) Additionally, Plaintiffs would mark responsive

-3-

documents "as either Confidential or Highly Confidential under the Stipulated Protective Order."[1] (*Id.*)

To comply with Defendants request regarding Heriot's immigration visa, Plaintiffs requested and received a paper copy of the visa from Heriot's immigration lawyer. (*Id.* at 5.) On or around August 22, 2008, Plaintiffs gave the Vendor Heriot's visa application "with instructions to (1) scan and add it to the Master Database, (2) copy the scanned versions to the Production Database, . . . (3) electronically stamp the application as 'Highly Confidential' for production[,] . . . [(4)] Bates Stamp all documents in the Production Database, and . . . [(5)] include Mr. Heriot's visa application and other sensitive material at the front of the production." (*Id.* at 5-6.) Unfortunately, the Vendor imported Heriot's visa application into the Master Database, assigning it the general "immigration" code. (*Id.* at 6.) The Vendor then made another mistake, copying all the documents with the "immigration" code from the Master Database to the Production Database, stamping them all "Highly Confidential." (*Id.*) This mistake resulted in the Vendor unintentionally including additional e-mails marked as "Highly Confidential" in the production. (*Id.*)

On August 25, 2008, after completing this process, Plaintiffs produced around 1499 documents comprised of 6952 pages. (Defs.' Mem. in Supp. of Defs.' Mot. 1; Pls.' Resp. to Defs.' Mot. 6.) On October 17, 2008, Defendants' counsel, David Elkins, asked Plaintiffs if they had withheld any documents on the basis of privilege, to which Plaintiffs responded in the negative. (Pls.' Resp. to Defs.' Mot. 6-7.) On October 22, 2008, apparently in preparation for a deposition

---

[1] On September 5, 2008, Judge Conlon entered a Stipulated Protective Order. Under this order, the parties could mark documents as either "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

scheduled to take place on October 24, 2008, Plaintiffs learned of the allegedly inadvertently

disclosed documents. (*Id.* at 7.) The next day, October 23, 2008, Plaintiffs sent Defendants a

letter in which Plaintiffs stated that they had inadvertently disclosed several documents protected

by the attorney-client privilege, identified those documents (the "Sequestered Documents"), and

requested their destruction. (*Id.*, Ex. B at ¶ 14; Defs.' Mem. in Supp. of Defs.' Mot. 6.)

Defendants complied with Plaintiffs' request, directing their "e-discovery vendor to seal off all

access to," and destroying all but one set of copies[2] of, the Sequestered Documents by

October 27, 2008. (Defs.' Mem. in Supp. of Defs.' Mot. 6.)

Defendants then filed their Motion currently before this Court on November 14, 2008. In

their memorandum supporting this Motion, Defendants argued that this Court should prevent

Plaintiffs from "clawing back" the Sequestered Documents and order Plaintiffs to produce them.

(*Id.* at 1-2.) That same day, Defendants also sought leave to file its Motion under seal. Judge

Conlon referred these motions to this Court on November 19, 2008, expanding the scope of the

previous referral dated July 24, 2008. This Court granted Defendants leave to file documents

under seal on December 2, 2008. Plaintiffs responded to Defendants' Motion on December 5,

2008. In their response, Plaintiffs' asserted that the Documents were privileged. The next day,

December 9, 2008, Defendants filed their reply to Plaintiffs' Response to Defendants' Motion.

## B. Facts Concerning Plaintiffs' Motion

Plaintiffs' Motion, like Defendants' Motion, concerns documents, albeit different ones.

Sometime in or before October 2008, Plaintiffs propounded on Defendants requests for

---

[2] The Defendants kept one set of copies to file under seal with this Court. (Defs.' Mem. in Supp. of Defs.' Mot. 6.)

-5-

documents, to which Defendants responded on October 24, 2008, by producing a Privilege Log

("Log"). (Pls.' Mot. 2.) The Log identified 998 documents that Defendants withheld on the basis

of privilege. (*Id.*, Ex. A.) Eleven days later, on November 4, 2008, Defendants produced a

Supplemental Privilege Log ("Supplemental Log"), which identified a total of 1467 documents,

including those disclosed in the Log, withheld based on privilege. (*Id.*, Ex. B.)

In response, on November 11, 2008, Plaintiffs identified over 132 documents ("Identified

Documents") in Defendants Log and Supplement Log (collectively "Logs") that Plaintiffs

contended involved communications with three non-privileged third parties: Joan Kaufman

("Kaufman"), Martin Goodrich ("Goodrich"), and Cheryl Durham ("Durham"). (*Id.*, Ex. C.)

Plaintiffs contended that Kauffman was Prime Time's outside book-keeper, Goodrich was Prime

Time's outside accountant, and Durham was Goodrich's assistant. (*Id.* at 2.)

That same day, Plaintiffs requested the Identified Documents from Defendants, asking

Defendants to respond no later than November 14, 2008. (*Id.*, Ex. C) One day prior to the

deadline, Defendants responded that, "[w]hile [Plaintiffs] state that 'at least 132 entries' in

Defendants' . . . [Logs] appear challengeable . . . , [Plaintiffs'] e[-]mails actually identify 248

separate production ranges–almost twice that amount." (*Id.*, Ex. D.) Defendants further stated

that they were re-reviewing the Identified Documents and could not comply with the request by

November 14, 2008. (*Id.*) They did, however, state that they would eventually comply with the

request and would be "prepared to explain further why [the] [I]dentified [D]ocuments are

privileged . . . or promptly produce any erroneously designated as privilege (if any)." (*Id.*)

Later, Defendants noticed the depositions of, among others, Goodrich and Kaufman.

Plaintiffs filed a motion for a protective order and a motion to quash the deposition notices on

November 21, 2008.[3] Defendants filed a Memorandum in Opposition to Plaintiff's motion on

November 24, 2008. In that memorandum, Defendants referred to the depositions as "third-party

depositions," and otherwise referred to Goodrich and Kaufman as "third parties," "third party

witnesses," or "nonparty witnesses." (*Id.*, Ex. H at 1-3, 7.)

  That same day, Plaintiffs received Defendants' response to its November 14, 2008,

demand for documents. (*Id.* at 3, Ex. I.) In that response, Defendants explained why the

Identified Documents were privileged. (*Id.* at 3, Ex. I. at 1-6) Defendants asserted that the

attorney-client privilege protected communications with Goodrich because "[he] worked closely

with Prime Time and its counsel on many matters over several years." (*Id.* at 3, Ex. I. at 2.)

Defendants also stated that "Goodrich was asked to provide and provided facts and analysis to

assist Defendants' lawyers in rendering legal services." (*Id.*) Defendants further asserted that

"Goodrich essentially acted as Prime Time's Chief Financial Officer . . . [because he] was

intimately involved in certain maters involving *The Secret* entities and was treated in many

instances as if he was Defendants' trusted employee." (*Id.* at 3, Ex. I. at 2-3 (emphasis added).)

According to Defendants, Goodrich communicated "for the purpose of providing or obtaining

legal services regarding the current litigation with Plaintiffs, a commercial lease, an intellectual

property transaction related to *The Secret*, the structure of business related to *The Secret*, various

corporate agreements, corporate documentation, and a tax matter." (Defs.' Mem. in Opp'n to Pls.'

Mot. 2 (footnotes omitted) ("Defs.' Mem. in Opp'n").)

---

[3] On December 2, 2008, this Court granted, without prejudice, Plaintiffs' motion to Quash
Deposition Notices of James Armstrong, Joan Kaufman, Martin Goodrich, and Marc Goldenfein.

Defendants stated that "[t]he attorney-client privilege extends to disclosures made to . . .

Durham for the same reasons it extends to . . . Goodrich." (Pls.' Mot., Ex. I at 4.) In other words, the privilege applied because Durham, as Goodrich's assistant, acted on Goodrich's behalf; therefore, her conversations were privileged. (Defs.' Mem. in Opp'n 3.)

As to Kaufman, Defendants stated that she "was Prime Time's agent and provided accounting services to Prime Time for approximately nine years." (Pls.' Mot., Ex. I at 4.) As a result, Defendants contended, her communications were privileged. (*Id.*; Defs.' Mem. in Opp'n 2.)

Shortly thereafter, on November 26, 2008, Plaintiffs filed their Motion to compel production of these documents. Specifically, Plaintiffs requested the following numbered documents: 2, 8, 193, 195, 196, 199, 203, 204, 215, 219, 220, 221, 230, 231, 232, 233, 234, 236, 240, 241, 242, 254, 257, 269, 279, 281, 282, 283, 285, 604, 620, 621, 622, 628, 629, 630, 639, 640, 641, 642, 643, 644, 855, 1235, 1272, 1273, 1274, 1275, 1276, 1289, 1290, 1291, 1292, 1293, 1294, 1295, 1296, 1314, 1322, 1323, 1324, 1325, 1326, 1327, 1329, 1330, 1332, 1333, 1344, 1345, 1346, 1347, 1348, 1349, 1350, 1351, 1352, 1353, 1354, 1355, 1356, 1357, 1358, 1359, 1360, 1361, 1362, 1363, 1367, 1368, 1369, 1370, 1372, 1373, 1375, 1376, 1377, 1378, 1379, 1380, 1381, 1382, 1383, 1441, and 1442. (Pls.' Mot. 1-2.)

