IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Drew Heriot & Drew Pictures PTY LTD., <br><br> Plaintiffs, <br><br> v. <br><br> Rhonda Byrne, Prime Time US Inc., TS Production Holdings LLC, TS Production LLC, and TS Merchandising Ltd., <br><br> Defendants. | No. 08 CV 2272 <br><br> Honorable Suzanne B. Conlon |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF ORAL MOTION FOR JUDGMENT AS A MATTER OF LAW

### I.   INTRODUCTION

Defendants have moved for judgment as a matter of law at the close of the evidence on two grounds: (1) Plaintiffs and Defendants did not mutually intend to be joint authors of *The Secret*; and (2) Plaintiff Drew Heriot's work on *The Secret* was a work for hire under the Copyright Act because he was an employee of Prime Time Productions Pty. Ltd. ("Prime Time"). The Court has taken the motion under advisement pending the jury's verdict. Defendants respectfully submit this memorandum in support of their motion.

### II.   ARGUMENT

#### A.   Judgment As A Matter Of Law Is Warranted Under Rule 50(a)(1) Where There Is No Legally Sufficient Evidentiary Basis For A Reasonable Jury To Find For Plaintiffs.

Judgment as a matter of law is appropriate if there is no "legally sufficient evidentiary basis" for a reasonable jury "to find for [a] party on [an] issue . . . ." Fed. R. Civ. P. 50(a)(1).

"In other words, the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008). "[A] mere scintilla of evidence, however, will not suffice." *Id.* (internal quotation marks omitted).

### B. Judgment As A Matter Of Law Is Warranted Because The Parties Did Not Mutually Intend To Be Joint Authors.

Plaintiffs have failed to present evidence that would allow a reasonable jury to find that Rhonda Byrne and Drew Heriot had the mutual intent to be joint authors.

Under established Seventh Circuit law, to establish joint authorship, a plaintiff must prove the *mutual intent to be joint authors*, not just his own intent to be a joint author, or a mutual intent simply to merge separate contributions together. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir. 1994). In *Erickson*, the parties had collaborated in a series of plays, "but dispute[d] whether there was a *mutual* intent to create a joint work." *Id.* (emphasis added). The Seventh Circuit rejected the claim of joint authorship because the plaintiff and defendant's actors did not share the necessary intent to become joint authors:

> neither [the plaintiff] nor [the defendant] considered any of the actors to be co-authors with [the plaintiff] in [the first play], as is evidenced by the licensing agreement. Similarly with [the second play],. . . [t]he actors did not consider themselves to be joint authors with [the plaintiff], and there is no evidence that [the plaintiff] considered the actors as co-authors of the script. *Because [the defendant] cannot establish the requisite intent for [the two plays], the actors cannot be considered joint authors for the purposes of copyright protection.*

*Id.* at 1072 (emphasis added); *see also Childress v. Taylor,* 945 F.2d 500, 507 (2d Cir. 1991) ("What distinguishes the writer-editor relationship and writer-researcher relationship from the true joint author relationship is *the lack of intent of both participants in the venture to regard themselves as joint authors*." (emphasis added)); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1233-34

2

(9th Cir. 2000) (recognizing that the Second and Seventh Circuits "have held that a person claiming to be an author of a joint work must prove that *both parties* intended each other to be joint authors") (emphasis added).

The evidence demonstrates there was no intent on either Byrne's part or Heriot's part that they would be joint authors. Critically, Heriot *never testified* that he intended to be a joint author. And Byrne testified unequivocally that she did not intend Heriot to be a joint author. Trial Tr. 5/14/09AM at 47:8-20. Three categories of overwhelming evidence confirm that both lacked any intent that they would be joint authors:

*First*, both Byrne and Heriot recognized in written documents that authorship and copyrights belonged with Byrne and her companies alone, a fact fundamentally at odds with an intent to be joint authors. Exs. DX78, DX93 at 12. The pitch document for *The Secret* said "Copyright Prime Time Productions 2005," and Heriot never said it should identify Drew Pictures. PX20; Trial Tr. 5/13/09PM at 31:13-32:5. The credits to the DVD plainly stated "Original Concept Created by Rhonda Byrne" and did not identify Drew Heriot as a co-creator. Ex. DX93 at 12. There is no evidence Heriot ever objected to the credits. Trial Tr. 5/12/09PM at 44:22-45:9 (Heriot testifying that he did not ask to be credited as a co-creator after he saw that the film's credits would list Byrne as the creator of *The Secret*). In addition, Heriot sent an email instructing an assistant producer at Prime Time to include a copyright notice in the DVD that stated "© The Secret LLC." Ex. DX78. That copyright notice appeared in the DVD. Ex. DX79. And there is no evidence that Heriot ever suggested that he or Drew Pictures should also have been listed on the copyright notice. Indeed, he testified that he "assumed" that "the copyright belonged to The Secret L.L.C." Trial Tr. 5/12/09PM 37:3-14.