On December 8, 2008, Defendants filed a Memorandum in Opposition to Plaintiffs' Motion. In that memorandum, Defendants listed with specificity which privilege applied to which documents. First, Defendants asserted work-product privilege over six documents: 622, 630, 639, 640, 1441, and 1442. (Defs.' Mem. in Opp'n 5 n.12.) Second, Defendants asserted attorney-client privilege over the following numbered documents: 2, 8, 193, 195, 196, 199, 203,

204, 215, 219, 220, 221, 230, 231, 232, 233, 234, 236, 240, 241, 242, 254, 257, 269, 279, 281, 282, 283, 285, 604, 620, 622, 628, 630, 639, 640, 644, 855, 1235, 1272, 1273, 1274, 1275, 1276, 1289, 1290, 1291, 1292, 1293, 1294, 1295, 1296, 1314, 1322, 1323, 1324, 1325, 1326, 1327, 1329, 1330, 1332, 1333, 1344, 1345, 1346, 1347, 1348, 1349, 1350, 1351, 1352, 1353, 1354, 1355, 1356, 1357, 1358, 1359, 1360, 1361, 1362, 1363, 1367, 1368, 1369, 1370, 1372, 1373, 1375, 1376, 1377, 1378, 1379, 1380, 1381, 1382, 1383, 1441, and 1442. (*Id.* at 2-3 nn.2-10.)

Finally, Defendants contended that this Court should deny Plaintiffs' Motion as it pertains to documents 641, 642, and 643 because "Defendants' privilege log inadvertently listed Goodrich and Durham as recipients of these e[-]mails[, and t]hey were not." (Defs.' Mem. in Opp'n 1 n.1.) Defendants also asserted that this Court should deny Plaintiffs' Motion as to documents 621 and 629 because they are identical, and because Defendants "produced" them to Plaintiffs.[4] (*Id.*)

On December 9, 2008, Judge Conlon referred Plaintiffs' Motion to this Court, again expanding the scope of the July 24, 2008, referral. Plaintiffs filed their reply to Defendants' Memorandum in Opposition to Plaintiffs' Motion on December 11, 2008.

The parties appeared and this Court made several rulings on December 12, 2008, but continued Plaintiffs' and Defendants' Motions until January for a settlement conference. In the interim, the parties filed a flurry of motions that are not relevant to this matter. After an unsuccessful settlement conference on January 9, 2009, the parties appeared before this Court to argue their respective motions on February 5, 2009.

---

[4] Defendants did not include documents 621, 629, 641, 642, or 643 in the privilege log they submitted to this Court.

## II. Discussion

Because this case involves two different Motions, one by each party, this Court deals with each separately.

### A. Defendants' Motion to Compel

#### 1. Federal Rule of Evidence 502

As an initial matter, the parties dispute whether Federal Rule of Evidence 502 ("FRE 502") applies, and, if it does, whether it supercedes the test quoted in *Judson Atkinson Candies, Inc., v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 387-88 (7th Cir. 2008) (quoting *Sanner v. Bd. of Trade*, 181 F.R.D. 374, 376 (N.D. Ill. 1998)), *reh'g denied* (July 11, 2008). (Defs.' Mem. in Supp. of Defs.' Mot. 6-7; Pls.' Resp. to Defs.' Mot. 7-8.)

Congress amended FRE 502 on September 19, 2008, stating that "[t]he amendments made by this Act shall apply in all proceedings commenced after . . . [September 19, 2008], and insofar as is just and practicable, in all proceedings pending on . . . . [September 19, 2008]." Act of Sept. 19, 2008, Pub. L. No. 110-322, §1, 122 Stat. 3537, 3538 (amending the Federal Rules of Evidence to address the waiver of the attorney-client privilege and the work-product doctrine) (codified as FED. R. EVID. 502). The newly amended FRE 502 applies when communications or documents covered by the attorney-client or work-product privileges are disclosed during a federal proceeding. *Id.*

Ordinarily, disclosure of confidential information to an unprotected third party operates as a waiver. *See U.S. v. Hamilton*, 19 F.3d 350, 353 (7th Cir. 1994) (finding that, assuming privileged information existed, defendant waived the attorney-client privilege by voluntarily disclosing the confidential information to his cellmate); *Allendale Mut. Ins. Co. v. Bull Data Sys.,*

*Inc.*, 152 F.R.D. 132, 139 (N.D. Ill. 1993) ("The general rule is that material which is otherwise

privileged is discoverable if it has been disclosed to a third party."). Under FRE 502, however,

disclosure of privileged information will not operate as a waiver when "(1) the disclosure is

inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent

disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if

applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." FED. R. EVID. 502(b)(1)-(3).

All three elements described in FRE 502 must be satisfied to prevent a waiver. *Id.*

Plaintiffs argue that "[FRE] 502 is applicable to this case[,] and Defendants offer no

reason why it would not be 'just and practicable' to apply [FRE] 502 to this case as in every other

case." (Pls.' Resp. to Defs.' Mot. 8.) Defendants argue that this Court should apply the three-part

inquiry quoted in *Judson*, 529 F.3d at 387-88. (Defs.' Mem. in Supp. of Defs.' Mot. 6-7); *but see*

*Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113, 117-18 (N.D. Ill. 1996) (stating that

the court followed the "objective approach" and applying the "balancing test" in the alternative).

The *Judson* test requires the court to decide (1) whether the disclosed material was privileged, (2)

whether the disclosure was inadvertent, and (3) whether the privilege was waived. *Judson*, 529

F.3d at 387-88.

There is no question that FRE 502 applies to this case.[5] The 2008 Amendment clearly

stated that FRE 502 applies to matters pending on September 19, 2008, "insofar as is just and

practicable." Act of Sept. 19, 2008, Pub. L. No. 110-322, §1(c), 122 Stat. 3537, 3538. This matter

---

[5] Even assuming that the *Judson* test applies, this Court's decision remains unchanged under such an approach.

-11-

was pending on that date, and this Court finds no reason, and Defendants have pointed to none, that precludes the application of FRE 502.

The resolution of that issue, however, does not automatically dispose of Defendants' argument that *Judson* applies. Both *Judson* and *Sanner* were decided prior to the enactment of amended FRE 502, making the effect of FRE 502 an issue of first impression for this Court. To properly assess whether FRE 502(b) overrides *Judson*, this Court examines each step of the *Judson* test.

The first step of the *Judson* test requires the court to determine whether the documents at issue are privileged. *Judson*, 529 F.3d at 387. This step must remain in place under FRE 502(b), which applies only to privileged information that was inadvertently disclosed. FED. R. EVID. 502(b). Prior to addressing any of the elements stated in FRE 502(b), therefore, the court must determine whether the documents are privileged. If the documents are not privileged, the inquiry ends. *See* FED. R. EVID. 502(b); *see also Judson*, 529 F.3d at 387-88. If the documents in question are privileged, then FRE 502(b) applies, and the court must determine whether each of FRE 502(b)'s elements was satisfied. *See* FED. R. EVID. 502(b). The first element of FRE 502(b), which also is the second step of the *Judson* test, requires the court to assess whether the party's disclosure was inadvertent. *See* FED. R. EVID. 502(b)(1); *Judson*, 529 F.3d at 388. Therefore, this Court will assess whether a disclosure is inadvertent.[6]

Defendants also urge this Court to adopt *Judson*'s third step, which requires the court to determine, using a "balancing approach," whether a waiver occurred despite the inadvertent

---

[6] Inadvertence under FRE 502(b) is not necessarily the same as, and does not necessarily mirror the case law describing, inadvertence under *Judson*.

-12-

disclosure of privileged information. 529 F.3d at 388. The balancing approach requires the court to consider "(1) the reasonableness of the precautions taken to prevent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *Id.* (quoting *Harmony Gold*, 169 F.R.D. at 116-17).

That tack, however, has been at least partially foreclosed by Congressional action. FRE 502 specifically states that inadvertent disclosure "does not operate as a waiver in a Federal . . . proceeding." FED. R. EVID. 502(b). In other words, the second and third steps of the *Judson* test have been folded into the entire FRE 502(b) inquiry. *See* FED. R. EVID. 502(b)(1)-(3). FRE 502 does not, however, prohibit the use of the *Judson* factors. FED. R. EVID. 502(b) advisory committee's note (noting that the non-dispositive factors a court may consider "are the reasonableness of precautions taken, the time taken to rectify the error, the scope of discovery, the extent of disclosure and the overriding issue of fairness"). Thus, while "[FRE 502(b)] is flexible enough to accommodate any of those listed factors," it "does not explicitly codify [the *Judson*] test[] because [the factors it uses are] a set of non-determinative guidelines that vary from case to case." *Id.* Therefore, the court may, but need not, use some or all of the *Judson* factors to assess whether FRE 502(b)'s requirements have been satisfied.