This undisputed evidence about the way the parties billed themselves warrants judgment as a matter of law. "[T]he way in which the parties bill or credit themselves" is "significant" because it serves as a "window on the mind of the party who is responsible for giving the billing." *Thomson v. Larson*, 147 F.3d 195, 203 (2d Cir. 1998). Thus, "a writer's attribution of the work to herself alone is 'persuasive proof . . . that she intended this particular piece to represent her own authorship' and is '*prima facie* proof that [the] work was not intended to be joint.'" *Id*. (quoting *Weissman v. Freeman*, 868 F.2d 1313, 1320 (2d Cir. 1989)). That proof is even more compelling here where *both parties* recognized that the work had but one author and copyright owner.

*Second*, the evidence is conclusive that Rhonda Byrne had final decision-making authority over what went into *The Secret*, including the authority to overrule Heriot's opinions. "An important indicator of authorship is a contributor's decisionmaking authority over what changes are made and what is included in a work." *Thomson*, 147 F.3d at 202-03. Heriot's consultancy agreement with Prime Time explicitly stated that he was "expected at all times to obey all . . . directions of the Managing Director." Ex. DX6 ¶ 8(e). After the putative expiration date of the agreement, the parties' roles did not change. So, for example, Byrne instructed Heriot to show her all of his "drafts all along the way" of certain scripts. Ex. JX24 at 1; *see also id.* ("I understand Drew that you want to get things 'perfect' before you show me, and I am making it very clear that this is the opposite of what I want from you."); Ex. JX44 ("you would not get involved in the areas of *The Secret*, other than your role of director . . . . It will be the website team who will ultimately decide how the website will look, overseen by Paul and myself."). Heriot acknowledged and deferred to Byrne's ultimate authority by asking "if [she] agree[d]" with his decisions. Ex. DX48 ("Let me know if you want to hold back for any reason otherwise

4

I'll go ahead."). Confirming their relationship, Heriot referred to Byrne as his "boss." Trial Tr. 5/12/09PM at 42:20-22; *see also* Trial Tr. 5/13/09PM at 14:19-25 (Harrington testifying that Heriot "reported to me and to Rhonda above me"; *id.* at 10:4-7 and 16:11-12 (Harrington testifying that Byrne was the "executive producer," which is "the senior most position . . . . the boss, the creator"). Mr. Harrington's e-mails likewise reflect Byrne's authority over Heriot. *See, e.g.*, Ex. PX42 (asking Byrne if she had given Heriot "any directions" about the animated script); Ex. DX50 (reporting that he conveyed Byrne's instruction that Heriot "**WILL** work together [with David] to shape up the paper edit") (emphasis in original)).

*Third*, the parties in both their dealings with one another and their dealings with third parties did not behave as joint authors. When Byrne asserted authority over *The Secret*, Heriot never responded that he was a joint author, or that he had the authority to decide what went into the film. *See, e.g.*, *id.* at 63:19-20; *id.* at 79:12-13; *id.* at 81:9-11; *see also* Trial Tr. 5/12/09PM at 28:6-29:1 (Heriot testifying that he did not correct Byrne when she said she was the "sole director and all moneys or net profits were hers").

When Byrne offered Heriot the opportunity to invest $10,000 for 1% of the profits, Heriot responded not by insisting he had an entitlement to 50% of the profits, but by counter offering that he would invest $7,000 for 2% of the profits. Ex. JX10 at 4; Trial Tr. 5/12/09PM at 27:18-24. Then, when Byrne stated in writing that she would give Heriot 1% to 4% of the profits so long as he remained at Prime Time, he again did not protest, but instead responded: "That all feels great." Ex. JX20 at 1-2; Trial Tr. 5/13/09PM at 54:5-55:19; *see also* Trial Tr. 5/12/09PM at 26:12-23 (Heriot testifying that he "accepted her gift" of 1-4%). Heriot testified that "during the time that [he] worked at Prime Time," he never asked "for more than 1-4 percent." Trial Tr. 5/12/09PM at 30:21-24.