This Court therefore adopts the following test. First, a court determines whether the disclosed material is privileged. If it is not, the inquiry ends. If the material is privileged, the court applies FRE 502(b). If the court concludes that disclosing party satisfied all of the elements in FRE 502(b), the privilege is not waived. If, however, the disclosing party fails to satisfy any of the FRE 502 elements, the privilege is waived. In applying FRE 502(b), the court is free to consider any or all of the five *Judson* factors, provided they are relevant, to evaluate whether each element

-13-

of FRE 502(b) has been satisfied.[7] This Court applies and explains the details of this test in the following sections.

## 2. Privileged Information

### i. *Privileged Information Generally*

Before this Court can apply FRE 502(b), it must determine whether the material in question is privileged. The Seventh Circuit has articulated the following test for the existence of the attorney-client privilege: "(1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." *Naik v. Boehringer-Ingelheim Pharms., Inc.*, No. 07 C 3500, 2008 WL 4866015, at *1 (N.D. Ill. June 19, 2008) (citing *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991)). Of course, not all communications between the attorney and the client are privileged. *See Judson*, 529 F.3d at 388. The privilege adheres "'only if [the communications] constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence.'" *Id.* (quoting *U.S. v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990)).

---

[7] One court has applied FRE 502(b) in a rather peculiar fashion, choosing to adopt the factors articulated in the committee's note as a wholesale test of inadvertent disclosure. *Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*, 254 F.R.D. 216, 218-27 (E.D. Penn. 2008). Strangely, using only the *Judson* factors to determine the waiver question eliminates any need to consult the elements required under FRE 502. Such an approach would ignore a Congressional mandate and substitute judicial holdings for legislation. Therefore, this Court concludes that a better approach focuses on the elements required by FRE 502 and uses the *Judson* factors, where appropriate, to supplement this analysis. *See* FED. R. EVID. 502(b) advisory committee's note.

-14-

Defendants emphasize that Plaintiffs recalled the Sequestered Documents based on attorney-client privilege by merely stating those documents constituted privileged communications between Heriot and his immigration lawyer. (Defs.' Mem. in Supp. of Defs.' Mot. 7.) That "conclusory assertion," Defendants argue, "does not demonstrate that the privilege actually exists." (*Id.*)

That statement is a truism–but to ask Defendants to state with specificity why the attorney-client privilege applies could force them to disclose privileged information, something which the Federal Rules of Civil Procedure do not require. *See* FED. R. CIV. P. 26(b)(5) (requiring the party asserting privilege to "expressly make the claim[] and . . . describe the nature of the documents, communications, or tangible things not produced or disclosed . . . *in a manner that, without revealing information itself privileged or protected*, will enable the other parties to assess the claim") (emphasis added). It is this Court's responsibility, and certainly not Plaintiffs' or Defendants', to determine whether privilege exists. *Am. Nat'l Bank & Trust Co. of Chicago v. Equitable Life Assurance Soc'y of the U.S.*, 406 F.3d 867, 880 n.7 (7th Cir. 2005) ("'The responsibility of determining whether the [attorney-client] privilege exists rests upon the District Judge and not upon the lawyer whose client claims the privilege.'" (quoting *U.S. v. Tratner*, 511 F.2d 248, 252 (7th Cir. 1975) (citation omitted))).

After a document-by-document review, *Am. Nat'l Bank & Trust Co. of Chicago v. Equitable Life Assurance Soc'y of the U.S.*, 406 F.3d 867, 879-880 (7th Cir. 2005) (holding that a court must review all of the documents claimed as privileged and cannot rely on a "random sampling" of documents to determine privilege), this Court has determined that the attorney-client privilege applies to nearly all of the Sequestered Documents. These confidential communications

are between Heriot and his immigration lawyer. In them, Heriot seeks legal advice concerning legal matters regarding Heriot's presence in this country.

Not all of the documents, however, are privileged. Documents DREW002797 and DREW002798 are not privileged because they contain communications between Heriot and his employer, Miki Willis ("Willis"). Nevertheless, Plaintiffs may redact the text of document DREW002797 above the line entitled, "Original Message," below which is an e-mail from Willis to Heriot.

The following documents also are not privileged because they involve Leni Mex ("Leni"), an unprotected third party: DREW002290-DREW002294, DREW002312-DREW002316, DREW002397-DREW002401, DREW002901-DREW002902, DREW002913-DREW002923, DREW002925, and DREW002928-DREW002931. Plaintiffs, however, may redact documents DREW002397 and DREW002312 to exclude the first e-mail on each of those pages, which Heriot sent to his attorney. The remaining portions of documents DREW002397 and DREW002312 must be produced un-redacted.

Because the party asserting the privilege must prove that the privilege exists, the law required Plaintiffs to inform this Court why the privilege applied to the communications involving Leni or Willis. Plaintiffs failure to do so means that they did not meet their burden.[8] For the documents this Court has found not to be privileged, Plaintiffs must produce them to Defendant.

_____

[8] For the remaining part of this of Order, the term "Sequestered Documents" refers to all of the documents, or portions thereof, that this Court determined were protected by the attorney-client privilege. This term does not include any of the documents, or portions thereof, that this court determined were not protected by the attorney-client privilege.

Prior to doing so, however, Plaintiffs must be given the opportunity to redact the portions

specified above.

ii.    *The Crime-Fraud Exception*

Defendants do not, however, give in so easily. They argue that, even if the attorney-client

privilege adheres, Plaintiffs forfeited that privilege because the crime-fraud exception applies.

(Defs.' Mem. in Supp. of Defs.' Mot. 8-9.) Plaintiffs resist this contention and argue that they have

committed no crime or fraud. (Pls.' Resp. to Defs.' Mot. 10-13.)

Although communications subject to the attorney-client privilege are protected, that

protection can be forfeited when, for example, "'the attorney . . . assist[s] his client to commit a

crime or a fraud.'" *U.S. v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007) (quoting *Mattenson v.

Baxter Healthcare Corp.*, 438 F.3d 763, 769 (7th Cir. 2006)). In other words, "[t]he crime-fraud

exception places communications made in furtherance of a crime or fraud outside the attorney-

client privilege." *U.S. v. BDO Seidman, LLP*, 492 F.3d 806, 818 (7th Cir. 2007) (citing *U.S. v.

Zolin*, 491 U.S. 554, 563 (1989)).

Twenty years ago, the United States Supreme Court clarified when a court may review

materials *in camera* to determine whether the crime-fraud exception applies. *Zolin*, 491 U.S. at

572. The Supreme Court created a two-step framework that the judge should apply before

reviewing materials *in camera. See Medallion Prods., Inc. v. McAlister*, No. 06-2597, 2008 WL

4542997, at *10-11 (N.D. Ill. Oct. 9, 2008) (quoting *Zolin*, 491 U.S. at 572). First, the party

asserting the crime-fraud exception must show a "'factual basis adequate to support a good faith

belief by a reasonable person' . . . that *in camera* review of the materials may reveal evidence to

establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (quoting

*Caldwell v. Dist. Court*, 644 P.2d 26, 33 (Colo.1982)). Once the moving party has made that showing, the decision to review the materials *in camera* "rests in the sound discretion of the district court." *Id.*

In arguing that the crime-fraud exception applies, Defendants contend that Heriot's deposition testimony shows that he fabricated projects, stating that "Heriot perpetrated a fraud on the U.S. Department of Homeland Security by soliciting fake deal memos to trick the government into issuing him an O-Visa." (Defs.' Mem. in Supp. of Defs.' Mot. 8.) Plaintiffs counter that Defendants presented Heriot's statements out of context. (Pls.' Resp. to Defs.' Mot. 10-13.)

On this point, this Court agrees with Plaintiffs. Although Heriot's deposition testimony reveals that he told the businesses with whom he had discussed employment that they could "just make up a project" (Pls.' Resp. to Defs.' Mot. 11, Ex. D at 304), to Heriot, "make up" meant "create," as his following statement relating to a project entitled "Star Power" reveals: "we made up the project, [and] it turned into a pretty interesting project" (Pls.' Resp. to Defs.' Mot. 11, Ex. D at 304-05). Moreover, Heriot explicitly stated in his deposition that, when he discussed projects, "[he] . . . intend[ed] to come up with some ideas that were feasible that we could make. [He] was not trying to be false [sic]."(Pls.' Resp. to Defs.' Mot. 11, Ex. D at 305.) Furthermore, what Defendants allege to be "fake deal memos" are no such thing (Defs.' Mem. in Supp. of Defs.' Mot. 8); in fact, the record reveals that some of these deal memos came to fruition, resulting in full-fledged projects (Pls.' Resp., Ex. C at DREW000058-DREW000059; Pls.' Supplemental Mem. in Resp. to Defs.' Mot., Ex. 1 at ¶ 5-11).