5

The parties also did not present themselves as joint authors to third parties. When the Nine Network entered into a Commission Agreement for *The Secret*, it did so with Prime Time alone, not with Drew Heriot or Drew Pictures. Ex. JX30; Trial Tr. 5/13/09PM at 43:20-45:16. Similarly, when the teachers who were interviewed for *The Secret* signed agreements authorizing the use of their images and voices in *The Secret* and disclaiming any copyright interest in the program, the counterparty was Prime Time, not Drew Pictures. Ex. DX87; *see also* Trial Tr. 5/12/09PM at 86:12-22; *id.* at 87:2-14 (Heriot acknowledging that Gozer "granted their copyright interest to Prime Time" and not to "Drew Heriot or Heriot Pictures").

Even after Heriot had left Prime Time, he did not act like a joint author. Instead, he entered into a distribution agreement with Defendant TS Merchandising in which he agreed to: (1) obtain prior consent from TS Merchandising before publishing any advertising or promotional material for *The Secret*, and (2) cease using the legends "The Secret" and "The Secret DVD," as well as "The Secret Wax Logo," if the distribution agreement was terminated. Ex. DX98 at 3-5, 12; *see also* Trial Tr. 5/12/09PM at 78:23-79:15 (Heriot acknowledging that he read the distribution agreement's statement that said "TS merchandising company[] had exclusive rights to the trade names, trademarks, and product trademarks [of] The Secret" before signing the agreement). All of this evidence of the parties' agreements with each other and with third parties amounts to overwhelming evidence of Prime Time's exclusive authorship. *See Thomson*, 147 F.3d at 204.

To counter this mountain of evidence that neither party had the requisite intent to be joint authors, Heriot points only to a single letter in which he referred to himself as a "co-creator" and to "the co-creation of this program." JX10 at 4. But, as Heriot admitted, the term "co-creation" had a particular meaning "under the law of attraction." Trial Tr. 5/12/09 at 44:13-21. It "did not

6

necessarily mean to persons co-creating a positive work product." *Id.* at 44:16-17; *see also* Ex. PX13 ("murder is a co-creation of the victim and the perpetrator who are vibrating at the same negative frequency"). In the letter itself, Heriot also offered to invest $7000 to obtain a right to 2% of the profits from *The Secret*—an offer inconsistent with the notion that he was already a co-author or co-owner. The letter thus provides no evidence that Heriot ever intended to be a joint author as that term is used in the Copyright Act. Or, if considered evidence of such intent, it is a "mere scintilla" of evidence this is insufficient to allow a reasonable jury to find that a mutual intent existed to be joint authors. Defendants are thus entitled to judgment as a matter of law. *See Zimmerman v. Chi. Bd. of Trade*, 360 F.3d 612, 626, 629 (7th Cir. 2004) (holding that notes by decision-maker defendant referring to political pressure were "at best" a "scintilla" of evidence that the challenged decision was motivated by politics rather than by good faith justifications, and so upholding judgment as a matter of law entered pursuant to Rule 50(a)).[1]

### C. Judgment As A Matter Of Law Is Also Appropriate On The Work-For-Hire Issue.

Under the Copyright Act, "a work prepared by an employee within the scope of his or her employment" is considered a "work made for hire." 17 U.S.C. § 101(a). "If the work is for hire, 'the employer or other person for whom the work was prepared is considered the author' and

---

[1] Defendants respectfully reassert their position that Plaintiffs' co-authorship claim, which incorporates both the work-for-hire and joint-intent issues, sounds in equity and so carries no right to a jury trial. The right to a jury turns on whether the nature of the action and requested relief sound at law—in which case a right to jury trial exists—or in equity—in which case no right to jury trial exists. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990). Where a plaintiff seeks a declaratory judgment, "the nature of the underlying dispute," not the request for a declaration itself, "determines whether a jury trial is available." *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 649 (7th Cir. 2002). In the groundbreaking case *Maurel v. Smith*, 220 F. 195 (D.C.N.Y. 1915), Judge Learned Hand held that a claim of joint ownership, such as that asserted here, sounds in equity. *Id.* at 201-02. Correspondingly, *Bercovici v. Chaplin*, 7 F.R.D. 61 (S.D.N.Y. 1946), expressly held that a plaintiff who sought a finding of co-authorship in a copyright and a share of the profits had no right to a jury. *Id.* at 62; *see also* Melville D. Nimmer & David Nimmer, Nimmer on Copyright §12.10[A] n.14 (Rel. 74-11/2007) ("To the extent a simple declaration of rights is sought, the action is equitable."). Whether the requested relief of an accounting is legal or equitable turns on the nature of the claim for which the accounting is sought. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477-78 (1962). Because the claim here is equitable, any accounting would also be equitable. There is thus no right to a jury trial here.