Defendants' argument that Heriot tried to "weave Australia in[to]" the deal memos solely to secure an O-Visa also is unfounded. (Defs.' Reply Mem. 5.) At Heriot's deposition, Defendants'

-18-

counsel asked Heriot why the "deal memos suggest that there will be an Australian element to them[.]" (Pls.' Resp. to Defs.' Mot. 11, Ex. D at 306; Defs.' Mem. in Supp. Defs. Mot., Ex. E at 306.) Heriot responded that he was trying "to weave Australia in." (*Id.*) In response, Defendants' counsel asked the following question: "Even though there probably wasn't going to be an Australian element?" (*Id.*) Heriot responded, "No," and clarified that several of the deal memos had "very clear potential in Australia." (*Id.*) Additionally, Willis, Heriot's employer, stated that "Australia was a potential shooting location for the film" (Pls.' Supplemental Mem. in Resp. to Defs.' Mot., Ex. 1 at ¶ 6), and that he planned to expand his business Australia "because of Heriot's connections" (*Id.* at ¶ 9).

None of these statements resemble any countenance of fraud. If anything, they show that Heriot, who was legally in the country on an I-Visa (Pls.' Resp. to Defs.' Mot., Ex. C), actively sought work in the United States. Contrary to Defendants' contention (Defs.' Mem. in Supp. of Defs.' Mot. 8-9), it is irrelevant that *some* of the deal memos were not binding, especially in light of the fact that other deal memos produced full-fledged projects (Pls.' Resp., Ex. C at DREW000058-DREW000059; Pls.' Supplemental Mem. in Resp. to Defs.' Mot., Ex. 1 at ¶ 5-11). Based on the materials presented, this Court finds that Defendants have not shown a "'factual basis adequate to support a good faith belief by a reasonable person' . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (quoting *Caldwell*, 644 P.2d at 33). As a result, this Court need not review these documents *in camera* to determine whether the crime-fraud exception applies.

Nevertheless, this Court already has reviewed the Sequestered Documents *in camera* to determine whether they are privileged. From this review the Court concludes that none of the

communications between Heriot and his lawyer show that "Heriot perpetrated a fraud on the U.S. Department of Homeland Security by soliciting fake deal memos to trick the government into issuing him an O-Visa." (Defs.' Mem. in Supp. of Defs.' Mot. 8.) Therefore, the crime-fraud exception does not apply.[9]

### 3. Inadvertent Disclosure Under FRE 502

Having determined that the Sequestered Documents are protected by the attorney-client privilege, this Court applies FRE 502(b). Prior to the 2008 amendment of FRE 502, "the burden of proving inadvertent disclosure [was] on the party asserting the privilege." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 417 (N.D. Ill. 2006). This Court sees no reason to modify this approach and so applies it to FRE 502(b). Because FRE 502(b) has three requirements, this Court discusses each one separately.

#### i. *Inadvertent Disclosure*

The first requirement of FRE 502(b) is that the disclosure of confidential material must have been inadvertent. FED. R. EVID. 502(b)(1). To determine whether a disclosure was inadvertent, "this Court has . . . look[ed] to factors such as the total number of documents

---

[9] It is appropriate to point out the tension that exists between the determination of privilege and the determination of the crime-fraud exception. On the one hand, this Court must engage in a document-by-document review to determine whether the attorney-client privilege applies. *Am. Nat'l Bank & Trust Co. of Chicago*, 406 F.3d at 879-880. On the other hand, the Supreme Court has stated that, when determining whether the crime-fraud exception applies, the court has discretion to review the material *in camera* when the party asserting the exception shows a "'factual basis adequate to support a good faith belief by a reasonable person' . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (quoting *Caldwell*, 644 P.2d at 33). The *Zolin* rule prevents courts from engaging in a lengthy review of documents. In most (if not all) cases in this District, however, the court will already have conducted a document-by-document review to determine whether the attorney-client privilege applies. *Am. Nat'l Bank & Trust Co. of Chicago*, 406 F.3d at 879-880.

reviewed, the procedures used to review the documents before they were produced, and the actions of producing party after discovering that the documents had been produced." *Wunderlich-Malech Sys., Inc. v. Eisenmann Corp.* (Eisenmann II), No. 05-C-4343, 2007 WL 3086006, at *3 (N.D. Ill. Oct. 18, 2007) (citing *Wunderlich-Malech Sys., Inc. v. Eisenmann Corp.* (Eisenmann I), No. 05-C-4343, 2006 WL 3370700, at *3 (N.D. Ill. Nov. 17, 2006)). This Court can find no reason to discard these factors, which aptly address the issue of whether a party inadvertently disclosed confidential information.

Additionally, this Court considers "the extent of the disclosure" and "the scope of discovery." FED. R. EVID. 502(b) advisory committee's note; *see Harmony Gold*, 169 F.R.D. at 117. These two factors should work on a sliding scale: the broader the scope of the discovery, the more extensive a party's disclosure of confidential materials may be without waiving the privilege, and vice versa. *See Wunderlich-Malech II*, 2007 WL 3086006, at *3 ("[T]he greater the ratio is between privileged documents and total documents produced, the more persuasive claims of inadvertent production become."). This approach reflects the undeniable truth that the greater the possibility of errors, the more likely errors will occur. *See Judson*, 529 F.3d at 388 ("'Where discovery is extensive, mistakes are inevitable . . . .'" (quoting *In re Sulfuric Acid*, 235 F.R.D. at 417)).

Defendants' primary argument is that "Plaintiffs' counsel . . . [was] asleep at the switch" and should have examined the documents after turning them over to the Vendor. (Defs.' Reply Mem. 6.) In particular, Defendants place great weight on the amount of materials disclosed, a matter both parties contest.

Since the latter point goes to the extent of disclosure and the scope of discovery, this Court starts the analysis there. As a preliminary matter, this Court examines the total number of documents reviewed. Here, Plaintiffs reviewed and produced 1499 documents comprised of 6952 pages. (Defs.' Mem. in Supp. of Defs.' Mot. 1; Pls.' Resp. to Defs.' Mot. 6.) This amount is neither apoplectically large nor astonishingly small. *See Wunderlich-Malech II*, 2007 WL 3086006, at *3 (stating that 11,167 pages of documents was "a relatively large number"); *see Harmony Gold*, 169 F.R.D. at 117 (stating that review and production of 25,000 documents was an "admittedly large number"); *see also Harris Corp v. Amperex Elec. Corp.*, No. 86-6338, 1987 WL 4847, at *1 (N.D. Ill. May 15, 1987) (finding inadvertent disclosure where plaintiff disclosed six privileged documents when it produced 7864 total pages of documents).

Plaintiffs and Defendants dispute the percentage of confidential documents inadvertently disclosed. Plaintiffs compute the percentage based on the total number of pages disclosed, stating that only "357 pages – 5% of the total production – were inadvertently produced and contained privileged attorney[-]client communications." (Pls.' Resp. to Defs.' Mot. 6.) Defendants, on the other hand, use the total number of documents to compute the percentage, stating that "Plaintiffs . . . declared that . . . 196 documents, comprising 13% of Plaintiffs' production, were inadvertently produced attorney-client communications." (Defs.' Mem. in Supp. of Defs.' Mot. 1.)

Using either calculation, the extent of disclosure in this case was broad, and the error–regardless of the computational method chosen–not insignificant. *See Wunderlich-Malech II*, 2007 WL 3086006, at *3; *see Harmony Gold*, 169 F.R.D. at 117. Nevertheless, this Court finds that other, more relevant, factors outweigh these considerations.

The action of the producing party after discovering the disclosure, for example, carries more weight in this case. Here, Plaintiffs discovered their disclosure on October 23, 2008. Within twenty-four hours of this discovery, Plaintiffs sent a letter to Defendants that claimed attorney-client privilege, identified the Sequestered Documents, and requested that Defendants destroy the Documents. (Pls.' Resp. to Defs.' Mot. 7, Ex. B at ¶ 14; Defs.' Mem. in Supp. of Defs.' Mot. 6, Elkins Decl. at ¶ 6.) Those actions can be described only as responsible. For that reason, this factor weighs in favor of finding inadvertent disclosure.

As to the procedures used to review the Sequestered Documents, Plaintiffs employed "paralegals and other non-lawyers." (Pls.' Resp. to Defs.' Mot. 4.) While the type of individuals who reviewed the disclosed documents may be a factor in determining inadvertence in some cases, this is not one of them.[10] Here, no problems occurred in the initial document review; the errors resulted *after* Plaintiffs gave them to the Vendor. (*Id.* at 4-6.) Thus, the procedures used to *review* the documents were reasonable, and sufficient to prevent an inadvertent disclosure. This factor therefore weighs in favor of inadvertent disclosure.