7

owns the copyright." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (U.S. 1989) (quoting 17 U.S.C. § 201(b)).

In the Seventh Circuit, "[t]he ultimate question of whether an individual is an employee or an independent contractor is a 'legal conclusion' which involves 'an application of the law to the facts.'" *E.E.O.C. v. North Knox Sch. Corp.,* 154 F.3d 744, 747 & n.1 (7th Cir. 1998) (holding district court could determine employee status on summary judgment even where some evidence tended to favor both the plaintiff's and the defendant's position). *see also International Code Council, Inc. v. National Fire Protection Assoc*., 79 U.S.P.Q.2d 1651, 2006 WL 850879, at *22 (N.D. Ill. March 27, 2006) (where the facts are settled, whether a person "is an employee for the purpose of the work-for-hire copyright analysis is a question of law"); *Langman Fabrics. v. Graff Californiawear, Inc*., 160 F.3d 106, 111 (2d Cir. 1998) ("the ultimate determination, on settled facts, of whether a work qualifies as a work-for-hire [under the Copyright Act] is a question of law") Heriot's work on *The Secret* was "for hire" if he acted as Prime Time's employee when he prepared the work. *Id.* at 738.[2]

A person can be an employee within the meaning of the Act without being formally employed, and regardless of whether the parties drafted a contract that purported to treat the person as an independent contractor. *Gaiman v. McFarlane,* 360 F.3d 644, 650 (7th Cir. 2004). To determine whether a person is an employee, the Supreme Court in *Reid* set forth a thirteen factor test.[3] 490 U.S. at 751-52.

---

[2] The work must also have been prepared within the scope of the employment, but there is no dispute that, if Prime Time employed Heriot, then his work on *The Secret* fell within the scope of his employment

[3] "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the

Under the *Reid* test, Heriot was unquestionably Prime Time's employee.

**1. Hiring Party's Control.**  In the Seventh Circuit, "the employer's right to control is the most important [factor] when determining whether an individual is an employee or an independent contractor."  *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996).  As explained above, the evidence conclusively established that Rhonda Byrne was the ultimate decision maker and that she had the right to control Heriot's work on *The Secret*.

**2. Source of Tools.**  Plaintiffs' Answer to the First Amended Cross-Complaint admitted that "Drew Pictures did not furnish motion picture or television equipment for the project." Answer to FACC at ¶ 39.  Heriot's own emails show he used Prime Time's email system and a Prime Time signature block.  Ex. DX35.  Prime Time's furnishing of equipment "favor[s] finding an employment relationship."  *Kirk v. Harter*, 188 F.3d 1005, 1009 (8th Cir. 1999).

**3. Location of the Work.**  Heriot worked in Prime Time's offices, Ex. JX13, which also favors finding an employment relationship.  *Kirk*, 188 F.3d at 1009.

**4. Duration of the Relationship**.  Heriot worked at Prime Time for over four years. (Complaint ¶¶ 17, 39.) This duration "suggests a finding of employee status."  *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 62 (1st Cir.1997).

**5. Hiring Party's Right to Assign Additional Projects.**  Heriot's contract with Prime Time specified that he "may be required to undertake other duties and responsibilities."  Ex. DX6 ¶ 8(b).

**6. Hired Party's Discretion Over When and How Long to Work.**  Heriot's contract with Prime Time required him to work full time during normal business hours, and it prohibited him from working for anyone else without written permission.  Ex. DX6 ¶¶ 8(d), 9, 10(b); Trial

---

hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."  *Reid*, 490 U.S. at 751-52

Tr. 5/13/09PM at 47:9-17. These conditions indicate an employment relationship. *See Saenger*, 119 F.3d at 60 (agreement about hours contractor would work "points towards the existence of an employment relationship"); *Kirk*, 188 F.3d at 1008 (work for "other companies [is] a factor suggesting that he was an independent contractor").

**7. Method of Payment.** Heriot was paid every two weeks at a standard bi-weekly rate irrespective of the number of hours he worked. Ex. JX39 (specifying $2000/week); Trial Tr. 5/13/09PM at 49:7-16 (Harrington testifying that Heriot was paid every two weeks, as was Harrington). Such "regular, periodic payments" indicate employee status. *Kirk*, 188 F.3d at 1008.