Defendants suggest that Plaintiffs knowingly disclosed the Sequestered Documents they have asserted were privileged. (Defs.' Reply Mem. 6.) Defendants argued that, if Plaintiffs' "counsel [had] made a reasonable inquiry" "[w]hen Defendants inquired [as to] whether Plaintiffs were withholding any documents on the ground of privilege," "[Plaintiffs' counsel] would have discovered the supposedly accidental disclosure." (*Id.* 6.)

---

[10] This factor may be relevant if, for example, the initial review by non-lawyers resulted in the inadvertent disclosure. Nevertheless, this Court declines to hold that a procedure is unreasonable in every case that a paralegal or non-lawyer reviews documents for privilege.

That argument, however, must yield to FRE 502, which "does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake." FED. R. EVID. 502(b) advisory committee's note. Plaintiffs had no duty to re-review the documents after providing them to the Vendor. *Id.* That would be duplicative, wasteful, and against the spirit of FRE 502. Additionally, imposing on disclosing parties a duty to re-review would chill the use of e-vendors, which parties commonly employ to comply with onerous electronic discovery. Against this grain the Court cannot cut.

Moreover, there were no "obvious indications that a protected communication or information has been produced inadvertently." FED. R. EVID. 502(b) advisory committee's note. The mere fact that Defendants asked Plaintiffs if they "were . . . withholding any documents on the ground of privilege" does not make the inadvertent production "obvious." (Defs.' Mem. in Supp. of Defs.' Mot. 6, Elkins Decl. at ¶ 6.) Plaintiffs relied, and should be able to rely, on their Vendor to faithfully carry out the instructions it has been given. Defendants' cursory inquiry did not, nor should it have, alerted Plaintiffs to any inadvertently disclosed documents.

In sum, although Plaintiffs disclosed 13 percent of their privileged documents, the weight of the factors tips the balance in favor of inadvertent disclosure. First, Plaintiffs used reasonable procedures to review the Sequestered Documents and, *after* this review, the Vendor erroneously disclosed privileged documents. Plaintiffs had no reason to suspect the Vendor would inadvertently produce documents that Plaintiffs had already designated as privileged. Furthermore, there were no signs or indications after production that the Vendor made any inadvertent disclosure. Finally, upon learning of the disclosure, Plaintiffs immediately contacted

Defendants, claimed attorney-client privilege, identified the privileged documents, and requested their destruction.

## ii.    *Reasonable Steps to Prevent Disclosure*

The second element of FRE 502(b) requires the disclosing party to take reasonable steps to prevent the disclosure. FED. R. EVID. 502(b)(2). The committee's note helps guide this Court in determining what constitute reasonable steps to prevent disclosure. The note states that a court, in making this determination, may consider several factors, including "the number of documents to be reviewed and the time constraints for production"; whether "a party that use[d] advanced analytical software applications and linguistic tools in screening for privilege and work product"; and whether "[t]he implementation of an efficient system of records management before litigation." FED. R. EVID. 502(b) advisory committee's note. The note also makes clear that FRE 502(b) does not require the producing party to review documents *after* submitting them to the opposing party. *Id.* ("The rule does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake.") It does, however, require that the producing party "follow up on any obvious indications that a protected communication or information has been produced inadvertently." *Id.*

The dearth of cases addressing this issue is no surprise considering its newness. The cases that do confront this issue, however, are useful reference points. In one case, the court found that a disclosing party had taken reasonable steps to prevent disclosure where, prior to disclosure, documents underwent an "inspect and copy" procedure. *Laethem Equip. Co. v. Deere and Co.* (Laethem II), No. 05-10113, 2008 WL 4997932, at *9 (E.D. Mich. Nov. 21, 2008). The parties established this procedure, which allowed the disclosing party to review the documents after a

document vendor copied them, but before the vendor disclosed them to the opposing party. *Id.* Another court found that redacting the privileged parts of two documents constituted reasonable steps to prevent disclosure even though the disclosing party produced the unredacted documents. *B-Y Water Dist. v. City of Yankton*, No. 07-4142, 2008 WL 5188837, at \*2 (D.S.D. Dec. 10, 2008).

Defendants assert that "Plaintiffs did not take reasonable [pre]cautions to prevent the disclosure" because "Plaintiffs needed only review [sic] the documents in their initial production to locate" any privileged documents. (Defs.' Mem. in Supp. of Defs.' Mot. 11.) "Their failure to do so," Defendants argue, "shows that their precautions were not reasonable." (*Id.*) With these statements this Court cannot agree.

As noted earlier, FRE 502(b) does not require a post-production review. FED. R. EVID. 502(b) advisory committee's note. In other words, if the procedures in place *prior to* turning the documents over to the Vendor were reasonable, then this requirement is satisfied. This Court finds that the multi-step process Plaintiffs used to produce the Sequestered Documents, like procedure in *Laethem II,* entailed reasonable precautions to prevent disclosure. Although the parties in *Laethem II* agreed to a review procedure that took place after copying had been completed, a pre-copy review procedure is not per se unreasonable. The procedure used here–where Plaintiffs reviewed the documents and then provided them to the Vendor for production–was reasonable; no disclosure would have occurred but for the Vendor's error. Additionally, here, unlike in *B-Y Water District*–where the privileged information had been redacted, but the disclosing party accidentally produced the un-redacted copy–the culpability lies not with Plaintiffs, but the Vendor.

Finally, as to the other factors not yet discussed, we note that Plaintiffs did not use analytical software to screen the documents; instead non-lawyers reviewed them prior to production. The Vendor used software to *produce*, not to "screen," the documents. Moreover, the parties briefs did not address how Plaintiffs kept their records prior to litigation; therefore, both of these factors are neutral.

Based on the foregoing analysis, this Court finds that Plaintiffs used reasonable procedures when they reviewed the documents, assigned them codes, and provided them to the Vendor to properly disclose.

### iii.   *Prompt Steps to Rectify the Inadvertent Disclosure*

The final element under FRE 502(b) requires the disclosing party to take prompt steps to rectify the inadvertent disclosure. FED. R. EVID. 502(b)(3). According to Defendants, Plaintiffs' statements that they were not withholding any privileged documents "suggest that they reviewed their production and[,] . . . over that two-month period[, verified] that no privileged documents were inadvertently disclosed." (Defs.' Mem. in Supp. of Defs.' Mot. 12.)

The case law this Court unearthed is directly on point and disposes of Defendants' argument. In *Laethem II*, the first time "Plaintiffs' counsel . . . discovered the inadvertent disclosure [was] at the January 31, 2008, deposition of plaintiffs' expert," *Laethem II*, 2008 WL 4997932, at *9, nearly two weeks after Plaintiffs' initial disclosure. *Laethem Equip. Co. v. Deere & Co.* (Laethem I), No. 05-10113, 2008 WL 4427736, at *3 (E.D. Mich. Sept. 30, 2008) (stating that a judge discussed "the handling of plaintiffs' inadvertently disclosed and designated as privileged information from the January 18, 2008, document copying session"). Almost immediately, Plaintiff's counsel objected to use of the information based on privilege and "sent a

letter to defense counsel demanding return of the information on the same day." *Laethem II*, 2008 WL 4997932, at *9. Plaintiff's counsel repeated these requests over the course of three more weeks until it obtained a court order compelling defendants to return the inadvertently disclosed information. *Id.* The court found that "plaintiffs diligently attempted to rectify the inadvertent disclosure." *Id.*

Similarly, in *B-Y Water District*, the plaintiff's counsel "immediately asserted its privilege when the two privileged documents were referenced during a deposition on July 15, 2008, the first time that counsel for [defendant] realized he may have accidentally produced the privileged information." 2008 WL 5188837, at *2. In *Harmony Gold*, by contrast, "[plaintiff] dragged its feet in taking appropriate correction action . . . [when] [i]t . . . spent two weeks . . . 'reviewing its copy of the produced documents in an attempt to determine how the inadvertent disclosure occurred.'" 169 F.R.D. at 117 (citation omitted). That type of delay, the court found, was not reasonable. *Id.*

These cases illustrate that *how* the disclosing party *discovers and rectifies* the disclosure is more important than *when* after the inadvertent disclosure the discovery occurs. In *B-Y* and *Laethem II*, the parties discovered the disclosure at the deposition where the privileged documents became a topic of discussion, and they immediately asserted privilege. *B-Y Water Dist.*, 2008 WL 5188837, at *2; *Laethem II*, 2008 WL 4997932, at *9. In *Harmony Gold*, on the other hand, the disclosing party waited three weeks after discovering the disclosure before attempting to rectify the error by notifying the other party. 169 F.R.D. at 117.