**8. Hired Party's Role in Hiring and Paying Assistants.** Although, for tax purposes, Drew Pictures paid a few of the individuals who worked at Prime Time, Heriot did not make the hiring decisions with regard to those individuals. Ex. DX52 (Harrington announcing that he had "arranged for Leni to come in next week to fill the void . . ." and inviting Prime Time employees to assign her work); Trial Tr. 5/13/09PM at 48:23-24 (Harrington testifying that he hired Leni).

**9. Whether Work is Part of Hiring Party's Regular Business.** It is undisputed that the work Heriot did is part of Prime Time's regular production business.

**10. Whether Hiring Party is in Business.** Prime Time is indisputably in business.

* * *

Confirming Heriot's employee status, Byrne referred to Heriot as an employee paid "salary" in an email she sent to Heriot. Ex. JX20. Heriot's response indicated full agreement. *Id.* Indeed, even when Prime Time was running out of money, Heriot was treated as an "employee" to be paid. Exs. JX8, JX13; Trial Tr. 5/13/09PM at 50:3-51:9. "The understanding

of the parties as to the nature of their relationship is . . . probative of . . . a conventional master-servant relationship [under] common law agency doctrine." *Saenger*, 119 F.3d at 61.

In short, a reasonable jury could only find that this was a work for hire.

### III.     CONCLUSION

For these reasons, Defendants respectfully request that the Court grant their motion for judgment as a matter of law.

Respectfully submitted,

Date:   May 15, 2009                                         By:             /s/ Brad Brian
                                                                                    Brad D. Brian

MUNGER, TOLLES & OLSON, LLP
Brad D. Brian (Cal. Bar #079001)
brad.brian@mto.com
Luis Li  (Cal. Bar # 156081)
luis.li@mto.com
Jonathan E. Altman (Cal. Bar #170607)
jonathan.altman@mto.com
Grant A. Davis-Denny (Cal. Bar #229335)
grant.davis-denny@mto.com
355 S. Grand Ave., Suite 3500
Los Angeles, CA 90071
Phone: (213) 683-9100
Fax: (213) 687-3702


Jack J. Carriglio
Meckler Bulger, Tilson, Marick, & Pearson LLP
jack.carriglio@mbtlaw.com
James G. Argionis
jim.argionis@mbtlaw.com
123 N. Wacker Drive Suite 1800
Chicago, Illinois  60606
Phone: (312) 474-7900
Fax: (312) 474-7898


SQUIRE, SANDERS & DEMPSEY L.L.P.
David S. Elkins (Cal. Bar #148077)
delkins@ssd.com

Joseph P. Grasser (Cal. Bar #255156)
jgrasser@ssd.com
600 Hansen Way
Palo Alto, CA 94304-1043
Telephone: +1.650.856.6500
Facsimile: +1.650.843.8777


SQUIRE, SANDERS & DEMPSEY L.L.P.
Joseph A. Meckes (State Bar #190279)
jmeckes@ssd.com
One Maritime Plaza, Third Floor
San Francisco, CA 94111
Telephone: +1.415.954.0200
Facsimile: +1.415.393.9887


Attorneys for Defendants
RHONDA BYRNE, PRIME
TIME US INC., TS PRODUCTION
HOLDINGS LLC, TS PRODUCTION LLC,
and TS MERCHANDISING LTD.

# CERTIFICATE OF SERVICE

Under penalties as provided by law, the undersigned, an attorney, hereby certifies and states that he caused a true and an accurate copy of the foregoing Memorandum In Support Of Defendants' Oral Motion For Judgment As A Matter Of Law to be served this 15th day of May, 2009 upon the counsel listed below by delivery via the United States district court for the Northern District of Illinois, Eastern Division's CM/ECF electronic filing system.

| | |
|---|---|
| Pau L. Price | Mark S. Werbner |
| Edna L. McLain | Richard A. Sayles |
| Helper, Broom, MacDonald, Hebrank, | Darren P. Nicholson |
|   True & Noce, LLC | Sayles / Werbner, P.C. |
| 150 N. Wacker Drive, Suite 3100 | 4400 Renaissance Tower |
| Chicago, Illinois 60606 | 1201 Elm Street |
| | Dallas, Texas 75270 |

By:     /s/ Grant Davis-Denny
        Grant A. Davis-Denny