In this case, Plaintiffs' counsel discovered the inadvertent disclosure *before the deposition*. That demonstrates that Plaintiffs' counsel displayed greater diligence than the attorneys in *B-Y Water District* and *Laethem II* where the courts found that the attorneys acted reasonably. Unlike

-28-

the attorney in *Harmony Gold*, Plaintiffs' counsel did wait to notify Defendants; he, like the attorneys in *B-Y Water District* and *Laethem II*, notified Defendants of the disclosure within twenty-four hours of discovering the Vendor's error. (Pls.' Resp. to Defs.' Mot. 7, Ex. B at ¶ 14; Defs.' Mem. in Supp. of Defs.' Mot. 6.) In that notification, Plaintiffs' counsel asserted attorney-client privilege, identified the documents subject to that privilege, and requested that Defendants destroy those documents. (*Id.*) Therefore, this Court finds that Plaintiffs took prompt steps to rectify their inadvertent disclosure.

To summarize, this Court has found that Sequestered Documents are privileged, and that Plaintiffs have satisfied all three elements of FRE 502. For that reason, this Court holds that Plaintiffs' disclosure was inadvertent and therefore did not waive the attorney-client privilege as to the Sequestered Documents. In making this finding, this Court also considered the unfairness of penalizing Plaintiffs for an error that it neither caused nor anticipated. FED. R. EVID. 502(b) advisory committee's note. Therefore, if Defendants have any remaining copies of the Sequestered Documents, they must destroy them or return them to Plaintiffs.

## B. Plaintiffs' Motion to Compel Production of Documents

Plaintiffs argue that none of the documents they have requested from Defendants are privileged. Defendants make two arguments in response to Plaintiffs' Motion. First, Defendants contend that documents 622, 630, 639, 640, 1441, and 1442 are protected work product. Second, regardless of the Court's holding as to those documents, Defendants argue that the attorney-client privilege protects all of the documents at issue.

### 1. Work-Product Privilege

Defendants claim that "[t]he work[-]product privilege applies to communications involving Goodrich and Durham." (Defs.' Mem. in Opp'n Mot. 5.) In particular, they assert this privilege over documents 622, 630, 639, 640, 1441, and 1442.[11] (*Id.* at 5 n.12) Plaintiffs respond that "the Court should disregard any assertion by [Defendants'] counsel that . . . Goodrich and . . . Durham have a 'special relationship' with Prime Time" because Defendants have represented Mr. Goodrich as a third-party or non-party witness. (Pls.' Mot. 7.) Alternatively, Plaintiffs argue the documents are not protected work product because they did not involve an attorney, or only tangentially involved an attorney or a law clerk. (*Id.* at 7 -8.)

The Federal Rules of Civil Procedure offer protection for work product: "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." FED. R. CIV. P. 26(b)(3)(A) ("Rule 26(b)"). Stated another way, materials produced in the ordinary course of business are not protected work product. *Equity Residential v. Kendall Risk Mgmt., Inc.*, 246 F.R.D. 557, 564 (N.D. Ill. 2007). Thus, a party asserting the privilege must establish work-product protection, *Allendale*, 152 F.R.D. at 137, and can do so by showing that the party or its representative created the document primarily because it anticipated future litigation. *Equity*, 246 F.R.D. at 564. While

---

[11] Any reference to documents in this section is limited to these numbered documents. Also, at oral argument, Defendants intimated, but did not clearly argue, that *all* the documents over which they asserted privilege were protected work product. This Court, however, addresses arguments stated explicitly in the briefs, not the intimations made at oral argument. Therefore, this Court addresses whether the work-product privilege applies to documents 622, 630, 639, 640, 1441, and 1442 only.

litigation need not have been ongoing at the time of creation, the "primary motivating purpose" behind the documents' creation must be to aid possible future litigation. *Id.*; *see Allendale*, 152 F.R.D. at 136. Additionally, the party asserting privilege must "prove the existence of objective facts establishing an identifiable resolve to litigate." *Equity*, 246 F.R.D. at 564.

With these guiding principles in mind, this Court's determination of whether the documents are protected work product can be described as a two-part inquiry. First, were the individuals who created the documents at issue "representatives" of Prime Time? *Id.*; FED. R. CIV. P. 26(b)(3)(A). Second, if so, were the "representatives" motivated to create those documents primarily by an anticipation of litigation? *Id.*

Plaintiffs' first argument takes issue with the initial question, essentially contending that none of these three individuals are "representatives" of Prime Time because Defendants referred to Goodrich and Durham as "third parties." (*Id.*, Ex. H at 1-3, 7.) This Court finds spurious Plaintiffs' suggestion, which resembles an estoppel argument, that Defendants' previous references to Goodrich and Durham as "third-parties" prevents the privilege from attaching to their work product. The context in which Defendants made these statements reveals that Defendants used the term "third party" and its iterations as shorthand for "non-parties." (Defs.' Resp. to Pls.' Mot. 3-4; Pls.' Mot., Ex. H, 1-3, 7.)

Regardless of the terminology used, Plaintiffs' argument that *Equity*, 246 F.R.D. at 567, precludes the application of the work-product doctrine is incorrect. (Pls.' Mot. 7.) The *Equity* court specifically stated that, "[w]hen communications otherwise protected by the attorney-client privilege become disclosed to an *unprotected* third party, such communications are no longer privileged." 246 F.R.D. at 567 (emphasis added). Including the adjective "unprotected" would be

unnecessary, and therefore surplusage, if *all* third parties were unprotected. The court's use of the adjective "unprotected" necessarily implies that *some* third parties are protected by the attorney-client privilege. "Representatives" under Rule 26(b) are just such people.

Because this Court finds that Defendants' references to Goodrich and Durham as "third parties" do not affect the work-product argument, it must next determine whether these individuals are Defendants' "representatives" under Rule 26(b). Courts have found that accountants can qualify as "agents" or "representatives" under Rule 26(b) when they act as the agent of the party or the party's attorney. *See In re ContiCommodity Servs., Inc., Sec. Litig.*, 123 F.R.D. 574, 577 (N.D. Ill. 1988) ("To the extent . . . that [the accountant employed by a law firm representing parties in a pending suit] was an agent of the customers' attorneys involved in an investigation for purposes of the district court suit, documents he prepared for that purpose are protected by the work product immunity."); *see U.S. v. Willis*, 565 F. Supp. 1186, 1220 (S.D. Iowa 1983) (finding that the work product privilege applied to "the [certified public] accountant [because he] was acting as [defendant's] agent in preparing the documents").

This Court has little trouble concluding that both Goodrich and Durham were Defendants' "representatives" under Rule 26(b). Defendants state, and this Court finds no reason to doubt, that Goodrich, as Prime Time's accountant, rendered advice at the behest of Defendants' lawyers. (Pls.' Mot., Ex. I at 2-4.) Defendants also assert that Goodrich acted as Prime Time's Chief Financial Officer. (*Id.*) Goodrich communicated with Defendants "for the purpose of providing or obtaining legal services regarding the current litigation with Plaintiffs, a commercial lease, an intellectual property transaction related to *The Secret*, the structure of business related to *The Secret*, various corporate agreements, corporate documentation, and a tax matter." (Defs.' Mem. in Opp'n 2

(footnotes omitted).) Durham, as Goodrich's assistant, acted on his behalf when conducting business, "communicat[ing] . . . with Defendants' counsel for the purpose of providing or obtaining legal services regarding the current litigation with Plaintiffs." (*Id.* at 3 (footnote omitted).) Therefore, both Goodrich and Durham are "representatives" under Rule 26(b).

The next stop in this Court's journey through Rule 26(b) is determining whether Goodrich and Durham prepared these documents in anticipation of litigation. Only Plaintiffs broach this subject, arguing that "it is not evident from Defendants' . . . [Logs] that the documents over which Defendants' are claiming work[-]product privilege . . . contain communications 'in anticipation of litigation.'" (Pls.' Reply 6.) To be clear, the rules do not require "communications in anticipation of litigation." *See* FED. R. CIV. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial . . . ."). As noted above, the primary motivating factor in *preparing the document* must be the anticipation of litigation, which may, but need not, include a communication. *See Allendale*, 152 F.R.D. at 136. This court finds, after *in camera* review of documents 622, 630, 639, 1441, and 1442, that each of these documents was created in anticipation of litigation. It appears that each of these documents was created at the specific request of a lawyer and each was to be used in preparation for filing a lawsuit.

These facts also undercut Plaintiffs' argument that the documents are not protected work product because no lawyer was involved, or only tangentially involved, in the communications with Goodrich and Durham. (Pls.' Mot. 7-9.) First, it appears a lawyer was the primary agent directing the inquiry in response to which Goodrich or Durham created documents. Second, even if a lawyer did not direct the production of the document, the text of Rule 26(b) makes clear that

-33-

the work product privilege covers any documents or tangible things created in anticipation of litigation "*by or for another party or its representative*." FED. R. CIV. P. 26(b)(3)(A) (emphasis added). The rules do not require a lawyer to be involved at all. *Id.* Therefore, documents 622, 630, 639, 1441, and 1442 are protected work product under Rule 26(b).

### 2. Attorney-Client Privilege

#### i. *Agency of Goodrich, Durham, and Kaufman*

Next, Defendants contend that the attorney-client privilege applies to nearly all the documents requested by Plaintiffs.[12] Plaintiffs argue that the attorney-client privilege does not apply for several reasons. Like its argument in the previous section, Plaintiffs argue that Goodrich, Durham, and Kaufman are third parties that dissolve the protective cloak of the attorney-client privilege. (Pls.' Mot. 7-9.)

Similar to the work-product doctrine, the attorney-client privilege applies to third parties who are agents of either the lawyer or the client.[13] *Cf. U.S. v. Evans*, 113 F.3d 1457, 1462 (7th Cir. 1997) (stating that "the attorney-client privilege will not shield from disclosure statements made by a client to his or her attorney in the presence of a third party who is not an agent of either the

---

[12] As already noted, these documents are the following: 2, 8, 193, 195, 196, 199, 203, 204, 215, 219, 220, 221, 230, 231, 232, 233, 234, 236, 240, 241, 242, 254, 257, 269, 279, 281, 282, 283, 285, 604, 620, 622, 628, 630, 639, 640, 644, 855, 1235, 1272, 1273, 1274, 1275, 1276, 1289, 1290, 1291, 1292, 1293, 1294, 1295, 1296, 1314, 1322, 1323, 1324, 1325, 1326, 1327, 1329, 1330, 1332, 1333, 1344, 1345, 1346, 1347, 1348, 1349, 1350, 1351, 1352, 1353, 1354, 1355, 1356, 1357, 1358, 1359, 1360, 1361, 1362, 1363, 1367, 1368, 1369, 1370, 1372, 1373, 1375, 1376, 1377, 1378, 1379, 1380, 1381, 1382, 1383, 1441, and 1442. (Defs.' Mem. in Opp'n 2-3 nn.2-10; *see* Pls.' Mot. 1-2.) In this section, all references to "documents" means the documents listed in this footnote.

[13] Because this Opinion has previously discussed the attorney-client privilege, it will, in this and the remaining sections, explicate that privilege only insofar as the law differs with respect to "third party" communications.

client or attorney" (citing 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW §

2311 (John T. McNaughton rev.1961))); *see also Jenkins v. Bartlett*, 487 F.3d 483, 490 (7th Cir.

2007) (citing *Evans*, 113 F.3d at 1642, for the proposition that attorneys' agents do not destroy the

privilege). In the previous section the Court found Goodrich and Durham to be Prime Time's

"representatives" under Rule 26(b). For the same reasons stated in that section, this Court finds

that Goodrich and Durham are agents of Prime Time.

In so finding, this Court rejects Plaintiffs' argument that Goodrich's self-asserted status as

an "external advisor" and not an employee shows he is not Prime Time's agent. (Pls.' Supplemen-

tal Br. in Supp. of Pls.' Motion 2-4, Ex. 1 at 2.) The appellation that Goodrich ascribes to himself

does not determine his legal status; that is this Court's task.

As to Kaufman, the Court finds that he also was Prime Time's agent for the same reasons

that Goodrich and Durham were Prime Time's agents. Kaufman "was a contractor of Prime Time

Australia as its accountant and bookkeeper . . . for about nine years," a relationship of sufficient

depth and duration to make Kaufman Prime Time's agent. (Defs.' Mem. in Opp'n 1.; Pls.' Mot. 2,

Ex. I at 4.) Therefore, Kaufman, Goodrich, and Durham are all Prime Time's agents, and their

status as such does not, by itself, destroy the attorney-client privilege.

ii.    *Involvement of Attorneys and Accountant-Client Privilege*

Additionally, Plaintiffs contend that the six communications involving Kaufman, and the

remainder involving Goodrich and Durham, are not privileged because "no attorney [was]

involved in the communication[s]" (Pls.' Mot. 7, 8-9.), and because "'there is no such thing' as an

'accountant-client privilege'" (Pls.' Mot. 5 (quoting *In re Grand Jury Proceedings*, 220 F.3d at

571) (Plaintiffs' alteration omitted)).

The attorney-client privilege can extend to communications between non-lawyer employees of a company. *Equity*, 246 F.R.D. at 567; *In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. at 433; *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 1996 WL 341537, at \*2 (N.D. Ill. June 20, 1996). In such a case, the privilege attaches where "the communications rest on confidential information obtained from the client, or would reveal the substance of a confidential communication by the client." *In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. at 433.[14]

Thus, Plaintiffs' argument that a lawyer must be "involved" is correct in a loose sense: a lawyer must have some relationship to the communication such that the communication(s) between the non-lawyer employees would "reveal, directly or indirectly, the substance of a confidential attorney-client communication." *Id.* at 433. But the claim that the privilege cannot extend to communications between non-lawyers is false. Thus, this Court rejects Plaintiffs' argument insofar as it conflicts with this analysis.

The attorney-client privilege also can apply to third parties, including, in some circumstances, accountants. *In re Grand Jury Proceedings*, 220 F.3d at 571; *see Stafford Trading*, 2007 WL 611252, at \*6. And while "[t]here is no accountant-client privilege[,] . . . material transmitted

---

[14] There is some uncertainty as to whether the communications must relate directly to the legal advice given by a lawyer, or whether an indirect relationship is sufficient, for the privilege to attach. *Compare Equity*, 246 F.R.D. at 567 (stating that the communications are protected because they "directly relate to the legal advice given to the non-attorneys") *with In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. at 433 (stating that the privilege applies when the communications between non-lawyer employees "reveal, directly or indirectly, the substance of a confidential attorney-client communication"). This Court follows the jurisprudential path cleared by the attorney-client privilege itself, which protects communications that "tend directly or indirectly to reveal the substance of client confidence." *Judson*, 529 F.3d at 388 (quoting *U.S. v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990)). As a corollary, this Court holds that the privilege applies when the communications between non-lawyer employees "reveal, directly or indirectly, the substance of a confidential attorney-client communication." *In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. at 407.

to accountants may fall under the attorney-client privilege if the accountant is acting as an agent of an attorney for the purpose of assisting with the provision of legal advice."[15] *In re Grand Jury Proceedings*, 220 F.3d at 571 (citing *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 817-19 (1984)). "If[, however,] what is sought [by the client] is not legal advice but only accounting service[,] . . . or if the advice is the accountant's rather than the lawyer's, no privilege exists." *Id.* (quoting *U.S. v. Brown*, 478 F.2d 1038, 1040 (7th Cir. 1973)).

Moreover, since *In re Grand Jury Proceedings*, this Court has adopted a "balanced approach" to the application of the attorney-client privilege to third parties. *Stafford Trading*, 2007 WL 611252, at *6-7. Under this approach, the attorney-client "privilege should be limited to instances where a third party . . . assists a lawyer in giving legal advice," and "where the third party's participation was required to enable the attorney to render legal advice." *Id.*

This Court holds, consistent with *Arthur Young* and *Stafford Trading*, that the attorney-client privilege applies to an accountant who performs services (i) that are not required by federal law or do not otherwise make him an individual acting on the public's behalf; (ii) on behalf of a party; (iii) for the purposes of rendering legal advice; and (iv) that make "the accountant . . . necessary, or at least highly useful, for the effective consultation between the client and the

---

[15] Of course, the reverse must also be true: information transmitted by accountants in response to lawyer's privileged communication must be protected by the attorney-client privilege. *Jaffee v. Redmond,* 518 U.S. 1, 11 (1996). An approach that protected only communications from the lawyer to the accountant would defang the attorney-client privilege, the purpose of which is to "'encourage full and frank communication *between* attorneys and their clients.'" *Redmond*, 518 U.S. at 11 (quoting *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981) (emphasis added)). The attorney-client privilege could not facilitate communication if it protected the communication in only one direction. Under such an approach, attorneys could maintain the attorney-client privilege only by transmitting documents to an accountant; any response to a privileged request would immediately become discoverable. That approach finds little common sense on which to cling.

lawyer."[16] *U.S. v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961); *see Stafford Trading, Inc. v. Lovely*, No. 05-4868, 2007 WL 611252, at \*6-7 (N.D. Ill. Feb. 22, 2007); *see also Arthur Young*, 465 U.S. at 810-14. This includes "instances where the [accountant] . . . assists a lawyer in giving legal advice," and "where the [accountant's] participation was required to enable the attorney to render legal advice." *Stafford Trading*, 2007 WL 611252, at \*6. In so holding, this Court echoes *Stafford Trading*'s assertion that "that, in today's market place, attorneys need to be able to have confidential communications with [accountants] . . . to render adequate legal advice."[17] *Id.*

---

[16] This proposition already has been adopted by the Second Circuit. *Kovel*, 296 F.2d at 922. That is significant because the Seventh Circuit adopted from *Kovel* the proposition that, "[i]f what is sought is not legal advice but only accounting service[,] . . . or if the advice is the accountant's rather than the lawyer's, no privilege exists." *In re Grand Jury Proceedings*, 220 F.3d at 571 (quoting *U.S. v. Brown*, 478 F.2d at 1040 (quoting *U.S. v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961))). In *Kovel*, the court noted that an accountant "relating a complicated tax story to the lawyer, ought not destroy the privilege." *Kovel*, 296 F.2d at 922. In such a case, "the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Id.* Similarly, the court stated that, where a client communicates to the accountant at the direction of the lawyer, the attorney-client privilege applies. *Id.* (stating that the attorney-client privilege attaches "where the client in the first instance consults a lawyer who retains an accountant as a listening post, or consults the lawyer with his own accountant present" but not "where the client communicates first to his own accountant ( . . . even though he later consults his lawyer on the same matter)").

[17] This approach dovetails with the case law addressing this topic. *See Lawrence E. Jaffe Pension Plan v. Household Int'l*, 244 F.R.D. 412, 420 (N.D. Ill. 2006) (holding that the attorney-client privilege applied to communications with accountants where "Defendants . . . demonstrated the necessity of [the accountants' services]" by showing that the accountants provided services that "[were] beyond . . . counsel's resources and abilities, but [were] uniquely within [the accountants'] qualifications"); *see U.S. v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999) (endorsing *Kovel*'s holding and distinguishing it from the facts of the case); *Cavallaro v. U.S.*, 284 F.3d 236, 247-48 (1st Cir. 2002) (stating that the attorney-client privilege can protect communications with the accountant where the accountant is necessary or useful, and the communication is for purposes of legal advice); *In re Grand Jury Proceedings*, 658 F.2d 782, 784 (10th Cir. 1981) (holding that accountant's worksheets did not contain privileged communications); *U.S. v. Cote*, 456 F.2d 142, 144 (8th Cir. 1972) (finding that the attorney-client privilege applied where accountant's aid to the lawyer was integral to the lawyer providing the clients with legal advice). These cases show that when determining whether the attorney-client privilege applies to

Therefore, this Court rejects, only insofar as it conflicts with this analysis, Plaintiffs'

argument that the attorney-client privilege cannot apply to communications involving Prime

Time, Goodrich, or Kaufman because they are accountants, or to communications involving Prime

Time and Durham because she is Goodrich's agent.

### iii. *Whether the Documents are Privileged*

The foregoing discussion has not answered the main question presented by Plaintiffs'

Motion: are Defendants' documents privileged? This Court will now undertake that task, but

before doing so, it notes that, in cases involving allegedly privileged communications by third

parties, courts determine whether the attorney-client privilege applies on a document[-]by[-

]document basis." *Stafford Trading*, 2007 WL 611252, at *7; *American Nat'l Bank and Trust Co.

of Chicago*, 406 F.3d at 879-880. Courts should consider the totality of the circumstances when

determining whether the attorney-client privilege applies. *In re Grand Jury Proceedings*, 220 F.3d

at 571. The party asserting the privilege has the burden of showing that the documents are

privileged. *Id.*

This Court has reviewed the documents over which Plaintiffs have asserted attorney-client

privilege. After an exhaustive page-by-page review of these documents and an entry-by-entry

---

communications with an accountant, the primary inquiry focuses on the purpose for which the
accountant was retained and the function the accountant served: the court should not focus on the
individual–the lawyer or the party–who retained the accountant. *See Ackert*, 169 F.3d 136, 139
(focusing on the purpose of the attorney-client privilege to determine whether the
communications with a third party were protected); *see Cote*, 456 F.2d at 144 (stating that the
accountant's "prior employment . . . is not controlling" in determining whether the attorney-client
privilege applies to an accountant's communications).

review of the privilege log, the Court reserves its ruling on whether they are protected by the attorney-client privilege.

Many of the documents contain multiple e-mails and forwarded e-mails, an incestuous intermingling of privileged and unprivileged documents. Some of these e-mails are entirely unprotected and can nowise be claimed as covered by the attorney-client privilege. One document, for example, contained an e-mail that stated nothing more than an individual's Christmas wishes. Forcing the Court to read individuals' good tidings may have salutary effects, but efficiency and clarity are not among them.

This befuddling assemblage of documents is especially intractable in light of the fact that this Court may have to order Defendants to redact some, all, or part of the documents. Describing how Defendants should redact multiple e-mails contained in multiple unpaginated documents is not only burdensome, it is a waste of this Court's time. The party asserting privilege, not the Court, should organize the documents in a manner that enables an efficient and effective determination of privilege.

Because Defendants failed to accomplish this task, the Court will withhold its ruling on whether the documents are protected by the attorney-client privilege until after Defendants submit an amended privilege log and a revised compilation of documents for *in camera* review. The revised compilation of documents should be separated chronologically on a e-mail-by-e-mail basis–such that each listed "document" contains only one e-mail–and labeled so the Court can efficiently rule on each. If a series of e-mails belong together in a "chain," Defendants should group and label those e-mails accordingly. Defendants should also place Bates numbers or other means of identification on each page, something they failed to do on the documents they

-40-

submitted to this Court. Additionally, the amended privilege log, which is to be submitted under seal (along with the revised compilation of documents), should describe, in sufficient detail, the circumstances surrounding each e-mail and Defendants' argument as to why it should be considered privileged. Finally, the amended privilege log must "comport[] with the this district's case law." *In re Morgan Chase & Co. Sec. Litig.*, No. 06-4674, 2007 WL 2363311, at *12 (N.D. Ill. Aug. 13, 2007) (citing *Allendale*, 145 F.R.D. at 88 (stating the requirements for a privilege log)).

Finally, as to documents 621, 629, 641, 642, and 643, this Court does not entirely understand why, as Defendants claim, these "[f]ive challenged documents [should] be eliminated from consideration . . . ." (Defs.' Mem. in Opp'n 1 n.1.) Defendants failed submit to these documents to Court and did not include these documents in their *in camera* privilege log. As a result, this Court cannot rule on whether those documents are privileged. Therefore, Defendants revised compilation of documents and amended privilege log should contain these documents unless Defendants no longer claim them as privileged. If Defendants no longer assert that these documents are privileged, they should include a statement to that effect in their amended privilege log and disclose those documents to Plaintiffs if they have not done so already.

In the interim, this Court suggests that Defendants reassess their privilege claims as to all portions of every submitted document. If Defendants conclude that some of the documents, or portions of the documents, are not privileged, they should notify this Court and produce those documents to Plaintiffs. Within fourteen days, Defendants shall file a revised compilation of documents and an amended privilege log consistent with this Order.

## III. Conclusion

With respect to Defendants' Motion, the Court makes the following conclusions:

### A.    Defendants' Motion

1.    The attorney-client privilege applies to the Sequestered Documents except for documents DREW002290-DREW002294, DREW002312-DREW002316, DREW002397-DREW002401, DREW002797-DREW002798, DREW002901-DREW002902, DREW002913-DREW002923, DREW002925, and DREW002928-DREW002931. Plaintiff must disclose these non-privileged documents to Defendants. Plaintiffs, however, may redact documents DREW002397 and DREW002312 to exclude the first e-mail on each of those pages, which Heriot sent to his attorney. Plaintiffs must produce the remaining portions of documents DREW002397 and DREW002312 un-redacted. Plaintiffs also may redact the text of document DREW002797 above the line entitled, "Original Message," below which is an e-mail from Willis to Heriot.

2.    Although Plaintiffs disclosed the Sequestered Documents found by this Court to be privileged, Plaintiffs satisfied all of the elements of inadvertent disclosure under FRE 502(b); therefore, Plaintiffs did not waive the attorney-client privilege as to the Sequestered Documents the Court found to be privileged. Therefore, Defendants' Motion is denied as to these documents.

3.    If Defendants have remaining copies, electronic or otherwise, of the Sequestered Documents found by this Court to be privileged, they must destroy them or return them to Plaintiffs.

**B.     Plaintiffs' Motion**

With respect to Plaintiffs' Motion, the Court makes the following conclusions:

1.     Documents 622, 630, 639, 640, 1441, and 1442 are Defendants' protected work product. Plaintiffs' Motion is therefore denied with respect to these numbered documents.

2.     Based on the information Defendants provided, this Court cannot determine whether the attorney-client privilege applies to the remaining documents Defendants' identified as privileged. To enable this Court to make this determination, this Order set forth conditions with which Defendants must comply within fourteen days. Accordingly, this Court withholds its judgment on that issue until after Defendants comply with this Order.

For the aforementioned reasons, this Court denies in part and grants in part Defendants' Motion. This Court also denies in part Plaintiffs' Motion and withholds its ruling on the remainder of Plaintiffs' Motion until after Defendants comply with this Order.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: March 20, 2009                    United States Magistrate Judge